CULLEN AND DYKMAN, LLP
100 Quentin Roosevelt Boulevard
Garden City, NY  11530
(516) 357-3700
C. Nathan Dee, Esq.
Matthew G. Roseman, Esq.
Bonnie L. Pollack, Esq.
Counsel to Trocom Construction Corp.

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

 --------------------------------------------------------------x
                                                               :
In re:                                                         :   Chapter 11
                                                               :
TROCOM CONSTRUCTION CORP.,                                     :   Case No. 15-42145(NHL)
                                                               :
                                                               :
              Debtor.                                          :
                                                               :
 --------------------------------------------------------------X

**DEBTOR'S MOTION FOR (A) ENTRY OF ORDER SCHEDULING EMERGENCY INTERIM HEARING AND (B) ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING POST-PETITION SECURED FINANCING PURSUANT TO 11 U.S.C. §§105(a), 361, 362 AND 364 OF THE BANKRUPTCY CODE, (II) GRANTING ADEQUATE PROTECTION PURSUANT TO 11 U.S.C. §§361 AND 364 OF THE BANKRUPTCY CODE, AND (III) SCHEDULING FINAL HEARING PURSUANT TO BANKRUPTCY RULE 4001(c)**

To the Honorable Nancy Hershey Lord, United States Bankruptcy Judge:

Pursuant to sections 105, 361, 362 and 364 of the United States Bankruptcy Code (the "Bankruptcy Code") and Rules 4001, 6004(h) and 7062 of the Federal Rules of Bankruptcy Procedure, Trocom Construction Corp. (the "Debtor"), through its counsel Cullen and Dykman LLP, hereby moves for (a) entry of an order scheduling an emergency interim hearing and (b) entry of an emergency interim order (the "Interim Order") (i) authorizing the Debtor to incur post-petition debt on a secured basis under section 364(c) of the Bankruptcy Code and to enter into a certain Memorandum of Understanding encompassing a post-petition financing agreement (the "Loan Agreement") in the amount of up to $5,000,000 (the "Loan Facility") with Liberty

Mutual Insurance Company ("Liberty"), the most recent version of which is annexed hereto as Exhibit "A" (the version of the Loan Agreement attached hereto is unexecuted. An executed version will be filed upon receipt of all signatures. All parties' rights are reserved.); (ii) authorizing immediate funding under the Loan Agreement up to the amount of $3,477,131 on an interim basis in order to avoid irreparable harm to the Debtor's estate pursuant to the Interim Order in substantially the form annexed hereto as Exhibit "B"; (iii) granting Liberty adequate protection; (iv) scheduling a final hearing (the "Final Hearing") on the relief sought herein and (v) entry of a final order (the "Final Order" which will be filed before the Final Hearing and, together with the Interim Order, the "Financing Orders"), and respectfully represents as follows:

### JURISDICTION

1.    The Court has jurisdiction over this Motion under 28 U.S.C. §1334.  This matter is a core proceeding with the meaning of 28 U.S.C. §157(b)(2).  Venue of this proceeding is proper pursuant to 28 U.S.C. §§1408 and 1409.  The statutory predicates for this Motion are sections 105(a), 361, 362 and 364 of the Bankruptcy Code and Bankruptcy Rules 4001(c), 6004(h) and 7062.

### INTRODUCTION

2.    On May 7, 2015 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.  The Debtor continues to operate its business and manage its affairs as a debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

3.    The United States Trustee has not yet appointed an official unsecured creditors committee pursuant to section 1102 of the Bankruptcy Code.

2

4.      In support of this Motion, the Debtor relies upon and incorporates by reference the affidavit of Joseph Trovato (the "Trovato Affidavit"), the Debtor's president, filed under Local Rule 1007-4 in support of the Debtor's voluntary petition.  A detailed factual background of the Debtor's business and operations, as well as the events leading to the filing of this chapter 11 case, is more fully set forth in the Trovato Affidavit.

5.      The Debtor is in the heavy construction business.  Its primary customer is the City of New York through its various agencies.  In particular, the Debtor works with the Department of Design and Construction, the Parks Department and the Economic Development Corp. regarding the replacement of water mains, sewers, retaining walls and refurbishment of parks. The Debtor is presently providing services on eighteen (18) ongoing construction projects throughout the New York Metropolitan area.

6.      In connection with those projects, the Debtor's total receivables from the City agencies is estimated to amount to $11,339,038.00 as of December 31, 2014.  In addition, the Debtor has filed or will soon be filing notices of claim against the City seeking the payment of more than $19 million in connection with certain prior construction projects.

7.      The Debtor has been experiencing severe cash flow issues primarily because of losses on certain projects and the City's failure to timely pay amounts due and owing to the Debtor.  The Debtor's cash flow problems are impacting its operations because certain subcontractors are starting to lien projects, further exacerbating the Debtor's cash flow situation. At this point, the Debtor has enough assets through its receivables that are due and owing by the City and its claims against the City to work its way through its financial problems.  However, the Debtor will have to restructure and reorganize its operations in order to gain its financial footing.

3

8.      Although the Debtor's receivables and claims against the City will ultimately be sufficient to pay its creditors in full, the timing of obtaining such monies from the City is problematic.  The Debtor's liquidity crisis threatens the viability of its business.  The Debtor does not lack for valuable assets, just cash.  Because of the City's failure to timely pay amounts due and owing to the Debtor, the Debtor presently only has cash on hand and expected receivables to cover the cost of its operations for mere days.  As a result, it was necessary for the Debtor to obtain post-petition financing to fund its operations until the payments due from the City get back on track and the Debtor's cash flow thus improves.  The Debtor therefore entered into negotiations with Liberty, the Debtor's Surety, to provide such financing.

9.      The Debtor and Liberty have agreed on the terms of the Loan Facility that will satisfy the Debtor's essential short term liquidity needs under terms which are fair, reasonable and the best available under the circumstances, and will facilitate preservation of estate assets thereby maximizing recovery for all stakeholders.  In light of the considerable benefits that the Loan Facility provides, and with a lack of viable alternatives, authorization to enter into the Loan Facility is in the best interest of the Debtor's estate.

10.      As set forth herein, the Debtor requires immediate access to the Loan Facility. Indeed, the Debtor and its advisors estimate that absent immediate access to the Loan Facility, the Debtor will experience dangerously low liquidity levels which would place its business and assets at risk.  Accordingly, the Debtor believes that approval of the Loan Facility on an emergency, interim basis and therefore on a final basis is warranted.

### SUMMARY OF EXISTING SECURED INDEBTEDNESS

11.      The Debtor has a Line of Credit with M&T Bank ("M&T") in the original principal amount of $10 million.  The Debtor has drawn down the Line of Credit, and there is

due and owing to M&T as a result thereof, the amount of $6,277,598 as of December 31, 2014. The M&T credit line is secured by a blanket lien in all of the Debtor's assets and is guaranteed by various members and affiliates of the Trovato family.

12.    Because of the Debtor's severe cash flow issues discussed above, prior to the Debtor's filing, it was necessary for the Debtor to obtain loans from certain of its related entities in order to continue providing services on its ongoing construction projects and to operate.  Thus, the Debtor obtained the sum of $250,000 from 460, secured by a blanket lien against the Debtor's assets subordinate to M&T, and a $250,000 loan from Reveal, also secured by a blanket lien against the Debtor's assets subordinate to M&T.

## CONCISE STATEMENT PURSUANT TO BANKRUPTCY RULE 4001

13.    Pursuant to, and in accordance with, Bankruptcy Rule 4001(b), Local Rule 4001-5 and the Guidelines for Financing Motions set forth in Administrative Order No. 558 of the United States Bankruptcy Court for the Eastern District of New York, the following is a concise statement of the material provisions of the Loan Facility and the Interim Order:[1]

| MATERIAL TERMS OF THE PROPOSED POST-PETITION FINANCING | |
| --- | --- |
| **Parties**<br><br>[Fed. R. Bankr. P. 4001(c)(1)(B)] | Borrower:    Trocom Construction Corp and the Indemnitors listed below.<br><br>Indemnitors:    Newfound LLC, Found Property Resources, Inc., the Estate of Salvatore Trovato, Joseph Trovato, Ali Trovato, Antoinette Trovato |

---

[1] This concise statement is qualified in its entirety by reference to the applicable provisions of the Loan Agreement or the Interim Order, as applicable.  To the extent there exists any inconsistency between this concise statement and the provisions of the Loan Agreement and the Interim Order, the provisions of the Loan Agreement shall control over the concise statement, and the Loan Agreement shall control over the Interim Order  Any capitalized terms used but not defined in the concise statement shall have the meanings ascribed to such terms in the Loan Agreement.

| MATERIAL TERMS OF THE PROPOSED POST-PETITION FINANCING | |
|---|---|
| | <u>Lender:</u>        Liability Mutual Insurance Company<br><br>[Loan Agreement at Preamble] |
| **Amounts**<br><br>[Fed. R. Bankr. P. 4001(c)(1)(B)]<br><br>[Guidelines §1(a)] | The Loan Facility will provide the Debtor with a post-petition loan facility in the aggregate principal amount of up to $5,000,000, the first tranche of which amounts to $3,477,131 (the "Initial Advance").<br><br>[Loan Agreement ¶ E] |
| **Purpose**<br><br>[Fed. R. Bankr. P. 4001(c)(1)(B)] | The Debtor has an immediate need to obtain loans under the Loan Facility to, among other things, permit continuation of critical business operations while it pursues a reorganization.  The Loan Agreement permits the use of the Initial Advance in accordance with the initial budget set forth in the Loan Agreement, subject to later funding requests at Liberty's sole and absolute discretion.<br><br>[Loan Agreement ¶ E; Interim Order ¶ 5] |
| **Maturity & Termination**<br><br>[Fed. R. Bankr. P. 4001(c)(1)(B)]<br><br>[Guidelines §1(l)] | The Loan matures on August 1, 2021.<br><br>[Loan Agreement, Exhibit E ¶ 1(c)]<br><br>The Loan may be prepaid in whole or in part without penalty.<br><br>[Loan Agreement, Exhibit E ¶ 3] |
| **Events of Default and Effect on Financing Availability**<br><br>[Fed. R. Bankr. P. 4001(c)(1)(B)]<br><br>[Guidelines §1(o)]<br><br>[Guidelines §1(i)] | Any failure to timely pay principal or interest owing under the Loan and/or any material breach by Borrowers under the documents executed in connection with the Loan which remains uncured after ten (10) calendar days after written notice will be an Event of Default.<br><br>[Loan Agreement, Exhibit E ¶ 4]<br><br>The outstanding principal balance of the Loan (together with all unpaid accrued interest, fees, expenses and other sums due and owing under the Loan Documents, if any) shall immediately become due and payable upon the occurrence of any of the following events: (i) Borrowers shall have |

| MATERIAL TERMS OF THE PROPOSED POST-PETITION FINANCING | |
| --- | --- |
| | transferred, sold or conveyed, or caused to have been transferred, sold or conveyed to any person, title to any of the properties subject to Liberty's liens, or any part thereof, whether voluntarily, involuntarily or by operation of law, unless Liberty's mortgage against such property is satisfied in full from such sale or transfer, or (ii) the filing by any person or entity of any foreclosure or *in rem* proceeding of any kind against the any of the properties subject to Liberty's liens.<br><br>[Loan Agreement, Exhibit E ¶ 1(d)]<br><br>Trocom shall execute and provide, with respect to each Bonded Contract, an (a) irrevocable assignment, (b) irrevocable letter of direction, and (c) voluntary letters of default (each of which shall be in forms provided by Liberty), and each of which shall be held by Liberty and used, in Liberty's sole discretion, with respect to a specific Bonded Contract if, pursuant to an Order of the Court, (x) Trocom is terminated for default on that specific Bonded Contract or (y) Trocom rejects that specific Bonded Contract.<br><br>[Loan Agreement ¶ I] |
| **Interest Rates**<br><br>[Fed. R. Bankr. P. 4001(c)(1)(B)]<br><br>[Guidelines §1(c)] | **Interest Rate**.  The loan will bear interest at the rate of 3.09% per annum.  Payments of interest only shall be paid each month for the period of August 1, 2015 to July 1, 2016.  Thereafter, and continuing monthly through July 1, 2021, payments of interest plus $75,000 per month shall be made.<br><br>**Default Rate**.  9%.<br><br>[Loan Agreement, Exhibit E ¶¶ 2, 4] |

| | |
|---|---|
| **Conditions**<br><br>[Fed. R. Bankr. P. 4001(c)(1)(B)]<br><br>[Guidelines §1(b)] | Execution of Indemnification Agreement by the Estate of Salvatore Trovato and Found Property Resources in favor of Liberty.<br><br>[Loan Agreement ¶ B]<br><br>Reaffirmation of all Indemnitors' obligations under their Indemnification Agreement.<br><br>[Loan Agreement ¶ G]<br><br>In the event this Motion is not granted in whole or in part, the Loan Agreement will remain effective as to the non-Debtor Indemnitors.<br><br>[Loan Agreement ¶ I; Interim Order ¶    ] |

| | |
|---|---|
| **Adequacy of the Budget**<br><br>[Guidelines §7] | In accordance with section 7 of the Guidelines, the Debtor has a reason to believe that the initial budget and additional budget will be adequate (inclusive of professional fees and disbursement) considering all available assets, to pay all administrative expenses due or accruing during the period covered by the budget. |
| **Liens and Priorities and Effect on Existing Liens**<br><br>[Fed. R. Bankr. P. 4001(c)(1)(B)(i)]<br><br>[Guidelines §1(d)] | **Liens**.  Subject to the Carve-Out, the Debtor grants to Liberty as security for all obligations of the Debtor to Liberty under the Loan Facility (the "Loan Obligations") the following priorities, security interests and liens:<br><br>• pursuant to section 364(c)(1) of the Bankruptcy Code, the Loan Obligations shall be authorized and allowed as superpriority administrative expense claims in the Debtor's case senior to any superpriority administrative expense including without limitation those asserted by or granted to M&T in the Debtor's case;<br><br>• pursuant to section 364(c)(3) of the Bankruptcy Code, the Loan Obligations shall be secured by a lien junior to M&T against the Debtor's assets.  Reveal and 460 shall subordinate their liens to Liberty;<br><br>• A mortgage in the amount of $2,000,000 against the property located at 46-27  54th Road, Maspeth, New York, owned by Found Property Resources, an entity owned by the Estate of |

| | |
|---|---|
| | Salvatore Trovato;<br><br>• A second mortgage in the amount of $2,000,000 against the property located at 55-54 56th Road, Maspeth, New York, owned by Newfound LLC, an entity owned by various members of the Trovato family; and<br><br>• A mortgage in the amount of $2,000,000 against the property located at 30 Stone Hill Drive South, Manhasset, New York, owned by Antoinette Trovato.<br><br>The superpriority administrative expense claim and post-petition lien shall not extend to the proceeds of avoidance actions.<br><br>[Loan Agreement ¶¶ F, I; Interim Order ¶ 12] |
| **Carve-Out**<br><br>[Fed. R. Bankr. P. 4001(c)(1)(B)]<br><br>[Guidelines §1(e)]<br><br>[Guidelines §4] | The Superpriority Claims and Post-Petition Liens granted under the Interim Order shall be subject only to a carve-out for the following (the "Carve-Out"):  (i) all fees required to be paid by  Clerk of the Bankruptcy Court and to the Office of the United States Trustee pursuant to 28 U.S.C. §1930(a); and (ii) all reasonable and unpaid fees, costs, disbursements and expenses (the "Debtor Professional Fees") of any professionals retained or to be retained by the Debtor in this case (collectively, the "Debtor's Professionals") up to an aggregate of $500,000.  This Carve-Out is in addition to any carve-out given by M&T and to any of the Debtor's rights under section 506(c) of the Bankruptcy Code. For the avoidance of doubt, in no event shall the Carve-Out for Debtor's Professionals and the Debtor's 506(c) rights against Liberty's collateral exceed the aggregate amount of $500,000.<br><br>[Loan Agreement ¶ I; Interim Order ¶ 14] |

| Stipulations of the Debtor<br><br>[Fed. R. Bankr. P. 4001(c)(1)(B)(iii)] | The Debtor acknowledges, represents, warrants and agrees that it has no defenses, offsets or counterclaims to the obligations to Liberty under the Indemnity Agreement and waives and releases all claims and defenses.<br><br>[Loan Agreement ¶ R, Interim Order ¶ 4] |
| Binding Effect of the Debtor's Stipulations on Third Parties<br><br>[Fed. R. Bankr. P. 4001(c)(1)(B)(viii)] | The above stipulation is binding on any successor to the Debtor, including any trustee appointed under chapter 11 or chapter 7.<br><br>[Interim Order ¶ 18] |

| Waiver/Modification Of Automatic Stay<br><br>[Fed. R. Bankr. P. 4001(c)(1)(B)(iv)]<br><br>[Guidelines §1(o)] | To the extent the automatic stay is applicable to any provision of the Loan Agreement, Liberty shall be granted relief from the automatic stay.<br><br>[Loan Agreement at ¶ I; Interim Order ¶ 19]<br><br>The provisions of Bankruptcy Rules 6004(h) and 7062 shall be waived and the Interim Order shall be effective upon entry. |

### THE LOAN BUDGET AND FUNDING NEEDS

14.     The Debtor and its advisors, together with Liberty, have worked tirelessly over the recent weeks to analyze the Debtor's cash needs in an effort to determine what is necessary to maintain its operations in chapter 11 and work towards a successful reorganization.

15.     As part of the Debtor's recent financial analysis and projections, the Debtor developed a budget of immediate cash needs which includes payroll, supplies and payment to critical vendors.  The immediate, emergency budget, totaling $3,477,131, is included in paragraph E(iii) of, and Exhibit D to, the Loan Agreement.  Without payment of the amounts set

forth on the emergency budget, the Debtor will not be able to perform under its contracts with the City agencies, throwing it into default and effectually putting the Debtor out of business.

16.     After payment of the immediate amounts needed, the Debtor will have further funding needs in the amounts of which will be dependent on the flow of money from the City. Those needs will dissipate over time as the funds owed by the City are more timely paid.  The Loan Facility provides up to an additional $1,522,869 of funding.

## LOAN NEGOTIATIONS

17.     The terms of the Loan Agreement and related documents have been negotiated in good faith and at arm's length among the Debtor and Liberty, reflect the Debtor's exercise of prudent business judgment consistent with its fiduciary duties, and are fair and reasonable under the circumstances.

18.     The Debtor currently lacks sufficient working capital to operate its business in the ordinary course of business without post-petition financing.  Before the Petition Date, the Debtor had sought proposals from several potential lenders including M&T, its pre-petition lender, for entering into a post-petition lending facility, to no avail.  After weeks of arm's length negotiations and financial analysis, the Debtor reached an agreement with Liberty whereby Liberty has agreed to provide the Debtors with the $5,000,000 Loan Facility as described more fully below.

## SUMMARY OF THE TERMS OF THE PROPOSED LOAN AGREEMENT

19.     In accordance with the terms and conditions of the Loan Agreement, Liberty has agreed to provide financing in the principal amount of up to $5,000,000, subject to specific funding requests to be made by the Debtor from time to time and subject to approval of such funding requests, in Liberty's sole and absolute discretion.

11

20.    Pursuant to the Loan Agreement, the Loan Facility shall be secured as follows:

- A lien against the Debtor's assets junior to that of M&T Bank. Under the Loan Agreement, Liberty is <u>not</u> seeking to prime M&T's position in the Debtor's assets, nor shall the post-petition liens extend to causes of action under Article 5 of the Bankruptcy Code;

- A mortgage in the amount of $2,000,000 against the property located at 46-27 54th Road, Maspeth, New York, owned by Found Property Resources, an entity owned by the Estate of Salvatore Trovato[2];

- A second mortgage in the amount of $2,000,000 against the property located at 55-54 56th Road, Maspeth, Brooklyn, New York, owned by Newfound LLC, an entity owned by various members of the Trovato family[3]; and

- A mortgage in the amount of $2,000,000 against the property located at 30 Stone Hill Drive South, Manhasset, New York, owned by Antoinette Trovato.

21.    Liberty shall also be allowed a super-priority administrative expense claim in the Debtor's chapter 11 case pursuant to section 364(c)(1) of the Bankruptcy Code having priority over all administrative expenses of the kind specified in sections 503(b) and/or 507(b) of the Bankruptcy Code, subject only to the carve-outs discussed below. The superpriority administrative claim shall be senior to any superpriority administrative claim asserted by M&T in the Debtor's case.

---

[2] Found Property Resources is not presently an indemnitor under the Debtor's bonding facility. Under the terms of the Loan Agreement, Found shall become an indemnitor for all purposes.
[3] M&T presently has a first mortgage against this property and has consented to Liberty's junior Mortgage against same.

22.    Liberty has consented to a Carve-Out from its post-petitions liens and superpriority claim for: (a) statutory fees payable to the U.S. Trustee pursuant to 28 U.S.C. §1930(a)(6); and (b) allowed professional fees for the Debtor's Professionals in the aggregate sum not to exceed $500,000. This carve-out is in addition to any carve-out given by M&T and to any of the Debtor's rights under section 506(c) of the Bankruptcy Code. For the avoidance of doubt, in no event shall the Carve-Out for Debtor's Professionals and the Debtor's 506(c) rights against Liberty's collateral exceed the aggregate amount of $500,000.

23.    The Court should take notice that Liberty has not charged any commitment fees, lender fees or exit fees in connection with the Loan Facility. The Loan matures on August 1, 2021. The interest rate shall be 3.09% per annum. Default interest shall be at the rate of 9% per annum. Payments of interest only shall be made each month for a period of August 1, 2015 to July 1, 2016. Thereafter and continuing through July 1, 2021, monthly payments of interest plus $75,000 per month.

24.    Subject to the approval of the Court, Trocom shall execute and provide, with respect to each Bonded Contract, an (a) irrevocable assignment, (b) irrevocable letter of direction, and (c) voluntary letters of default (each of which shall be in forms provided by Liberty), and each of which shall be held by Liberty and used, in Liberty's sole discretion, with respect to a specific Bonded Contract if, pursuant to an Order of the Court, (x) Trocom is terminated for default on that specific Bonded Contract or (y) Trocom rejects that specific Bonded Contract.

25.    To the extent the automatic stay is applicable to any provision of the Loan Agreement, the Financing Orders shall grant Liberty relief from the automatic stay.

13

### REQUEST FOR IMMEDIATE FUNDING AND  INTERIM AND FINAL APPROVAL OF THE LOAN AGREEMENT

26.     Section 364 of the Bankruptcy Code allows a debtor to (a) obtain unsecured credit in the ordinary course of business, (b) obtain unsecured credit out of the ordinary course of business, (c) obtain credit with specialized priority and (d) obtain secured credit by granting a secured lien on property of the estate.  If a debtor-in-possession cannot obtain post-petition credit on an unsecured basis, the Court may authorize the obtaining of credit or the incurring of debt repayment of which is entitled to super-priority administrative expense status or which is secured by liens on the debtor's property.

27.     Provided that an agreement to obtain secured credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code, courts grant debtors considerable deference in acting in accordance with its sound business judgment in obtaining such credit. *See In re Barbara K. Enters., Inc.*, 2008 WL 2439649 at *14 (Bankr. S.D.N.Y. June 16, 2008) (explaining that courts defer to a debtor's business judgment "so long as a request for financing does not 'leverage the bankruptcy process' and unfairly cede control of the reorganization to one party in interest."); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("cases consistently reflect that the court's discretion under section 364 [of the Bankruptcy Code] is to be utilized on grounds that permit [a debtor's] reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest."); *In re Farmland Indus., Inc.*, 294 B.R. 855, 881 (Bankr. W.D. Mo. 2003) ("the applicable factors can be synthesized as follows: (1) that the proposed financing is an exercise of sound and reasonable business judgment ....").

14

28.     The Debtor's execution of the Loan Agreement is an exercise of its sound business judgment that warrants approval by the Court.  The Debtor and its advisors undertook a detailed investigation as to the Debtor's projected financing needs and ultimately received committed financing only from Liberty.  Given the Debtor's dire cash situation, the Debtor worked to secure financing that would support the Debtor's chapter 11 goals of preserving the company and its value.  Accordingly, after extensive discussions by the Debtor and its advisors with both M&T and Liberty, the Debtor negotiated the Loan Agreement with Liberty in good faith, at arm's-length to obtain the required postpetition financing on the best and only terms available to the Debtor.

29.     As noted above, the Loan Facility will provide the Debtor with access to $3,477,131 immediately upon entry of the Interim Order and a total of up to $5 million (inclusive of the amount authorized by the Interim Order) after entry of the Final Order, which the Debtor and its advisors have determined should be sufficient to support the Debtor's essential ongoing operations while it pursues its claims against the City.  Thus, the Debtor submits that entry into the Loan Facility constitutes an exercise of the Debtor's sound business judgment that should be approved by the Court.

30.     Furthermore, section 364 of the Bankruptcy Code authorizes a debtor to obtain, in certain circumstances, postpetition financing on a secured or superpriority basis, or both. Specifically, section 364(c) of the Bankruptcy Code provides, in pertinent part, that the Court, after notice and a hearing, may authorize a debtor that is unable to obtain credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code to obtain credit or incur debt:

15

(a) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of [the Bankruptcy Code];

(b) secured by a lien on property of the estate that is not otherwise subject to a lien; or

(c) secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. §364(c).

31. To satisfy the requirements of section 364(c) of the Bankruptcy Code, a debtor need only demonstrate "by a good faith effort that credit was not available" to the debtor on an unsecured or administrative expense basis. *Bray v. Shenandoah Fed. Savs. & Loan Ass'n (In re Snowshoe Co.),* 789 F.2d 1085, 1088 (4th Cir. 1986). ''The statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." *Id.*; *see also Pearl-Phil GMT (Far East) Ltd. v. Caldor Corp.*, 266 B.R. 575, 584 (S.D.N.Y. 2001) (superpriority administrative expenses authorized where debtor could not obtain credit as an administrative expense). When few lenders are likely to be able and willing to extend the necessary credit to a debtor, ''it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing.'' *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom.*, *Anchor Savs. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n. 4 (N.D. Ga. 1989). *See also Ames Dep't Stores*, 115 B.R. at 40 (approving financing facility and holding that the debtor made reasonable efforts to satisfy the standards of section 364(c) where it approached four lending institutions. was rejected by two, and selected the most favorable of the two offers it received).

32. After extended, good faith and arm's length negotiations, Liberty agreed to provide the Loan Facility on the terms provided in the Loan Agreement and as summarized above. Because the Loan Facility proceeds are critical to the Debtor's operations and success for

reorganization, and because Liberty would not have been amenable to provide financing without the protections afforded by the Loan Agreement including without limitation the non-Debtor mortgages, junior liens against the Debtor's assets and a super-priority administrative claim, the Debtor believes that the terms of the loan facility are reasonable under the circumstances.

33.    M&T was unwilling to provide financing to the Debtor.  The Debtors sought, but was unable to obtain the required funds in the form of unsecured debt allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense, pursuant to section 364(a) or (b) of the Bankruptcy Code.  Additionally, any lending facility with a third party would have included a request for liens that would prime the liens of M&T.  In that regard, the Debtors would have incurred significant risks and costs in litigation with M&T over the requested priming liens.

34.    The Debtor cannot presently operate without additional funds.  The Debtor's ability to restructure successfully thus depends upon the expeditious approval of the Loan Agreement and immediate access to funds to pay the amounts necessary to progress its jobs.

35.    The Court should therefore (a) authorize the Debtor to provide Liberty junior liens on the Debtor's property that is subject to valid, perfected and unavoidable liens in existence immediately prior to the Petition Date; and (b) grant the Debtor's repayment obligations under the Loan Agreement superpriority administrative expense status as provided for in section 364(c)(l) of the Bankruptcy Code.

### LIBERTY SHOULD BE DEEMED A GOOD FAITH LENDER UNDER §364(e) OF THE BANKRUPTCY CODE

36.    Section 364(e) of the Bankruptcy Code protects a good faith lender's right to collect on loans extended to a debtor and its right in any lien securing those loans, even if the

authority of the debtor to obtain such loan or grant such lien is later reversed or modified on appeal.  Specifically, section 364(e) provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incurred debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt or the granting of such priority or lien were stayed pending appeal.

11 U.S.C. §364(e).

37.    The Loan Agreement is the result of the Debtor's reasonable and informed determination that Liberty offered favorable terms on which to obtain needed post-petition funding, and of extended arm's length good faith negotiations between the Debtor and Liberty. The terms and conditions of the Loan Agreement are fair and reasonable and the proceeds under the Loan Facility will only be used for purposes that are permissible under the Bankruptcy Code. According, the Court should find that Liberty is a good faith lender within the meaning of section 364(e) of the Bankruptcy Code and is entitled to the protections afforded by that section.

### THE DEBTOR REQUIRES IMMEDIATE ACCESS TO THE LOAN FACILITY

38.    The Court may grant interim relief in respect of a motion filed pursuant to section 364 of the Bankruptcy Code where, as here, interim relief is "necessary to avoid immediate and irreparable harm to the estate pending a final hearing."  Fed. R. Bankr. P. 4001(b)(2) and (c)(2).[4] In examining requests for interim relief under this rule, courts in this jurisdiction generally apply the same business judgment standard applicable to other business decisions.  *See, e.g., Ames Dep't Stores*, 115 B.R. at 36.

---

[4] *See also* Guidelines § 6 (requiring financing motion to describe the immediate or irreparable harm that may be caused to the estate if interim relief is not granted).

39.     The Debtor and its estate will suffer immediate and irreparable harm if the interim relief requested herein, including authorizing to borrow up to $3,477,131 under the Loan Facility, is not granted promptly.  The Debtor is out of cash and needs the proceeds of the Loan Facility to fund essential business operations. Access to liquidity also will address key constituents' concerns regarding the Debtor's financial health and ability to continue operations in light of this chapter 11 case.  Indeed, unless the Court approves the Debtor's interim access to the Loan Facility, the Debtor will run out of cash in the coming days.  Accordingly, the Debtor has an immediate need for access to liquidity to, among other things, permit the orderly continuation of the operation of its business, to maintain business relationships with vendors, suppliers and customers, to make payroll, to satisfy other essential operational needs, all of which are required to preserve and maintain the Debtor's value for the benefit of all parties in interest.

40.     The importance of a debtor's ability to secure postpetition financing to prevent immediate and irreparable harm to its estate has been repeatedly recognized in similar circumstances.  *See, e.g., In re Global Aviation Holdings, Inc.*, Case No. 12-40783 (CEC) (Bankr. E.D.N.Y. March 1, 2012); *In re United Retail Group, Inc.*, Case No. 12-10405 (SMB) (Bankr. S.D.N.Y. Feb. 2, 2012); *In re Insight Health Servs. Holdings Corp.*, Case No. 10-16564 (AJG) (Bankr. S.D.N.Y. Jan. 4, 2011); *In re NR Liquidation III Co. (f/k/a Neff Corp.)*, Case No. 10-12610 (SCC) (Bankr. S.D.N.Y. June 30, 2010); *In re Reader's Digest Ass'n*, Case No. 09-23529 (RDD) (Bankr. S.D.N.Y. Aug. 26, 2009); *In re Gen. Growth Prop. Inc.*, Case No. 09-11977 (Bankr. S.D.N.Y. May 14, 2009); *In re Tronox Inc.*, Case No. 09-10156 (Bankr. S.D.N.Y. Jan. 13, 2009); *In re Lyondell Chem. Co.*, Case No. 09-10023 (Bankr. S.D.N.Y. Jan. 8, 2009); *In re Lenox Sales, Inc.*, Case No. 08-14679 (S.D.N.Y. Nov. 25, 2008); *In re Wellman, Inc.*, Case

No. 08-10595 (S.D.N.Y. Feb. 27, 2008).  Accordingly, for all of the reasons set forth above, prompt entry of the Interim Order is necessary to avert immediate and irreparable harm to the Debtor's estate and is consistent with, and warranted under, Bankruptcy Rule 4001(c)(2).

## REQUEST FOR A FINAL HEARING

41.    Pursuant to Bankruptcy Rule 4001(c)(2), the Debtors request that the Court (a) schedule the Final Hearing and (b) fix the time and date for parties to file objections to the motion in advance of the Final Hearing.

## WAIVER OF BANKRUPTCY RULES REGARDING NOTICE AND STAY OF AN ORDER

42.    To implement the foregoing successfully, the Debtor seeks a waiver of the notice requirements under Bankruptcy Rule 6004(a) and any stay of an order granting the relief requested herein pursuant to Bankruptcy Rule 6004(h), 7062 or otherwise.

## REQUEST FOR ENTRY OF ORDER SCHEDULING EMERGENCY, INTERIM HEARING

43.    Because the Debtor will run out of cash for operations within days, the Debtor believes that is it imperative that the Court immediately address this Motion on an interim basis. As set forth in the Local Rule 9077-1 Affirmation submitted in connection with this request for an expedited hearing, without emergency relief, the Debtor will effectually be out of business and its reorganization could not proceed.

44.    Accordingly, the Debtor requests that the Court enter the order scheduling an emergency, interim hearing on this Motion submitted simultaneously herewith.

## WAIVER OF MEMORANDUM OF LAW

45.    The Debtor submits that no new or novel issue of law is presented with respect to the matters contained herein, and respectfully requests that the requirement of a memorandum of law, pursuant to LBR 9013-1(b) be waived.

20

**<u>NO PRIOR REQUESTS</u>**

46.    No prior request for the relief sought in this Motion has been made to this or any other Court.

**<u>NOTICE</u>**

47.    The Debtors propose to give notice of the relief requested herein by serving a copy of the Motion and related pleadings (a) by email upon (i) the United States Trustee, (ii) counsel to Liberty and (iii) counsel to M&T, and (b) by overnight mail upon the Debtor's top twenty largest unsecured creditors and any entity that filed a Notice of Appearance in the Debtor's case.

**WHEREFORE**, the Debtor respectfully requests that the Court enter an Order:

A.    Finding that the notice of this Motion provided above is sufficient and appropriate in these circumstances;

B.    Authorizing the Debtor to obtain interim and final post-petition financing up to a maximum principal amount of $5,000,000 in accordance with the terms of the Loan Agreement;

C.    Authorizing the Debtor's immediate use of funding up to the amount of $3,477,131 on an interim basis to pay the amount set forth in the Loan Agreement in order to avoid immediate and irreparable harm to the Debtor's estate;

D.    Authorizing the Debtor to grant Liberty such protections and assurances as set forth in the Loan Agreement pursuant to section 364 of the Bankruptcy Code;

      E.      Scheduling the Final Hearing and with respect to the approval of the Loan

      Agreement no later than fifteen (15) days from the Interim Hearing; and

      F.      Granting such other and further relief as is just and proper.

Dated: Garden City, New York
      June 29, 2015

                CULLEN AND DYKMAN LLP

      BY:    s/ Bonnie L. Pollack
              Mathew G. Roseman, Esq.
              C. Nathan Dee, Esq.
              Bonnie L. Pollack, Esq.
              100 Quentin Roosevelt Boulevard
              Garden City, New York 11530
              (516) 357-3700

              Attorneys for Trocom Construction Corp.

22

**Exhibit A**

## <u>MEMORANDUM OF UNDERSTANDING</u>

This Memorandum of Understanding ("Agreement") is executed this ___ day of June 2015 ("Effective Date") by and between Trocom Construction Corp. (Debtor-in-Possession) ("Trocom"), Newfound LLC ("Newfound"), Found Properties Resources, Inc. ("Found"), Mrs. Antoinette Trovato as fiduciary of the Estate of Salvatore Trovato (the "Estate"), Antoinette Trovato (individually), Joseph Trovato (individually) and Ali Trovato (individually) (collectively, the "Indemnitors") and Liberty Mutual Insurance Company ("Liberty"), and reflects the understandings, agreements and intent of the parties hereto (collectively the "Parties") regarding the subject matter discussed herein:

A.  Liberty issued various surety bonds on behalf of Trocom (the "Bonds"), which, as limited by their terms and by applicable statutes, guarantee (i) the performance of various contracts (the "Bonded Contracts") by Trocom and (ii) the payment of certain obligations of Trocom with respect to the Bonded Contracts. A list of the Bonds and Bonded Contracts (which may not be all inclusive) is annexed hereto as **Exhibit A**.

B.  As partial consideration for the issuance of the Bonds, certain of the Indemnitors (Trocom and Salvatore Trovato) executed and delivered to Liberty a General Agreement of Indemnity, dated December 4, 2007 with Amendments No. 01 (Joseph Trovato, Ali Trovato and Antoinette Trovato) and 02 (Newfound) dated September 20, 2011 and October 2, 2013 respectively. A true and correct copy of the Indemnity Agreement, with Amendments, is attached and incorporated by reference as **Exhibit B**. Contemporaneously herewith, the Estate and Found have executed and delivered to Liberty Amendment No. 03 to the Indemnity Agreement, dated June ___, 2015, a true copy of which is attached and incorporated by reference as **Exhibit C** (the General Agreement of Indemnity and any amendments thereto as referred to as the "Indemnity Agreement"). Pursuant to the Indemnity Agreement, the Indemnitors have agreed, among other things, to exonerate, hold harmless and indemnify Liberty from and against any and all liability for losses, fees, costs and expenses incurred by Liberty as a result of issuing the Bonds or the Indemnitors' breach of the Indemnity Agreement, as well as any expenses incurred by Liberty in enforcing its rights under the Indemnity Agreement.

The Indemnitors and Liberty acknowledge and agree this Agreement is being executed in addition to, and not in lieu of, the Indemnity Agreement and nothing in this Agreement abrogates or in any way diminishes those rights set forth in the Indemnity Agreement. Liberty expressly reserves all rights under the Indemnity Agreement and all other rights at law and in equity.

C.  Prior to the Effective Date, Trocom failed to pay when due certain of its obligations to laborers, subcontractors and/or suppliers for labor, materials, equipment rental, supplies and other charges incurred by Trocom in performing the work under the Bonded Contracts. As a result, the Indemnitors admit they are presently in default of their obligations to Liberty under the terms of the Indemnity Agreement.

D.  On May 7, 2015, Trocom filed a voluntary petition for relief pursuant to chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States

Bankruptcy Court for the Eastern District of New York (the "Court"); Trocom continues to operate its business and manage its affairs as a debtor-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

E.    Trocom has requested that Liberty provide Trocom with financial assistance of up to but not exceeding five million dollars ($5,000,000) (the "DIP Facility") in order for Trocom to pay due and necessary payables and other obligations directly relating to the Bonded Contracts. Liberty is currently investigating Trocom's request for financial assistance.

Liberty has agreed to provide Trocom with financial assistance in an amount not to exceed five million dollars ($5,000,000). Any disbursement from the DIP facility is subject to Liberty's approval, in Liberty's sole and absolute discretion, and shall be used solely for direct costs relating to the Bonded Contracts. The Parties contemplate that Liberty will make an initial advance of the sum of $3,477,131 in the aggregate (the "Initial Advance") as set forth in paragraph E (iii) below. As further described in paragraph F herein, as consideration for Liberty's provision of the DIP Facility to Trocom, the Indemnitors shall issue the Note which shall be secured by the Mortgages.

Liberty will consider Trocom's specific written requests for funding, both for the Initial Advance and for any subsequent advances with respect to the balance of the DIP Facility after disbursement of the Initial Advance, on a per request basis, which payments, if any, shall be deemed to be reimbursable losses pursuant to the Indemnity Agreement. The Parties anticipate that such funding shall be primarily as follows:

(i)    payments to be made directly by Liberty to subcontractors, suppliers, laborers and/or labor union fringe benefit funds which have provided and/or which may hereafter provide material and/or labor to or on behalf of Trocom in furtherance of the work for the Bonded Contracts;

(ii)    payments to be made by Liberty to third parties, designated by Trocom, for the purpose of funding Trocom's direct payroll costs for the Bonded Contracts, and other expenses directly relating to the Bonded Contracts;

(iii)    The Indemnitors have requested that Liberty make Initial Advance on behalf of Trocom consisting of (a) $2,352,131 to the third parties listed in Exhibit D hereto, (b) $500,000 to certain union benefit funds, and (c) payments of (i) $58,413.00 to Hylan Datacom & Electrical LLC, (ii) $213,723.79 to T. Mina Supply, Inc., (iii) $77,864.31 to Aspen Landscaping Contracting, Inc., and (iv) $ 275,000.00 to  Advanced Mill & Pave, Inc. and Liberty has agreed to make those advances, but no others, subject to the terms and conditions hereof.

The Indemnitors acknowledge that to consider and process payment requests, including but not limited to payments to the proposed payees listed in Exhibit D, Liberty will require advance written notice of at least four (4) business days in advance of the requested payment(s), copies of all relevant documents (e.g., purchase orders, subcontracts, etc.) regarding the requested payments, the tax identification number and exact name and address of the proposed payee, and Liberty shall also require that the

2

proposed payee(s) of any such payment(s) sign and deliver in advance of such payment(s) conditional releases, assignments and acknowledgments of Liberty's rights of subrogation with respect to such payment(s), in a form similar to that annexed hereto as Exhibit G, and that Liberty's rights under such documents shall be in addition to, and cumulative with, its rights to repayment by the Indemnitors of all such funds so paid or advanced by Liberty.

In addition, with respect to requests for payments for the wages of Trocom's employees providing labor for Bonded Contracts through a third-party payroll service, to consider and process such payment requests, including but not limited to payments to the proposed payees listed on Exhibit D, Liberty shall require advance copies of applicable project-specific payroll reports (by email not later than 5:00 p.m on Monday to be reconciled by the following Friday with certified payroll documentation), and contemporaneous documentation that all associated tax withholding obligations of Trocom are being met. As noted above, payments from the DIP facility are limited to payment for direct costs associated with the Bonded Contracts, and payments shall not be used for home office costs (including overhead or home office personnel payroll).

The Indemnitors agree their execution of this Agreement has not been induced by or made in reliance upon any oral or written representations by Liberty. Any agreement to provide funding shall be made at Liberty's sole judgment, option and discretion and in the best interests of Liberty only, and not the Indemnitors. Any agreement by Liberty to consider specific requests for funding shall not bind or commit Liberty to provide any other funding or any other type of financial assistance. Pursuant to the Indemnity Agreement and otherwise, the Indemnitors acknowledge and agree that Liberty has no obligation to provide additional surety bonds to the Indemnitors, and that Liberty is not a fiduciary with respect to any of the Indemnitors.

F.    As partial consideration for Liberty's agreeing to advance funds under this Agreement, the Indemnitors have further executed and delivered, or will concurrently execute and deliver, to Liberty the following instruments:

    1.    The promissory note (the "Note") annexed hereto as **Exhibit E**, as partial security for funds advanced by Liberty under this Agreement as well as other payments reimbursable to Liberty under the Indemnity Agreement; and

    2.    The mortgages (the "Mortgages") annexed hereto as **Exhibits F (1), (2) and (3)**, which Liberty may file without further notice to the Indemnitors, with all applicable filings fees to be treated as an advance under this Agreement and recoverable amounts under the Indemnity Agreement.

G.    The Indemnitors each reaffirm their obligations under the Indemnity Agreement, including their promise to exonerate, hold harmless and indemnify Liberty from and against all liability for losses, fees, costs and expenses incurred by Liberty as a result of issuing the Bonds or the Indemnitors' breach of the Indemnity Agreement. Nothing in this Agreement is intended to waive, impede, impair or modify Liberty's rights under the

3

Indemnity Agreement, as any rights afforded Liberty under this Agreement are in addition to any rights Liberty has under the Indemnity Agreement.

H.    All sums paid on the account of the Indemnitors under this Agreement or otherwise, less any amounts received by Liberty on account of money due, or to become due on the Project, shall conclusively be deemed a loss covered and recoverable under the Indemnity Agreement.  Moreover, Liberty shall have the option of allocating recoveries from any source against any compensable loss or expense under its Indemnity Agreement and/or this Agreement.

I.    Trocom (subject to the approval of the Bankruptcy Court) and the other Indemnitors (unconditionally) agree that:

- Subject to the approval of the Court, Trocom shall execute and provide, with respect to each Bonded Contract, an (a) irrevocable assignment, (b) irrevocable letter of direction, and (c) voluntary letters of default (each of which shall be in forms provided by Liberty), and each of which shall be held by Liberty and used, in Liberty's sole discretion, with respect to a specific Bonded Contract if, pursuant to an Order of the Court, (x) Trocom is  terminated for default on that specific Bonded Contract or (y) Trocom rejects that specific Bonded Contract.

- Trocom and the Indemnitors shall continue to commit their full cooperation and diligent efforts to the efficient, timely and successful completion and closeout of the Bonded Contracts, including, without limitation, full and final completion of contract work and collection of all contract funds, including any pending change orders or claims pertaining to the Contract or Project.

- Trocom retains control of and responsibility for its operations, over which Liberty assumes no responsibility.

- This Agreement shall be incorporated into a motion to approve DIP financing under Section 364 of the Bankruptcy Code ("DIP Financing Motion").  In addition, Trocom shall include in the DIP Financing Motion a request that Liberty be granted administrative expense claims with priority over any or all administrative expenses of the kind specified in Sections 503(b) or 507(b) of the Bankruptcy Code, pursuant to, inter alia, Sections 364 and 105 of the Bankruptcy Code, to the extent of any losses incurred by Liberty in connection with the Bonds or the Indemnity Agreement (the "Superpriority Claim").  Any losses incurred by Liberty in connection with the Bonds or the Indemnity Agreement shall also be secured by a lien second in priority to M&T Bank's senior lien in all of Trocom's assets pursuant to, inter alia, Sections 364 (c)(2) and (3) of the Bankruptcy Code. Liberty's Superpriority Claim and post-petition lien granted pursuant to an Order approving the DIP Financing Motion shall be subject only to a carve-out (the "Liberty Carve-Out") for the following  (i) all fees required to be paid by the Clerk of the Bankruptcy Court and to the Office of the United States Trustee; and (ii) all reasonable and unpaid fees, costs, disbursements and expenses (the "Debtor Professional Fees") of any professional retained or to be retained by the

4

Debtor in this case (collectively, the Debtor's Professionals") up to an aggregate amount of $500,000.00.    This Carve-Out shall be in addition to any carve-out given by M&T Bank (the "M&T Carve-Out) and to any of the Debtor's rights under Section 506 (c) of the Bankruptcy Code to the extent that those rights relate to Liberty's collateral in the bankruptcy case (and not collateral provided to Liberty by parties other than Trocom); however, the maximum amount of the Liberty Carve-Out, including any claims under Section 506(c) of the Bankruptcy Code relating to Liberty's collateral in the bankruptcy case, shall in no event exceed $500,000.    For the avoidance of doubt, Liberty's Superpriority Claim shall be senior to any superpriority claim asserted by M&T Bank in the Debtor's chapter 11 case.    Liberty's junior lien in substantially all of the Debtor's assets shall not extend to any causes of action for preferences, fraudulent conveyances and other avoidance power claims and causes of action arising under sections 542, 544, 545, 546, 547, 548, 549, 550 and 553 of the Bankruptcy Code and the recoveries or proceeds thereof (the "Avoidance Actions"). To the extent the automatic stay of Section 362 of the Bankruptcy Code is applicable to any provision of this Agreement, Liberty shall be granted relief from the automatic stay and such grant of stay relief shall be included in any order approving the DIP Financing Motion.

- The DIP Financing Motion must be approved by the Bankruptcy Court only as to Trocom, or it will be null and void and of no force and effect as to only Trocom; provided, however, that this Agreement shall, upon execution by the Parties, be effective as to all the Indemnitors other than Trocom regardless of whether the Court approves the DIP Financing Motion (in whole or in part).

J.    The Indemnitors hereby acknowledge and agree that Liberty may contact any third party as is reasonable and necessary and notify it of the Indemnitors' current financial condition and of the terms of this Agreement and the Indemnity Agreement, and otherwise communicate and disclose any and all documents and/or information regarding this Agreement, the Indemnity Agreement, the Bonded Contracts and the Bonds, and copies of all other documents pertaining to the Indemnitors Liberty presently possesses or acquires during the course of its investigation provided, however, to the extent Liberty seeks to disclose any personal financial information of the individual, and not corporate, Indemnitors, Liberty shall obtain prior written consent from the individual whose information Liberty seeks to disclose and such written consent shall not be unreasonably withheld.  In any event, Liberty shall not be required to seek such written consent from an individual Indemnitor to the extent it seeks to enforce its rights under this Agreement, the Bonds or the Indemnity Agreement

K.    The Indemnitors hereby acknowledge and agree they will continue to provide Liberty representatives with immediate and continuous access to their books and records, including, but not limited to, all financial and other documents relating to Trocom's business generally, the Bonded Contracts, and the Bonds, and all other matters directly or indirectly pertaining the any and all of the Indemnitors' assets or liabilities.    The Indemnitors agree to maintain, protect and preserve their respective books and records, and future books and records, and not move, transfer, or destroy, those books and records

without Liberty's express written consent.  The Indemnitors agree to suspend immediately any document destruction policy in effect at Trocom, Newfound or Found, pending further notification from Liberty that they may resume.

L.      Nothing contained in this Agreement shall be construed as a promise by Liberty to issue bonds to the Indemnitors in the future or to provide any type of financial assistance, except as provided in this Agreement.

M.      Except as provided in this Agreement, the Indemnitors hereby acknowledge and agree Liberty has no obligation to provide financial assistance to them in any manner or method, or to make any payments other than those payments, if any, Liberty has specifically agreed to make pursuant to this Agreement.  The Indemnitors specifically acknowledge and agree their execution of this Agreement, the Note, the Mortgages and the Indemnity Agreement has not been induced by or made in reliance on any oral or written representations by Liberty or its agents, employees, attorneys or consultants that Liberty will provide any financial assistance to them.

N.      The Indemnitors represent, covenant and warrant that all signatories to this Agreement have the full right, power and authority, uninhibited by contract or otherwise, to execute and perform this Agreement and the signatories have been duly authorized, as needed, by all necessary and corporate action, and that all consents and approvals of all stockholders or other interested parties have been obtained.

O.      The Indemnitors hereby acknowledge and agree that they, and not Liberty, are and will be responsible for payment of all required state and federal taxes in any way relating to amounts advanced under this Agreement.  The Indemnitors are responsible for the timely preparation and filing of all federal, state and local tax filings, including, but not limited to, IRS Forms 940, 941, 1099s, W-2s, etc.  The Indemnitors agree to provide to Liberty satisfactory documentation verifying the payment of all required state and federal taxes from funds so received or advanced.

P.      Each and every obligation of the Indemnitors under the Indemnity Agreement, this Agreement, the Note and the Mortgages are joint and several.  In the event that any Indemnitor fails to sign this Agreement or the Note, or if any Indemnitor's signature is invalid or nonbinding for any reason (including but not limited to invalidity under the Bankruptcy Code), this Agreement, the Note, and the Mortgages shall nevertheless be and remain binding and enforceable as to all other Indemnitors.  In addition, in the event that any provision hereof is found to be invalid or unenforceable, all other provisions of this Agreement, the Note and the Mortgages shall be and remain enforceable in favor of Liberty.  All rights and protections in favor of Liberty under paragraphs Tenth, Fifteenth, Sixteenth, Seventeenth, Twentieth, and Twenty-First of the Indemnity Agreement shall apply equally in Liberty's favor with respect to this Agreement, the Note and the Mortgages. THE INDEMNITORS EXPRESSLY WAIVE THE RIGHT TO A TRIAL BY JURY IN ANY DISPUTE WITH LIBERTY UNDER OR RELATING TO THE INDEMNITY AGREEMENT, THIS AGREEMENT, THE NOTE, OR THE MORTGAGES.

Q.      This Agreement shall be governed by the law of the State of New York, without regard to conflicts of law principles.

R.      The Indemnitors each acknowledge, represent, warrant and agree that they have no defenses, offsets or counterclaims to any obligations or liabilities to Liberty under the Indemnity Agreement and hereby waive and release all claims and/or defenses against Liberty, including all of its affiliates, predecessors in interest, parent corporations, subsidiaries, successors-in-interest and assigns and all of Liberty's present and future directors, officers, employees, agents and attorneys, from any and all claims, causes of action, suits and damages (including claims for attorneys' fees) which any or all of the Indemnitors ever had or now has – and to the maximum degree allowed by law, any and all future claims - against any or all of said parties whether arising out of this Agreement, the Indemnity Agreement, the Bonds, the Bonded Contracts, the Note, the Mortgages, the Indemnity Agreement, or otherwise.  The Indemnitors further acknowledge that Liberty is not a fiduciary in any way with respect to any of the Indemnitors.

S.      **THE INDEMNITORS ACKNOWLEDGE AND REPRESENT THAT THEY HAVE CONSULTED WITH THEIR OWN ATTORNEY(S) REGARDING THE CONTENT OF THIS AGREEMENT AND EXECUTE THIS AGREEMENT VOLUNTARILY AND WITH FULL AND COMPLETE KNOWLEDGE OF THE IMPLICATIONS OF SAME.  THIS AGREEMENT, THE NOTE AND THE MORTGAGES SHALL NOT BE SUBJECT TO THE DOCTRINE OF CONTRA PROFERENTEM, AND SHALL BE INTERPRETED AND APPLIED IN FAVOR OF PROTECTING LIBERTY'S RIGHTS.**

This Agreement may be executed in any number of counterparts, and each such counterpart hereof shall be deemed to be an original instrument, but all such counterparts together shall constitute but one agreement.  A "PDF" signature shall be deemed sufficient to bind the parties until an original Agreement has been executed by all parties.

        IN WITNESS WHEREOF the undersigned have executed this Agreement as of the Effective Date.

Trocom Construction Corp. (DIP)            Liberty Mutual Insurance Company

By: _____            By: _____
        Joseph Trovato, President                      Brian Kuhn, Sr. Surety Counsel

Newfound LLC                              Found Properties Resources, Inc.

By: _____            By: _____
        Joseph Trovato, Managing Member              Joseph Trovato, President

_____                  _____
Antoinette Trovato                         Antoinette Trovato, as fiduciary of
                                          The Estate of Salvatore Trovato

7

_____          _____
Joseph Trovato                                              Ali Trovato

5345972.2

**Exhibit A**

| Bond No. | Amount | Obligee | Bond Description |
|---|---|---|---|
| 015001327 | 1,987,719.35 | NYC | Contract Seq200243/002375 Construction Of Storm & Sanitary Sewers, Watermain, and seepage basin in 8 |
| 015001328 | 245,769.00 | NYC | Contract Senoo2125 For The Construction Of A Combined Sewer |
| 015001330 | 292,383.00 | NYC | Contract - Seq200255 For The Construction Of Storm Sewers An |
| 015002389 | 3,958,805.00 | NYC Dept. of Highways | PIN #84196Q4861RW (HWQ121B1) Reconstruction of South Jamaica Area |
| 015001497 | 2,971,455.00 | People of the State of NY | Safety Improvements To Nyc West Side Pier - Contract # 02571 |
| 015003374 | 592,200.00 | MTA | Contract #A-35809 - Water Remedy Work @ Various Stations (1996) |
| 015003376 | 550,188.00 | MTA | Contract # C-31333 Test Pits - Various Locations |
| 015006191 | 1,962,116.00 | NYC DDC | HWM1149 - PIN #85089HW0041C - Installation of New Guiderails, Replacement Of Curbs Removal of Turn O |
| 015008026 | 6,478,973.00 | NYC DDC | Contract # MED-579/EP-7 - Abandonment of the Existing High Pressure Fire System in Lower Manhattan - |
| 015001518 | 20,000.00 | Building, Excavation and Common | Welfare/Pension Bond |
| 015007256 | 869,100.00 | NYCTA/MTA | Contract #A35812 - Water Remedy Work at Various Stations. |
| 015007261 | 100,000.00 | Supreme Court State of New York | Plaintiff's Injunction Bond. |
| 015006190 | 1,181,099.00 | NYC DDC | Construction of Combined Sewers on Rockaway Ave. Bet. Pitkin Ave. and Prospect Place, Borough of Bro |
| 015001519 | 2,200,000.00 | NYC DPR | Contract #M071-496 - Pin #84698M071C02 - Construction of the Cherry Walk Path - Furnishing All Labor |
| 015003731 | 8,893,065.00 | NYC DDC | CAPIS ID: HWK701W - PIN #85099HW0007C - Reconstruction of Manhattan Avenue from Driggs Avenue to As |
| 015010398 | 1,279,850.00 | NYC DPR | Contract #M028-200M - Emergency Stabilization of the Rock Wall Face on the East Side of the Henry Hu |
| 015010402 | 1,204,486.00 | NYC DDC | Contract #HARDWAR01 - PIN #8502001HW0003C - Replacement and Adjustment of Defectie Hardware When and |
| 015010407 | 10,445,770.00 | NYC DDC | Contract #HWM207DR - PIN #8502001HW0005R - Reconstruction of Avenue of the Americas from W. 56th Str |
| 015010446 | 1,578,911.83 | NYC DDC | Contract #HARDWAR99 - Furnishing all labor & materials necessary & required for:  Replacement and ad |
| 015010432 | 943,850.00 | NYC DDC | Contract #B073 0 201M.  Reconstructon of a portion of the Bennenwater & Surrounding landscape from N |
| 015001501 | 25,000.00 | NYC | Street Obstruction Bond |
| 015010435 | 357,248.62 | NYC DDC | The reconstruction of Park Paths bounded by Northern Blvd., Cross Island Parkway & Utopia Parkway in |
| 015010437 | 692,920.00 | NYC DDC | Reconstruction of the Shore Parkway Promenade, Contract #B082A-102M |
| 015010438 | 1,541,925.00 | NYC DPR | Reconstruction of Bailey Fountain & Surrounding Landscape located in Grand Army Plaza @ Flatbush Ave |
| 015010439 | 5,191,277.73 | NYC DDC | Replacement of Eddy Hydrants in various locations within the former Jamaica Water Supply area, borou |
| 015010436 | 500,000.00 | NYC DDC | Furnishing all labor and materials necessary for project ID: HWXPEMERG. |
| 015014221 | 12,855,603.00 | NYC DPR | Contruction & Reconstruction of various parks, playgrounds & gateways in Lower Manhattan, Boro of Ma |
| 015010445 | 1,197,351.00 | NYC DDC | Contract #SEHDWR02N - Pin #8502002SE0048C - For the Replacement and Adjustment of Defective Hardware |
| 015014214 | 1,711,459.00 | NYC | The Reconstruction of portions of the Binnenwater, Lullwater and surrounding landscape from the Musi |
| 015014215 | 980,614.00 | NYC DDC | Contract #SECB04QB - PIN 8502002SE0016C - Reconstruction & Construction of Catch Basis in various lo |
| 015014217 | 2,185,598.20 | NYC DDC | Reconstruction & Construction of Catch Basins in various locations, Boro of Brooklyn, IN # 8502002SE |
| 015014218 | 2,368,837.00 | NYC DPR | Contract No. BG-38150-102M, PIN #8462003B00C07.  Reconstruction of Brooklyn Bridge Park. |
| 015014219 | 848,370.68 | NYC DDC | Reconstruction of Vernon Blvd. Bulkhead - 31 Ave. To 30th Drive. Boro of Queens, FMS ID: HWQP181 - P |
| 015014220 | 784,145.60 | NYC DDC | Reconstruction of Barclay Street, Boro of Manhattan, FMS ID: HWMWTCALE - PIN #8502003HW0014C. |
| 015014221 | 1,994,990.00 | NYC DDC | FMS ID: HWK1152, PIN: 8502004HW0072C. Reconstruction of Roadways & Bulkheads located in the Gerritse |
| 015014222 | 10,400,000.00 | NYC DPR | The Construction & Reconstruction of various parks, playgrounds & Gateways in Lowaer Manhattan, in t |
| 015014224 | 1,412,463.52 | NYC DDC | FMS ID: HWMWTCA6D - PIN:  8502004HWoo1C - reconstruction of Old Slip North 7 South from Water Street |
| 015014225 | 1,387,131.00 | NYC DDC | FMS ID: SEHDWRO4N: 8502004SE0075 - Replacement & Adjustment of Defective Hardware - Boro of Manhatta |
| 015014226 | 5,188,459.99 | NYC DDC | FMS ID: QED-985, PIN:  8502004WM0010C - Replacement of Distribution Water Mains in various locations |

| Bond No. | Amount | Obligee | Bond Description |
|---|---|---|---|
| 015003176 | 10,000.00 | NY Dist. Council - Carpenters | Wage And Welfare Bond |
| 015014228 | 7,842,135.00 | NYC DDC | Contract #D25965, FMS ID: HWK 1152 PIN: 8502004HW0072C.  Reconstruction of Roadways & Bulkheads loca |
| 015023349 | 2,000,000.00 | NYC DDC | Emergency Stabilization of retaining Wall on Kappock Street at Henry Hudson Parkway - Boro of The Br |
| 015014239 | 1,000,000.00 | NYC DDC | Contract HWMWEMERG, Emergency stabilization of Retaining Wall along Riverside Drive between 181st St |
| 015014232 | 1,245,795.00 | NYC DDC | FMS ID: SECBC05Q2 PIN: 8502004SE0016C - Reconstruction & Construction of Catch Basins in various Loc |
| 015023804 | 817,350.00 | NYC | Pin #8462006M037C01 DPR No. M037-106M |
| 015014234 | 1,249,213.00 | NYC DDC | FMS ID: SECB05Q3 - PIN 8502004SE0018C - Reconstruction &  Construction of Catch Basins - Borough of |
| 015014235 | 4,819,348.00 | NYC DDC | FMS ID - HWQ983 - PIN: 8502005HW0002C - Reconstruction of 44th Avenue, between National & 111th Stre |
| 015014237 | 732,077.00 | NYC DDC | FMS ID:  SECB06N2 - PIN:  8502005SE0017C - Reconstruction & Construction of Catch Basins in Various |
| 015014229 | 25,000.00 | NYC Bureau of Highways | Street Obstruction Bond. |
| 015024821 | 635,740.00 | NYC DPR | PIN No. 8462006M037C01 - DPR No. CNYG-207M - Emergency Construction and Stabilization of Retaining W |
| 015026047 | 5,119,485.00 | NYC DPR | Reconstruct and Stabilization of Retaining Walls, Citiwide. |
| 015024835 | 1,998,992.00 | NYC DDC | FMS ID: HWQP186 - PIN: 8502005HW0026C - Reconstruction of 20th Avenue from Whitestone Expressway Nor |
| 015025975 | 6,877,817.00 | NYC EDC | West Harlem Waterfront/Riverwalk Upland Site Work. Manhattan, NYC. Contract No. 10410006. |
| 015026162 | 3,950,000.00 | NYC DPR | Reconstruction and Stabilization of Retaining Walls, Citywide. Contract # CNYG-1806M-PIN 8462006C000 |
| 015026179 | 50,000.00 | NYC Comm. of Transportation | Street Obstruction Permit Bond - Two to Fifty Locations Liability |
| 015024968 | 89,581.00 | NYC DPR | Discharge of Public Improvement Mechanic's Lien Bond. |
| 015014230 | 3,000.00 | NYC | Plumber's Bond |
| 015027647 | 3,428,673.00 | NYC DDC | Contract - HWK472A.  Reconstruction of Sands Streetfrom Navy Street to Jay Street including sewer, s |
| 015027470 | 3,648,422.00 | NYC EDC | Contract 20330003 - Downtown Brooklyn, Flatbush Ave streetscape improvments and utility relocation a |
| 015025220 | 19,711,000.00 | MTA | Subway Tunnel Structural Rehab for Whitehall Street Station to Canal Street Station, Broadway Line, |
| 015024557 | 900,000.00 | NYC DDC | FMS ID: HWCRWALLC  PIN:  8502006HW0064C Repair and/or Reconstruction of Collapsed or Otherwise Defe |
| 015026139 | 14,421,531.00 | NYC DDC | Reconstruction of Beekman Street from Park Row to Gold Street and from Park Place to West Broadway. |
| 015027133 | 16,651,925.00 | NYC DDC | Reconstruction of Liberty Street to Gold Street, Maiden Lane from William Street to Water Street and |
| 015028574 | 8,418,816.00 | NYC DPR | MG-41100-107M - Construction of imagination playground in Manhattan. |
| 015028869 | 3,551,483.00 | NYC DPR | MG-909M, The Reconstruction of East River Access Slips. Rutgers Slip between South & Cherry Streets, |
| 015028829 | 2,021,267.00 | NYC DPR | The Construction of John DeLury Square on Fulton Street. |
| 015027594 | 20,580,372.00 | NYC DDC | HWCSCH2 - School safety improvements, phase 2 in the vicinity of various schools through out the fiv |
| 015027928 | 14,446,248.00 | NYC EDC | Fulton Mall Streetscape work in Brooklyn, NY. |
| 015025019 | 74,541.00 | NYC DDC | Discharge of Public Improvement Mechanic's Lien Bond. |
| 015028577 | 9,181,742.00 | NYC EDC | East River Waterfront Esplanade and Piers Project- improve and redevelop a portion of the East River |
| 015014216 | 21,413.00 | NYC DDC | Discharge of Mechanic's Lien Bond. |
| 015029752 | 211,435.00 | NYC DEP | Construct a private Combined sewer/drain as detailed on P.D.K 0036/07, in the Borough of Brooklyn. |
| 015030497 | 81,458.00 | Clerk of the County of Bronx | Discharge of Public Improvement Mechanic's Lien, Lienor: Bronx County Recycling LLC for Streets and |
| 015028580 | 58,002.00 | NYC DDC | Discharge Mechanic Lien Bond.  Project bonded under Bond # 015-027-133 |
| 44S101184 | 800,000.00 | NYS DEC | Restoration Bond |
| 44S101183 | 7,832,934.00 | MTA/NYCTA | Contract E-31299, Construction of New Duct Banks along Lenox Avenue from 141 St.to 147 St., Manhatta |
| 015030496 | 51,149.00 | NYC Dept. of Finance | Discharge of Public Improvement Mechanic's Lien, Lienor: Mega Engineering, Inc. for John DeLury Sr. |
| 015034323 | 247,500.00 | NYC Dept. of Finance | Release of Lien Bond; Lien Filed by New World Contracting Company; Project: Reconstruction of Columb |

| Bond No. | Amount | Obligee | Bond Description |
|---|---|---|---|
| 015034324 | 137,500.00 | NYC Dept. of Finance | Release of Lien Bond; New World Contracting Company; Project: Reconstruction of Columbia Street and |
| 015034325 | 247,500.00 | NYC Dept. of Finance | Release of Lien bond; a New World Contracting company; Reconstruction of Liberty Street, Boro of Man |
| 015039668 | 379,500.00 | NYC DDC | Release of Mechanics Lien; Spring City Electrical Manufacturing Co. - FMS ID: HWD105-01, PIN: 850200 |
| 015034309 | 18,697.00 | NYC Dept. of Finance | Discharge of Public Improvement Mechanic's Lien, Lienor: Answer Home Improvement, Inc. for contract |
| 015034310 | 71,500.00 | NYC Dept. of Finance | Discharge of Public Improvement Mechanic's Lien, Lienor: A New World Contract Company for contract w |
| 015014236 | 18,182,688.00 | NYC DDC | FMS ID: HWK700A-PIN: 8502005HW0045C - Reconstruction of Columbia Street & Area, etc., Borough of Bro |
| 015027947 | 28,157,807.00 | NYC DDC | Reconstruction of Fulton Street, from Church Street to South Street, Nassau Street from Fulton Stree |
| 44S101181 | 14,451,382.00 | NYC DDC | FMS ID: HWD105-01 - PIN: 8502009HW0030C - Reconstruction of Raised Medians on Metropolitan Avenue. e |
| 44S101182 | 6,244,765.00 | NYC DPR | Reconstruction of Allen & Pike St. Center Plots Located on Allen St. Between Delancey and Hester Sts |
| 44S101185 | 6,493,308.00 | NYC DPR | Q020-109M, reconstruction of perimeter pathways, fencing, security lighting at Ridgewood Reservoir |
| 015033598 | 1,854,006.00 | NYC-DDC | Construction of Willoughby Plaza Along Willoughby Street, etc. - Boro of Brooklyn - FMS ID: HWK1170 |
| 015033601 | 3,551,475.00 | NYC DDC | FMS ID: HWXP2022 - E-PIN: 85011B0082001 - DDC PIN: 8502010HW0036C, Reconstruction of Conner Street B |
| 015034318 | 1,789,575.00 | NYC DDC | Cont. #HWSEMERG7 - Emergency Installation of Sidewalks, Adjacent Curbs and Pedestrian Ramps as Neces |
| 015034320 | 7,872,938.00 | NYC DDC | DDC PIN: 8502011 SE0021C - Construction of Storm Sewers & Ap34th and Brookside |
| 015034328 | 23,276,664.00 | NYC EDC | East River Waterfront Esplanade & Piers project package 3 IFB |
| 015034329 | 5,367,231.00 | NYC DPR | Contract # CNYG-1511M Reconstruction & Stabilization of Retaining Walls and Seawalls citywide |
| 015042718 | 14,473,690.00 | NYC EDC | Contract # 18260004 - West 125 Street Streetscape Project - Construction Work |
| 015036820 | 851,469.00 | NYC EDC | FMS ID: HWPLZ006K - E-PIN: 85012B0096 - DDC PIN: 8502012HW0044C Construction of Knickerbocker Plaza |
| 015039673 | 3,551,415.00 | NYC EDC | Reconstruction of Springfield Blvd. Project - NYCEDC Cont. #1900013 |
| 015036829 | 1,659,388.00 | NYC DPR | Contract #X002-111M, Installation of Andromous Fish Passage & Reconstruction - E. Side side retaining wall Bx River |
| 015039677 | 10,765,042.00 | NYC | FMS ID: HWXRCPLZ, E-PIN: 85013B0044001, DDC PIN: 8502012HW0007C, Reconstruction of Roberto Clemente |
| 015040888 | 315,000.00 | MTA/NYCTA | Contract E-31299, Construction of New Duct Banks along Lenox Avenue from 141 St.to 147 St., Manhatta |
| 015042715 | 19,764,390.00 | NYC DDC | DDC PIN 850211WM0011C - Installation of Trunk and Distribution Springfield Blvd between LIE & 56th |
| 015042716 | 3,583,631.00 | NYC DDC | FMS ID: HWPLZ008M - E-PIN: 85014B0008001 - DDC PIN: 8502013HW0069C Reconstruction of Forsyth Street |
| 015044824 | 2,989,228.00 | NYC DDC | FMS ID: HWPLZ009M, E-PIN: 85013B0117001, DDC PIN: 8502013HW0036C - Reconstruction of Plaza De Las Am |
| 015014231 | 3,000.00 | NYC | Plumber's Bond. |
| 015044833 | 159,012.00 | NYC DDC | Discharge of Public Improvement Mechanic's Lien for Cont. # SEQ200473 - Construction of Sewers at 34 |
| 015029510 | 81,101.00 | NYC DDC | Mechanic Lien Bond. Lienor: Dimension Development Corp. FMS ID: HWMWTCA8B - PIN 8502008HW0009C. |
| 015029511 | 114,425.00 | NYC DDC | Mechanic Lien Bond - Lienor: Dimension Development Corp. FMS ID: HWCSCH2 - PIN: 8502008HW0003C. |
| 015044839 | 137,933.00 | CFO - NYC EDC | Discharge of Public Improvement Mechanic's Lien -Lienor: Cooperfriedman Electric Supply Co., Inc. - |
| 015027912 | 250,000.00 | NYC DOT | Street Obstruction bond 100 Locations. |
| 015010374 | 100,000.00 | Building, Concrete, Excavating Funds | Union Welfare Bond. |
| 015024333 | 10,000.00 | NY District Council - Carpenters | Welfare Fund only. |

**Exhibit B**



# General Agreement of Indemnity

This General Agreement of Indemnity (hereinafter the "Agreement") is made and entered into by the following individuals, partnerships, corporations, and/or other business entities, as applicable, <u>Trocom Construction Corp., Salvatore Trovato</u> (individually and collectively hereinafter called the "Indemnitor(s)") jointly and severally, in favor of Liberty Mutual Insurance Company, Employers Insurance Company of Wausau (formerly "EMPLOYERS INSURANCE OF WAUSAU A Mutual Company"), Peerless Insurance Company, and/or any other company that is part of or added to the Liberty Mutual Group, severally not jointly, and for which Liberty Mutual Surety underwrites surety business (individually and collectively hereinafter called the "Surety") with respect to any surety bond, undertaking, recognizance, instrument of guarantee or other surety obligations (hereinafter called the "Bond(s)") requested from and/or issued by the Surety before or after the date of this Agreement, for i) <u>Trocom Consruction Corp., Salvatore Trovato; and any Indemnitor added hereto by Amendment;</u> ii) any of the Indemnitors or Principals' subsidiaries or affiliates, whether present or future, and whether directly or indirectly held; and iii) any other entity or person in response to a request from any Indemnitor or Principal named herein, and, as to all of the foregoing, whether they act alone or in joint venture with others and whether or not said others are named herein (individually and collectively hereinafter called the "Principal(s)").

**WITNESSETH**

WHEREAS, the Indemnitors and Principals, in the performance of contracts and the fulfillment of obligations generally, whether in their own names solely or as co-adventurers with others, may desire, request, or be required to give or procure certain Bonds, and/or to renew, continue, extend or substitute, from time to time, the same or new Bonds with the same or different penalties, and/or conditions, as may be desired, requested or required, in the renewal, continuation, extension and/or substitution thereof; or the Indemnitors or Principals may request the Surety to refrain from canceling the Bonds; and

WHEREAS, at the request of the Indemnitors and with both the express understanding that this Agreement be given and in reliance upon this Agreement, the Surety has heretofore or has presently been requested to and/or has executed or has procured to be executed, and, from time to time hereafter, may be requested to and/or may execute or may procure to be executed, the Bonds on behalf of the Principals; and

WHEREAS, the Indemnitors have a substantial, material and beneficial interest in the obtaining of the Bonds or in the Surety's refraining from canceling any or all Bonds.

NOW, THEREFORE, in consideration of the premises, and intending to be legally bound hereby, the Indemnitors and Principals for themselves, their heirs, executors, administrators, successors and assigns, jointly and severally, hereby covenant and agree with the Surety, its successors and assigns, as follows:

FIRST: **PREMIUMS** - The Indemnitors and Principals will pay to the Surety, promptly upon demand, all premiums, costs and charges of the Surety for any Bonds requested from and/or issued by the Surety in accordance with its rate filings, its manual of rates as determined by the Surety, or as otherwise determined by the Surety, and where such premium, costs and charges are annual, continue to pay the same until the Indemnitors or Principals shall deliver evidence satisfactory to the Surety of its discharge or release from the Bonds and all liability by reason thereof.

SECOND: **INDEMNITY** – The Indemnitors shall exonerate, hold harmless, indemnify, and keep indemnified the Surety from and against any and all liability for losses, fees, costs and expenses of whatsoever kind or nature including, but not limited to, pre- and post-judgment interest at the maximum rate permitted by law accruing from the date of a breach of this Agreement or a breach of any other written agreements between or for the benefit of the Surety and the Indemnitor(s) and/or Principal(s) (hereinafter referred to as "Other Agreements"), court costs, counsel fees, accounting, engineering and any other outside consulting fees and from and against any and all such losses, fees, costs and expenses which the Surety may sustain or incur: (1) by reason of being requested to execute or procure the execution of any Bond; or (2) by having executed or procured the execution of any Bond; or (3) by reason of the failure of the Indemnitors or Principals to perform or comply with any of the covenants and conditions of this Agreement or Other Agreements; or (4) in enforcing any of the covenants and conditions of this Agreement or Other Agreements. Payment by reason of the aforesaid causes shall be made to the Surety by the Indemnitors and/or Principals promptly, upon demand by the Surety, whether or not the Surety shall have made any payment therefor and, at the Surety's sole option, irrespective of any deposit of collateral. If the Surety determines, in its sole judgment, that potential liability exists for losses and/or fees, costs and expenses for which the Indemnitors and Principals will be obliged to indemnify the Surety under the terms of this Agreement or Other Agreements, the Indemnitors and/or Principals shall deposit with the Surety, promptly upon demand, a sum of money equal to an amount determined by the Surety or collateral security of a type and value satisfactory to the Surety, to cover that liability, whether or not the Surety has: (a) established or increased any reserve; (b) made any payments; or (c) received any notice of any claims therefor. At the Surety's sole option, such collateral shall be in addition to and not in lieu of any other collateral that has been previously provided to the Surety. The Surety shall have the right to use any collateral, or any part thereof, in payment or settlement of any such liabilities for which the Indemnitors and Principals would be obliged to indemnify the Surety under the terms of this Agreement or Other Agreements. In the event of any payment by the Surety, the Indemnitors and Principals further agree that in any accounting between the Surety and the Principals, or between the Surety and the Indemnitors, or either or both of them, the Surety shall be entitled to charge for any and all disbursements made by it in good faith in and about the matters herein contemplated by this Agreement or Other Agreements under the belief that it is, or was, or might be liable for the sums and amounts so disbursed or that it was necessary or expedient to make such disbursements, whether or not such liability, necessity or expediency existed; and that the vouchers or other evidence of any such payments made by the Surety shall be prima facie evidence of the fact and amount of the liability to the Surety. Surety shall have no obligation to invest or provide a return on any collateral provided to it under this Agreement.

THIRD: **ASSIGNMENT** - The Indemnitors hereby consenting do assign, transfer, pledge and convey to the Surety and agree to use their best efforts to cause the Principals to assign, transfer, pledge and convey to the Surety as collateral security for the full performance of the covenants and agreements herein contained, contained in Other Agreements and for the payment of any other indebtedness or liability of the Indemnitors and/or Principals to the Surety, whether heretofore or hereafter incurred, the assignment in the case of each contract being effective as of the date of the Bond covering such contract, the following: (a) all the right, title and interest of the Indemnitors and/or Principals in, and growing in any manner out of, all contracts referred to in the Bonds, or in, or growing in any manner out of the Bonds; (b) all the right, title and interest of the Indemnitors and/or Principals in and to all machinery, supplies, equipment, plant, tools and materials which are now, or may hereafter be, about or upon the site or sites of any and all contractual work referred to in the Bonds or elsewhere, including materials purchased for or chargeable to any and all contracts referred to in the Bonds, materials which may be in the process of construction, in storage at the site or elsewhere, or in transportation to any and all sites; (c) all the right, title and interest of the Indemnitors and/or Principals in and to

all subcontracts let or to be let in connection with any and all contracts referred to in the Bonds, and in and to all surety bonds supporting such subcontracts; (d) all actions, causes of actions, claims and demands whatsoever which the Indemnitors and/or Principals may have or acquire against any subcontractor, laborer or materialman, or any person furnishing or agreeing to furnish or supply labor, material, supplies, machinery, tools, or other equipment in connection with or on account of any and all contracts referred to in the Bonds; and against any surety or sureties of any subcontractor, laborer or materialman; and (e) any and all percentages retained and any and all sums that may be due or hereafter become due on account of any and all contracts referred to in the Bonds and all other contracts whether bonded or not in which the Indemnitors or Principals have an interest; (f) all licenses, patents, copyrights and trade secrets; (g) all warehouse receipts, bills of lading and general intangibles; (h) all tax refunds and claims for tax refunds; and (i) all limited partnership and general partnership interests; but only in the event of: (1) any abandonment, forfeiture or breach of any contract referred to in the Bonds or of any breach of any Bond; or (2) a default in discharging any other indebtedness or liabilities incurred in connection therewith, when due; or (3) any breach of the covenants and conditions of this Agreement or Other Agreements, including but not limited to the failure to obtain from the Surety written approval of a Change in Control; or (4) an assignment by any Indemnitor or Principal for the benefit of creditors, or of the appointment or any application for the appointment, of a receiver or trustee for any Indemnitor or Principal whether insolvent or not; or (5) any proceeding which deprives the Indemnitor or Principal of the use of any of the machinery, supplies, equipment, plant, tools or material referred to in section (b) of this paragraph; or (6) any Indemnitor or Principal's death, absconding, disappearance, incompetence, insolvency, conviction of a felony, or imprisonment, if the Indemnitor or Principal be an individual. Principal(s) shall further obtain, maintain and assign all proceeds from insurance coverage as may be required by the Surety from insurance companies acceptable to Surety, including, as may be applicable, coverage for acts of terrorism.  Failure to obtain or maintain insurance coverages so required by Surety shall be a breach of this Agreement and shall permit Surety to demand cash collateral from Principal(s) in an amount up to and including the full penal sum of any outstanding Bond(s).

**FOURTH: UNIFORM COMMERCIAL CODE** - This Agreement shall constitute a Security Agreement to the Surety and also a Financing Statement, both in accordance with the provisions of the Uniform Commercial Code of every jurisdiction wherein such Code is in effect and may be so used by the Surety without in any way abrogating, restricting or limiting the rights of the Surety under this Agreement or under law, or in equity.  A carbon, photographic or other reproduction of this Agreement may be filed as a Financing Statement.

**FIFTH: TAKEOVER** - In the event of any of the following: breach, default, or termination asserted by the obligee in any Bond; any Principal's abandonment of the work or forfeiture of any contract covered by any Bond, any Principal's failure to pay obligations incurred in connection therewith; or if the Principal is an individual, in the event of the Principal's death, absconding, disappearance, incompetence, insolvency, conviction of a felony, or imprisonment; the bankruptcy of any Principal; the appointment of a receiver or trustee for any Principal or for the property of any Principal; an assignment for the benefit of creditors of any Principal; if any action is taken by or against any Principal under or by virtue of the Federal Bankruptcy Code; should reorganization or arrangement proceedings be filed by or against any Principal under said Code; and/or if any action is taken by or against any Principal under the insolvency laws of any state, possession or territory of the United States, then the Surety shall have the right, at its option and in its sole discretion and is hereby authorized, with or without exercising any other right or option conferred upon it by law or under the terms of this Agreement, to take possession of any part or all of the work under any contract or contracts covered by the Bonds, and the Indemnitors hereby agree to use their best efforts to cause the Principal to permit the Surety to take possession of any part or all of the work under any contract or contracts covered by the Bonds, at the expense of the Indemnitors and Principals, to complete or arrange for the completion of the same, and the Indemnitors and Principals shall promptly, upon demand, pay to the Surety all losses, fees, costs and expenses so incurred.

**SIXTH: CHANGES** - The Surety is authorized and empowered, without notice to or knowledge of the Indemnitors or Principals, to assent to any change whatsoever in the Bonds, and/or any and all contracts referred to in the Bonds, and/or in the general conditions, plans and/or specifications accompanying said contracts, including, but not limited to, any change in the time for the completion of said contracts and to payments or advances thereunder before the same may be due, and to assent to or take any assignment or assignments, to execute or consent to the execution of any continuations, extensions or renewals of the Bonds and to execute any substitute or substitutes therefor, with the same or different conditions, provisions and obligees and with the same or larger or smaller penalties, it being expressly understood and agreed that the Indemnitors shall remain bound under the terms of this Agreement even though any such assent by the Surety does or might substantially increase the liability of said Indemnitors. Indemnitors further represent and warrant to surety that they are currently informed and remain informed and apprised of Principal's or Principals' business activities, ventures and financial affairs, including but not limited to the type, size (single job and/or aggregate program), location and status of projects and contracts performed by Principal(s) and secured by Bond(s) executed, provided or procured by Surety.  Surety has no obligation to inform the Indemnitors of any change in any aspect of Principal(s)' business activities or financial affairs.

**SEVENTH: ADVANCES** - The Surety is authorized and empowered, in its sole discretion and without any obligation to do so, to guarantee loans, to advance or lend to an Indemnitor or Principal any money, which the Surety may see fit, for the purpose of any contracts referred to in, or guaranteed by the Bonds, or pursuant to any Other Agreements, and all money so expended, lent, advanced, or loans guaranteed from time to time to or on behalf of any such Indemnitor or Principal in connection therewith, including costs of investigation, administration, and/or in the completion of any contract by the Surety, and any and all other costs and expenses incurred by the Surety in relation thereto, unless repaid with interest at the maximum rate permitted by law by any Indemnitor or Principal to the Surety when due, shall be presumed to be a loss by the Surety for which the Indemnitors and Principals shall be responsible notwithstanding that said money or any part thereof should not be so used by any such Indemnitor or Principal.

**EIGHTH: BOOKS AND RECORDS** – Principal(s) and Indemnitor(s) shall provide to Surety within 120 days of their fiscal year end, financial statements prepared in accordance with Generally Accepted Accounting Principles, and reports prepared by reputable accounting firms prepared in accordance with the AICPA's Statements on Standards for Accounting and Review Services ("SARS").  If Principal(s) and/or Indemnitor(s) have reports prepared by reputable accounting firms in accordance with the AICPA's Statements on Auditing Standards in the ordinary course of their financial reporting, then such reports shall be supplied instead of the reports in accordance with SARS.  Principal(s) and Indemnitor(s) shall also provide any management letters received from their accountants within 30 days of receipt.  In addition to the foregoing, at any time, and until such time as the liability of the Surety under any and all Bonds is terminated, or the Surety is fully reimbursed all amounts due to it under this Agreement or Other Agreements, the Surety shall have the right of reasonable access to the books, records and/or accounts of the Indemnitors and Principals for the purpose of inspection, copying or reproduction; and any financial institution, depository, materialman, supply house or other person, firm or corporation is hereby specifically authorized by each Indemnitor and Principal to furnish the Surety, at the Surety's request, any information requested including but not limited to, financial and credit reports relating to the financial condition of the Indemnitors and/or Principals, and as to any bonded or non-bonded contract performed, in progress or awarded, the status of the work, the condition of the performance of such contracts and payments of accounts.  The Indemnitors and Principals agree to provide any additional releases, requests, waivers or any other documents required in order to allow the Surety access to the requested information.  Failure to provide the information required in this paragraph shall be a breach of this Agreement, and shall entitle Surety to demand, in its sole discretion, cash collateral up to the penal sum of any outstanding Bond(s).

NINTH: **DECLINE EXECUTION** – The Surety, at its sole discretion, may decline to execute, renew or extend any Bond, including final bonds, and may cancel any Bond unless the Bond states otherwise, and the Indemnitors and Principals agree to make no claim to the contrary. If the Surety shall execute a Bid or Proposal Bond, it shall have the right to decline to execute any other Bonds that may be required in connection with any award that may be made under the proposal for which the Bid or Proposal Bond is given, and such declination shall not diminish or alter the liability that may arise by reason of having executed the Bid or Proposal Bond. The Indemnitors and Principals acknowledge that the Surety makes no representation as to the validity or acceptability of any Bond to any person, firm or entity of whatever sort or kind under any contract, and agree that they shall have no claim against the Surety arising out of or in any manner relating to the failure or refusal of any person, firm or entity of whatever sort or kind to award any contract to the Principals, or to accept any Bond executed and delivered by the Surety, or that the Surety has been requested to execute and delivery.

TENTH: **NOTICE OF EXECUTION** - The Indemnitors and Principals hereby waive notice of the execution of any Bond, the acceptance of this Agreement or Other Agreements, and of any change in surety credit or other fact that might materially alter the Indemnitors and Principals' obligations hereunder, and the Indemnitors and Principals hereby waive all notice of any default, or any other act or acts giving rise to any claim under any Bond, as well as notice of any and all liability of the Surety under any Bond, and any and all liability on their part hereunder, to the end and effect that, the Indemnitors and Principals shall be and continue to be liable hereunder, notwithstanding any notice of any kind to which they might have been or be entitled, and notwithstanding any defenses they might otherwise have been entitled to make as a result of lack of notice.

ELEVENTH: **TRUST FUND** – To the extent permitted under applicable law, the Indemnitors and Principals covenant and agree that all of their interest, title and rights in any contract or undertaking referred to in any Bond, or in, or growing in any manner out of any Bond, including but not limited to payments for or on account of any contract, shall be held as a trust fund and/or as a constructive or equitable trust in which the Surety has an interest, and shall inure to the benefit of the Surety for any liability or loss it may have or sustain under any Bond including but not limited to the payment of obligations incurred in the performance of any contract and for labor, materials, and services furnished in the prosecution of the work provided in any contract or any authorized extension or modification thereof; and, further, it is expressly understood and declared that all monies due and to become due under any contract covered by any Bond are trust funds, whether in the possession of the Indemnitors or Principals or otherwise, for the benefit of and for payment of all such obligations in connection with any such contract for which the Surety would be liable under any Bond; said trust also inures to the benefit of the Surety for any liability or loss it may have or sustain under any Bond, under this Agreement, or under any Other Agreements, and this Agreement constitutes notice of such trust.

TWELFTH: **HOMESTEAD** – To the extent permitted by applicable law, the Indemnitors and Principals hereby waive, so far as their respective obligations under this Agreement are concerned, all rights to claim any of their property including their respective homesteads, as exempt from levy, execution, sale or other legal process under the laws of any state, territory or possession.

THIRTEENTH: **SETTLEMENTS** - The Surety shall have the right, at its option and sole discretion, to adjust, settle or compromise any claim, demand, suit or judgment upon any Bond, unless any Indemnitor or Principal, providing a reasonable legal basis therefor, shall request the Surety to litigate such claim or demand, or to defend such suit, or to appeal from such judgment, and shall deposit with the Surety, at the time of such request, cash or collateral satisfactory to the Surety in kind and amount to be used in paying any judgment or judgments rendered or that may be rendered, with interest, costs, expenses and attorneys' fees, including those of the Surety.

FOURTEENTH: **SURETIES** - In the event the Surety procures the execution of any Bond by other sureties, or executes any Bond with co-sureties, or reinsures any portion of any Bond with reinsuring sureties, then all the terms and conditions of this Agreement shall inure also to the benefit of such other sureties, co-sureties and reinsuring sureties, their successors and assigns, as their interests may appear.

FIFTEENTH: **SUITS** - Separate suits may be brought hereunder as causes of action accrue, and the bringing of suit or the recovery of judgment upon any cause of action shall not prejudice or bar the bringing of other suits upon other causes of action, whether theretofore or thereafter arising.

SIXTEENTH: **OTHER INDEMNITY** - The addition to this Agreement of any Indemnitor, including any entities acquired after the date of execution of this Agreement, may be effected by written amendment executed by such Indemnitor only, notwithstanding any language herein to the contrary. The Indemnitors and Principals shall continue to remain bound under the terms of the Agreement, Other Agreements, and any other agreements containing indemnity obligations, even though the Surety may from time to time heretofore or hereafter, with or without notice to or knowledge of the Indemnitors and Principals, accept, release, or reduce any indemnity obligations or collateral of current or future Indemnitors and Principals for any reason. The Indemnitors and Principals expressly waive notice from the Surety of any such action and, furthermore, it is explicitly understood and agreed by the Indemnitors and Principals that any and all other rights which the Surety may have or acquire against the Indemnitors and Principals and/or others under any such agreements or additional agreements or collateral shall be in addition to, and not in lieu of, the rights afforded the Surety under this Agreement. No Indemnitor shall make any defense to the enforcement of this Agreement based on the execution of Other Agreements or related to the addition or the release of any Indemnitor, and each Indemnitor explicitly confirms its joint and several liability for Bonds issued by the Surety as provided in this Agreement. Principals and Indemnitors also waive and subordinate all rights of indemnity, subrogation and contribution against each other until all obligations to the Surety under the agreement, at law or in equity, have been satisfied in full.

SEVENTEENTH: **INVALIDITY** – Invalidity of any provision of this Agreement by reason of the laws of any jurisdiction shall not render the other provisions hereof invalid. In case any of the parties set forth in this Agreement fail to execute the same, or in case the execution hereof by any of the parties be defective or invalid for any reason, including lack of authority to bind any party, such failure, defect or invalidity shall not in any manner affect the validity of this Agreement or the liability hereunder of any of the parties executing the same, but each and every party so executing shall be and remain fully bound and liable hereunder to the same extent as if such failure, defect or invalidity had not existed. Each party agrees to execute promptly any documentation necessary to cure any such failure, defect or invalidity. It is understood and agreed by the Indemnitors and Principals that the rights, powers, and remedies given the Surety under this Agreement shall be and are in addition to, and not in lieu of, any and all other rights, powers, and remedies which the Surety may have or acquire against the Indemnitors and Principals or others whether by the terms of any other agreement or by operation of law or otherwise.

EIGHTEENTH: **ATTORNEY-IN-FACT** - The Indemnitors and Principals hereby irrevocably nominate, constitute, appoint and designate the Surety as their attorney-in-fact with the full right and authority, but not the obligation, to exercise all the rights of the Indemnitors and Principals assigned, transferred and set over to the Surety in this Agreement, with full power and authority to execute on behalf of and sign the name of any Indemnitor and/or Principal to any voucher, financing statement, release, satisfaction, check, bill of sale of all or any property by this Agreement assigned to the Surety, or other documents or papers deemed necessary and proper by the Surety in order to give full effect not only to the intent and meaning of the within assignments, but also to the full protection intended to be herein given to the Surety under all other provisions of this Agreement. The Indemnitors and Principals hereby ratify and confirm all acts and actions taken and done by the Surety as such attorney-in-fact and agree to protect and hold harmless the Surety for acts herein granted as attorney-in-fact.

NINETEENTH: **TERMINATION** – Any Indemnitor may terminate its liability under this Agreement upon twenty days' written notice sent by registered and certified mail or courier requiring proof of delivery signature to the Surety, in care of Liberty Mutual Surety, Interchange Corporate Center, 450 Plymouth Road, Suite 400, Plymouth Meeting, PA 19462-1644, but any such notice of termination shall not operate to modify, bar, or discharge Indemnitors or Principals as to any Bonds (a) that may have been executed or authorized prior to the expiration of the notice period; (b) which may be executed after the expiration of the notice period in fulfillment of any commitment given by the Surety prior to the expiration of such notice period; (c) executed in connection with any project as to which any bid bond was executed or authorized prior to the expiration of such notice period; and/or (d) which are renewed, extended, substituted or modified after the expiration of such notice period. Such termination of liability as to any Indemnitor or Principal in no way affects the obligation of any other Indemnitor or Principal who has not given notice as herein provided.

TWENTIETH: **AMENDMENTS** – This Agreement may not be changed or modified orally. No change or modification shall be effective unless made by written amendment executed to form a part hereof.

TWENTY-FIRST: **JURISDICTION -** As to any legal action or proceeding related to this Agreement, the Indemnitors and Principals consent to the general jurisdiction of any local, state or Federal court of the United States or its territories having proper subject matter jurisdiction or in any court of the United States or its territories in which any claim may be brought against the Surety under any Bonds, and waive any claim or defense in any such action or proceeding based on any alleged lack of personal jurisdiction, improper venue, forum non conveniens or any similar basis. Indemnitors and Principals further waive personal service or any and all process.

TWENTY-SECOND: **CURRENCY EXCHANGE** – Should the Surety, when making any payment or incurring any expense directly or indirectly related to Bonds expend funds in currencies other than U.S. Dollars, then Indemnitors shall either reimburse the Surety in U.S. Dollars equal to the amount expended by the Surety at the time the foreign currency was purchased or shall defray the cost of any exchange variation, thereby indemnifying the Surety for any decrease in the valuation of the currency purchased.

TWENTY-THIRD: **CHANGE IN CONTROL -** The Indemnitors agree to provide the Surety with, at least, forty five (45) days prior written notice of a Change in Control (defined below) and to designate the name and address of the Indemnitor with whom the Surety should correspond with respect to this paragraph, which Indemnitor, all Indemnitors agree is designated to act on behalf of them pursuant to this paragraph. Upon receipt of such notice, the Surety shall advise the Indemnitor designated above, in writing, of its election to (i) approve such Change in Control or (ii) demand that the Indemnitors' procure the discharge of the Surety from any Bonds and all liability by reason thereof. If the Indemnitors fail to give the Surety timely notice of a Change in Control or if the Surety does not approve the Change in Control and if such discharge is not procured to the sole satisfaction of the Surety then, immediately, upon the Surety's written demand, the Indemnitors shall deposit a sum of money or collateral, of a type and value satisfactory to the Surety, equal to the aggregate penal sum of the then outstanding Bonds, as determined by the Surety in its sole discretion. The Surety shall send its written demand to the Indemnitor designated above by overnight courier or by registered or certified mail. The Indemnitors hereby acknowledge that if they or any one of them breaches the obligations set forth in this paragraph, the Surety will not have an adequate remedy at law, will suffer irreparable harm and shall be entitled to injunctive relief, enforcing the terms of this paragraph, as well as a final decree, order or judgment granting Surety specific performance of the terms of this Agreement.

"Change in Control' shall mean: (a) the transfer, merger or consolidation (in one transaction or a series of transactions) of all or substantially all of the assets of any non-individual Principal or Indemnitor; (b) the acquisition (in one transaction or a series of transactions) by any person or group, directly or indirectly, of fifty (50%) percent or more of the beneficial ownership or control of any Principal or Indemnitor; or (c) the acquisition by any Principal or Indemnitor, directly or indirectly, of  fifty (50%) percent or more of the beneficial ownership or control in any joint venture, subsidiary, division, affiliate, limited partnership, limited liability partnership, limited liability company or other entity through the issuance of ten (10%) percent or more of the voting power of the total outstanding voting stock of any Principal or Indemnitor.

TWENTY-FOURTH: **DOMESTIC PRINCIPAL DOING FOREIGN CONTRACTS/GOVERNING LAW -** The Indemnitors and Principals hereby agree that as to any legal action or proceeding related to any Bond(s) issued in connection with contracts to be performed outside the United States and its territories, this Agreement shall be governed by and construed in accordance with the laws of the State of New York (without giving effect to the conflict of laws principles thereof), except to the extent superseded by Federal law.

DATED as of this _4 ᵀᴴ_ day of _DEC_ 20 0 7 .

*By signing below, each individual executing this Agreement on behalf of a business entity, and each business entity executing this Agreement on behalf of another business entity, represents and warrants that he, she or it is **duly authorized** by Indemnitor  to bind Indemnitor to all of the terms and conditions of this Agreement:*

**ATTEST OR WITNESS:**                                    **BY:**

                                                          **Trocom Construction Corp.**
                                                          Tax I.D. Number 11-2203562
                                                          46-27 54ᵗʰ Road
                                                          Maspeth, NY 11378

By: _[signature]_                                         By: _[signature]_ _____ (Seal)
Salvatore Trovato, Secretary                              Salvatore Trovato, President

Salvatore Trovato
Social Security Number 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
30 Stonehill Drive South
Manhasset, NY 11030

By:_____    By:_____
                                  Salvatore Trovato, Individually

## CORPORATE ACKNOWLEDGMENT

STATE of ___NY_____
                                    ss.
County of ___Queens_____

On this __4th__ day of ___Dec_____, 20_07_, before me personally appeared **Salvatore Trovato** and **Salvatore Trovato** known by me to be the President and Secretary of **Trocom Construction Corp.** ,the corporation described in and which executed the foregoing General Agreement of Indemnity; and who being me duly sworn, depose and say that that they know the seal of said corporation; that the seal affixed to said Agreement is such corporate seal; that it was so affixed by the order of the Board of Directors of said corporation, and that they signed their names thereto by like order.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my OFFICIAL SEAL the day and year first above written.

_____
(Signature of Notary Public)

                    Notary Public, residing at _____
(NOTARY SEAL)       My commission expires _____

RUTH ZEHNWIRTH
Notary Public, State of New York
No. 01ZE9793110
Qualified in Nassau County
Commission Expires July 31, 2010

## INDIVIDUAL ACKNOWLEDGMENT

STATE of ___NY_____
                                    ss.
County of ___Queens_____

On this __4nd__ day of ___Dec_____, 20_07_, before me personally appeared **Salvatore Trovato**, known by me to be the person who is identified in and who executed the foregoing General Agreement of Indemnity, and who being me duly sworn, deposes and says that (s)he executed said Agreement.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my OFFICIAL SEAL the day and year first above written.

_____
(Signature of Notary Public)

                    Notary Public, residing at _____
(NOTARY SEAL)       My commission expires _____

RUTH ZEHNWIRTH
Notary Public, State of New York
No. 01ZE9793110
Qualified in Nassau County
Commission Expires July 31, 2010

7300 A: Unanimous Consent for Sole Officer Corporations and              rev 02/06
Corporations where President and Secretary offices held by same person.
*FOR USE WITH 7300 ONLY*

## ACTION BY UNANIMOUS WRITTEN CONSENT OF THE BOARD OF DIRECTORS

The undersigned, constituting the entire Board of Directors of **Trocom Construction Corp.** (hereinafter called the "Corporation"), hereby consents in writing, without the formality of convening a meeting of the Board of Directors, to the following action of the Corporation.

WHEREAS, the Corporation has agreed to enter into a certain General Agreement of Indemnity in favor of Liberty Mutual Insurance Company, Employers Insurance Company of Wausau (formerly EMPLOYERS INSURANCE OF WAUSAU A Mutual Company), Peerless Insurance Company and/or any other company that is part of or added to the Liberty Mutual Group, severally not jointly, for which Liberty Mutual Surety underwrites surety business (any one or more individually and collectively hereinafter called the "Surety");

WHEREAS, the Corporation has a financial, material, and beneficial interest in the transaction in which (i) **Trocom Construction Corp. ; Salvatore Trovato ;** ii) any of the Indemnitors or Principals' subsidiaries or affiliates, whether present or future, and whether directly or indirectly held; and iii) any other entity or person in response to a request from any Indemnitor or Principal named herein, and, as to all of the foregoing, whether they act alone or in joint venture with others whether or not said others are named herein (individually and collectively hereinafter called the "Principal(s)")      have applied or will apply to the Surety for any surety bonds, undertakings, recognizances, instruments of guarantee or other surety obligation or whatever nature or kind (hereinafter called "Bond(s)");

WHEREAS, **Salvatore Trovato** is the sole officer of the Corporation or is both the President and the Secretary of the Corporation; and

WHEREAS, the Surety has executed or is willing to consider the execution of the Bonds, as Surety, upon being furnished with the written indemnity of the Corporation.

NOW THEREFORE BE IT:

RESOLVED, that **Salvatore Trovato** is authorized and empowered, at any time before or after the Surety's execution of any Bonds, to execute any indemnity agreement(s) that the Surety requires or may require as consideration for the Surety's execution of Bonds on behalf of the Principal;

RESOLVED FURTHER, that said officer is authorized and empowered, at any time before or after the Surety's execution of any Bonds, to execute any and all amendments to any and all indemnity agreement(s); and to execute any other or further agreements relating to any such Bonds or to any collateral that may have been deposited with the Surety in connection therewith; and to take any and all other actions that may be requested or required by the Surety, in connection with any such Bonds;

RESOLVED FURTHER, that **Salvatore Trovato** be, and hereby is, authorized to act as Corporate Secretary of the Company for the purposes of attesting the signature of **Salvatore Trovato** ;

RESOLVED FURTHER, that said Corporate Officer is authorized and empowered to affix the corporate seal to any and all indemnity agreement(s), to any and all amendments to said indemnity agreement(s), and to any other or further agreement(s);

RESOLVED FURTHER, that any and all actions heretofore taken by any representative of the Corporation in order to carry into effect the purposes of the foregoing resolutions, including the execution and delivery of any indemnity agreement(s) are hereby approved, ratified and confirmed; and

FURTHER RESOLVED, that this Action by Unanimous Written Consent of the Board may be executed in one or more counterparts (including by facsimile) and when each Director has executed at least one counterpart, the foregoing resolutions shall be deemed adopted and in full force and effect as of the date hereof.

Dated the _4th_ day of _Dec_ , 20_07_ .

_____

Director

_____

Director

_____

Director

7300 A: Unanimous Consent for Sole Officer Corporations and
Corporations where President and Secretary offices held by same person.
*FOR USE WITH 7300 ONLY*                                                                          rev 02/06

### AMENDMENT #01 TO THE GENERAL AGREEMENT OF INDEMNITY

This Amendment shall be attached to and form part of the General Agreement of Indemnity made and entered into by <u>Trocom Construction Corp.; Salvatore Trovato</u> in favor of the Surety, dated the 4th day of <u>December, 2007</u> and as may have been amended from time to time, (hereinafter "Agreement"). It is hereby agreed that:

1. All capitalized terms not defined in this Amendment shall have the meaning given them in the Agreement.

2. This Amendment shall take effect and form part of the Agreement immediately upon execution.

3. The following individual(s) and/or business entities shall be added to the Agreement as Indemnitor(s) and Principal(s) and shall be bound by all of its terms for all Bonds issued pursuant to the Agreement, whether such Bonds were issued before or after the execution of this Amendment or before or after the date of the Agreement.

   <u>Antoinette Trovato</u>
   <u>Joseph Trovato</u>
   <u>Ali Trovato</u>

4. Pursuant to Paragraph SIXTEENTH of the Agreement, the addition to the Agreement of the Indemnitor(s) named in Paragraph 3 above shall be effected by written amendment executed by such Indemnitor only.

IN WITNESS WHEREOF, we have signed and sealed this 20th day of Sept, 20 11.

By affixing their signatures hereto, each Indemnitor signing on behalf of a business entity warrants that each is duly authorized by Indemnitor to bind Indemnitor hereto.

WITNESS/ATTEST:

By: _____
Name: DOROTHY J WATERS
Title:

WITNESS/ATTEST:

By: _____
Name:
Title:

_Antoinette Trovato, Individually_
(Full Name of Indemnitor)

_30 Stonehill Drive South, Manhasset, NY, 11030_
(Address of Indemnitor)
Tax ID or Social Security Number _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_

By: _____
(Name)

_Joseph Trovato, Individually_
(Full Name of Indemnitor)

_333 Carnation Drive, Farmingdale, NY, 11735_
(Address of Indemnitor)
Tax ID or Social Security Number _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_

By: _____
(Name)

WITNESS/ATTEST:

Ali Trovato, Individually
(Full Name of Indemnitor)

 333 Carnation Drive, Farmingdale, NY, 11735
(Address of Indemnitor)
Tax ID or Social Security Number    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

By: _____
Name:
Title:

By: _ali novato_____
(Name)

**INDIVIDUAL ACKNOWLEDGMENT**

STATE of _____NEW YORK_____
                                                    ss.
County of _____QUEENS_____

On this ___7___ day of _____OCT_____ , 20_11_ , before me personally appeared _____Antoinette Trovato_____
_____ , known by me to be the person who is identified in and who executed the foregoing General Agreement of Indemnity, and who being by me duly sworn, deposes and says that (s)he executed said Agreement.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my OFFICIAL SEAL the day and year first above written.

                                                    _____Ruth Zehnwirth_____
                                                    (Signature of Notary Public)

                              Notary Public, residing at _____
(NOTARY SEAL)                 My commission expires _____
                                                    RUTH ZEHNWIRTH
                                                    Notary Public, State of New York
                                                    No. 01ZE9793110
                                                    Qualified in Nassau County
                                                    Commission Expires 07/31/2014

**INDIVIDUAL ACKNOWLEDGMENT**

STATE of _____New York_____
                                                    ss.
County of _____Nassau_____

On this _20th_ day of _____September_____ , 20_11_ , before me personally appeared _____Joseph Trovato_____
_____ , known by me to be the person who is identified in and who executed the foregoing General Agreement of Indemnity, and who being by me duly sworn, deposes and says that (s)he executed said Agreement.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my OFFICIAL SEAL the day and year first above written.

ELIZABETH A. NEVILLE                              _____Elizabeth G. Neville_____
NOTARY PUBLIC State of New York                    (Signature of Notary Public)
No. 01NE4968590
Certified in Nassau County         Notary Public, residing at _Levittown NY  11756_
(NOTARY SEAL)
Commission Expires July 2, 2014    My commission expires _July 2, 2014_


**INDIVIDUAL ACKNOWLEDGMENT**

STATE of _____New York_____
                                                    ss.
County of _____Nassau_____

On this _20th_ day of _____September_____ , 20_11_ , before me personally appeared _____Ali Trovato_____
_____ , known by me to be the person who is identified in and who executed the foregoing General Agreement of Indemnity, and who being by me duly sworn, deposes and says that (s)he executed said Agreement.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my OFFICIAL SEAL the day and year first above written.

                                                    _____Elizabeth G. Neville_____
                                                    (Signature of Notary Public)
                              Notary Public, residing at _Levittown NY 11756_
(NOTARY SEAL)                 My commission expires _July 2, 2014_

                    ELIZABETH A. NEVILLE
                 NOTARY PUBLIC State of New York
                        No. 01NE4968590
                   Certified in Nassau County
                 Commission Expires July 2, 2014

## AMENDMENT #02 TO THE GENERAL AGREEMENT OF INDEMNITY

This Amendment shall be attached to and form part of the General Agreement of Indemnity made and entered into by <u>Trocom Construction Corp.; Joseph Trovato; Ali Trovato; Antoinette Trovato</u> in favor of the Surety, dated the <u>4th</u> day of <u>December, 2007</u> and as may have been amended from time to time, (hereinafter "Agreement").  It is hereby agreed that:

1. All capitalized terms not defined in this Amendment shall have the meaning given them in the Agreement.

2. This Amendment shall take effect and form part of the Agreement immediately upon execution.

3. The following individual(s) and/or business entities shall be added to the Agreement as Indemnitor(s) and Principal(s) and shall be bound by all of its terms for all Bonds issued pursuant to the Agreement, whether such Bonds were issued before or after the execution of this Amendment or before or after the date of the Agreement.

   <u>Newfound LLC</u>
   _____
   _____

4. Pursuant to Paragraph SIXTEENTH of the Agreement, the addition to the Agreement of the Indemnitor(s) named in Paragraph 3 above shall be effected by written amendment executed by such Indemnitor only.

IN WITNESS WHEREOF, we have signed and sealed this __2__ day of __Oct__, 20 _13_ .

By affixing their signatures hereto, each Indemnitor signing on behalf of a business entity warrants that each is duly authorized by Indemnitor to bind Indemnitor hereto.

WITNESS/ATTEST:

                                 <u>Newfound LLC</u>          (seal)
                                   (Full Name of Indemnitor)

                                   (Address of Indemnitor)
                                   Tax ID or Social Security Number

By: _____ DIANA ESPOSITO, Witness        By: __Joseph Trovato__
                                         Joseph Trovato

                                   Its __Joseph Trovato__
                                      Managing Member

### LIMITED LIABILITY COMPANY ACKNOWLEDGMENT

STATE of __New York__
                            ss.
County of __Queens__
On this __2__ day of __Oct__ , 20 _13_ , before me personally appeared _Joseph Trovato_ _____ , known by me to be the person who is identified in and who executed the foregoing General Agreement of Indemnity, and who being by me duly sworn, deposes and says that (s)he is the Manager of ___Newfound LLC___ _____ , a limited liability company; that (s)he is duly authorized to execute said Agreement; and that (s)he executed said Agreement as the act and deed of said limited liability company.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my OFFICIAL SEAL the day and year first above written.

LINDA BARBATI
Notary Public, State of New York
No. 01BA6181795
Qualified in Queens County
Commission Expires February 11, 20__

_____
(Signature of Notary Public)
Notary Public, residing at _____
My commission expires _____

7300-Add Indemnitor to GAI                                              Rev 12.07

## LIMITED LIABILITY COMPANY RESOLUTIONS

At a meeting of the Members of **Newfound LLC** (hereinafter called the "Company"), duly called and held on the **2** day of **Oct**, 20 **13** , or as otherwise duly authorized, the following Preamble was approved and Resolutions were adopted:

"WHEREAS, the Company has agreed to enter into a certain General Agreement of Indemnity in favor of Liberty Mutual Insurance Company and/or any other company that is part of or added to the Liberty Mutual Group, severally not jointly, for which Liberty Mutual Surety underwrites surety business (individually and collectively hereinafter called the "Surety");

WHEREAS, the Company has a financial, material and beneficial interest in transactions in which (i) **Trocom Construction Corp.; Joseph Trovato; Ali Trovato; Antoinette Trovato**; ii) any of the Indemnitors or Principals' subsidiaries or affiliates, whether present or future, and whether directly or indirectly held; and iii) any other entity or person in response to a request from any Indemnitor or Principal named herein; and, as to all of the foregoing, whether they act alone or in joint venture with others whether or not said others are named herein (individually and collectively hereinafter called "Principal(s)"), have applied or will apply to the Surety for surety bonds, undertakings, recognizances, instruments of guarantee or other surety obligation or whatever nature or kind (hereinafter called the "Bond(s)"); and

WHEREAS, the Surety has executed or is willing to consider the execution of the Bonds, as surety, upon being furnished with the written indemnity of the Company.

NOW THEREFORE BE IT:

RESOLVED, that the Managers authorized to execute documents on behalf of the Company are hereby authorized and empowered, at any time prior or subsequent to the Surety's execution of any Bonds, to execute any indemnity agreement(s) that the Surety requires or may require as consideration for the Surety's execution of Bonds, of whatever kind or nature, on behalf of the Principals;

RESOLVED FURTHER, that the said Managers are authorized and empowered, at any time prior to or subsequent to the Surety's execution of any Bonds, to execute any and all amendments to any and all indemnity agreements; and to execute any other or further agreements relating to any such Bonds or undertakings or to any collateral that may have been deposited with the Surety in connection therewith; and to take any and all other actions that may be requested or required by the Surety, in connections with any such Bonds or undertakings; and

RESOLVED FURTHER, that any and all actions heretofore taken by any representative of the Company in order to carry into effect the purposes of the foregoing resolutions, including the execution and delivery of any indemnity agreement(s) are hereby approved, ratified and confirmed."

We, the undersigned, constituting all of the Members of the Company, agree to and execute these Resolutions effective as of the date listed below.

The titles and/or names of those Managers and/or Members authorized to execute documents on behalf of this Company are:

Joseph Trovato

_____

_____

Dated this **2** day of **Oct**, 20 **13** .

| | | MEMBERSHIP INTEREST |
|---|---|---|
| MEMBER: | | |
| By: _____ | | 33.33% |
| Joseph Trovato, Managing Member | | |
| By: _____ | | 33.33% |
| Rosemary Trovato | | |
| By: _____ | | 33.33% |
| Dawn Giordano | | |
| By: _____ | | ____ |
| By: _____ | | ____ |

Limited Liability Company Resolutions
*FOR USE WITH 7300, 7310*

rev 6/10

**Exhibit C**



# AMENDMENT #03 TO THE
# GENERAL AGREEMENT OF INDEMNITY

This Amendment shall be attached to and form part of the General Agreement of Indemnity made and entered into by Trocom Construction Corp.; Joseph Trovato; Ali Trovato; Antoinette Trovato; Newfound LLC in favor of the Surety, dated the 4th day of December_____, 2007 and as may have been amended from time to time, (hereinafter "Agreement"). It is hereby agreed that:

1. All capitalized terms not defined in this Amendment shall have the meaning given them in the Agreement.

2. This Amendment shall take effect and form part of the Agreement immediately upon execution.

3. The following individual(s) and/or business entities shall be added to the Agreement as Indemnitor(s) and Principal(s) and shall be bound by all of its terms for all Bonds issued pursuant to the Agreement, whether such Bonds were issued before or after the execution of this Amendment or before or after the date of the Agreement.

   Found Property Resources, Inc.
   46-27 54th Road
   Maspeth, NY 11378

   Estate of Salvatore Trovato
   c/o Antoinette Trovato
   30 Stone Hill Road South
   Manhasset, NY 11030

4. Pursuant to Paragraph Seventeen of the Agreement, the addition to the Agreement of the Indemnitor(s) named in Paragraph 3 above shall be effected by written amendment executed by such Indemnitor only.

IN WITNESS WHEREOF, we have signed and sealed this _____ day of _____, 20_____.

By affixing their signatures hereto, each Indemnitor signing on behalf of a business entity warrants that each is duly authorized by Indemnitor to bind Indemnitor hereto.

**ATTEST OR WITNESS:**                          **BY:**

                                               **Found Property Resources, Inc.**
                                               **T.I.N.**
                                               **46-27 54th Road, Maspeth, New York 11378**

By:_____              By:_____
                                               Joseph Trovato, President

**ATTEST OR WITNESS:**                          **BY:**

                                               **Estate of Salvatore Trovato**

By:_____              By:_____
                                               Antoinette Trovato, as fiduciary

## NOTARY ACKNOWLEDGMENT

State of _____)

County of _____)

On _____(Date) before me, _____(Notary), personally appeared _____(Signor), who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her authorized capacity, and that by his/her signature on the instrument the person(s), or the entity(ies) upon behalf of which the person acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of _____ that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____ **(Seal)**

Notary Public residing at: _____
My commission expires: _____

## NOTARY ACKNOWLEDGMENT

State of _____)

County of _____)

On _____(Date) before me, _____(Notary), personally appeared _____(Signor), who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her authorized capacity, and that by his/her signature on the instrument the person(s), or the entity(ies) upon behalf of which the person acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of _____ that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____ **(Seal)**

Notary Public residing at: _____
My commission expires: _____

Add Indemnitor
Rev. 10/14

**Exhibit D**

Exhibit D - Costs

| Job Costs | | | Terms | |
|---|---|---|---|---|
| | | | | |
| All City Recycling | $ 100,000.00 | | COD | Dumping |
| Allocco Recycling | $ 55,000.00 | | COD | Dumping |
| Arbor Consulting | $ 11,500.00 | | COD | Tree Consulting |
| Architectural Stone | $ 95,000.00 | | COD | Stone |
| Ash Tree Service | $ 5,000.00 | | COD | Landscaping |
| Aspro Plumbing | $ 40,000.00 | | Terms | Fountain |
| Bendall Industries | $ 23,400.00 | | COD | Curbs |
| Big Enterprises | $ 25,600.00 | | Deposit | Columns |
| Calpipe | $ 6,000.00 | | COD | Bollards |
| Casa Ready Mix | $ 41,000.00 | | COD | Concrete |
| City Transit Mix | $ 68,000.00 | | COD | Concrete |
| Coastal Pipeline Products | $ 12,500.00 | | COD | Castings |
| Dawn Trucking | $ 32,000.00 | | Weekly | Trucking |
| Deeproot / Silva Cells | $ 17,500.00 | | Deposit | Pavers |
| Double Nickel Contracting | $ 36,500.00 | | 30-days | Trucking |
| Durante Bros Construction | $ 35,000.00 | | COD | Dumping |
| Gaffney Plumbing & Htg Supply | $ 16,000.00 | | COD | Watermain Pipe |
| Greco Bros Ready Mix | $ - | | Terms | Concrete |
| Green Asphalt | $ 1,000.00 | | COD | Asphalt |
| Hyland Data Com | $ 112,081.00 | | Old & New | Electrical |
| Iron Smith -- Deposit | $ 23,000.00 | | COD | |
| Island Pavement Marking | $ 23,000.00 | | COD | Saw Cuts |
| Island Topsoil | $ 8,000.00 | | COD | Planting Mat'l |
| J.P. Hogan Coring | $ 2,500.00 | | COD | Saw Cuts |
| Metro Fab | $ 100,000.00 | | COD | Pipe |
| N.Y. Sand & Stone | $ 20,000.00 | | COD | Stone Fill |
| Net Work Patrol | $ 40,000.00 | | COD | Flagging |
| Newmark Engineering / Miramax | $ 39,400.00 | | COD | Design engineer |
| New York Recycling | $ - | | COD | Dumping |
| On-Site Petroleum | $ 10,500.00 | | COD | Fuel |
| Peak Security | $ 11,000.00 | | Terms | Security |
| R and H Trucking | $ 81,200.00 | | Weekly | Trucking |
| T.Mina Supply | $ 295,000.00 | | COD | Watermain Pipe |
| Twin Peaks Inc. | $ 17,000.00 | | COD | Testing |
| Willets Point Asphalt | $ 115,000.00 | | COD | Asphalt |
| | | $ 1,518,681.00 | | |
| | | | | |
| Trocom Labor & Benefits | | $ 833,450.00 | Weekly | |
| | | | | |
| | | | | |
| **Total Expected Costs** | | $ 2,352,131.00 | | |

**<u>Exhibit E</u>**

## PROMISSORY NOTE

Principal Amount: $5,000,000.00

Effective Date: June __, 2015

Secured by Mortgages on the following properties (the "Properties"): (i) 46-27 54th Road, Maspeth, NY, (ii) 55-54 56th Road, Maspeth, NY (iii) 30 Stonehill Drive So., Manhasset, NY (the "Mortgages")

FOR VALUE RECEIVED, the undersigned, Trocom Construction Corp. (Debtor-in -Possession), Newfound LLC, Found Property Resources Inc., Antoinette Trovato as fiduciary of the Estate of Salvatore Trovato (the "Estate"), Antoinette Trovato (individually), Joseph Trovato and Ali Trovato (individually and collectively, jointly and severally, hereinafter referred to as the "Maker"), hereby jointly and severally and unconditionally promise to pay to the order of Liberty Mutual Insurance Company (the "Payee"), in lawful money of the United States of America and in immediately available funds, all amounts that may be advanced by the Payee pursuant to a written "Memorandum of Understanding" dated June __, 2015 between the Maker and the Payee, the principal sum of FIVE MILLION AND 00/100 DOLLARS ($5,000,000.00) (hereinafter referred to as the "Loan"), together with interest, fees and other expenses, if any, as set forth below.

1.    **Repayment.**

(a)    Commencing on August 1, 2015 and continuing through and including July 1, 2016, on or before the first calendar day of each consecutive month, the Maker shall make monthly interest-only payments to the Payee.

(b)    Commencing on August 1, 2016 through July 1, 2021, on or before the first calendar day of each consecutive month, the Maker shall make monthly payments to the Payee, in the full amount of interest then owing on the Loan, together with an additional payment of $75,000.00 to be applied first against accrued interest and then in reduction of the remaining principal balance of this Note.

(c)    On or before August 1, 2021 (hereinafter, the "Maturity Date"), the Maker shall make payment to the Payee of the remaining principal balance amount of this Note, accompanied by payment of all accrued and unpaid interest, fees, expenses and other sums due and owing under this Note and/or the Mortgage, if any.

(d)    The outstanding principal balance of this Note (together with all unpaid accrued interest, fees, expenses and other sums due and owing under this Note and the Mortgages, if any) shall immediately become due and payable upon the occurrence of any of the following events: (i) The Undersigned shall have transferred, sold or conveyed, or caused to have been transferred, sold or conveyed to any Person, title to any of the Properties, or any part thereof, whether voluntarily, involuntarily or by operation of law, (ii) the filing by any person or entity of any foreclosure or *in rem* proceeding of any kind against the any of the Properties.

(e)     Should the indebtedness represented by this Note or any part hereof be collected at law or in equity, or in bankruptcy, receivership, or any other court proceeding, or should this Note be placed in the hands of attorneys for collection upon default, the Maker agrees to pay, in addition to the principal and interest due and payable hereon, all costs of collecting or attempting to collect this Note, including reasonable attorneys' fees and expenses.

(f)     This Note shall be and remain in full force and effect and in no way impaired until the actual payment thereof to the Payee, its successors or assigns.

2.     **Interest**.     Interest upon the principal balance of this Note shall accrue on all amounts advanced by the Maker under the Loan, from the date of each such advance.  So long as there is no Event of Default, as defined below, interest on the principal balance of this Note shall accrue at the rate of 3.09 percent per annum.

3.     **Prepayment**.  This Note may be prepaid in whole or in part at any time without premium or penalty.  All partial payments shall be applied first against accrued and unpaid interest and then against outstanding principal.

4.     **Default**.

Any failure to timely pay any principal or interest owing under this Note, and/or any material breach by the Maker of this Note or any of the Mortgages, which remains uncured after ten (10) calendar days after written notice to the Maker, shall be deemed an "Event of Default."  Should an Event of Default occur, all amounts outstanding hereunder shall become immediately due and payable, and shall accrue interest at the rate of nine (9%) percent per annum (the "Default Rate").  Notice under this paragraph shall be deemed made and received when sent by or on behalf of the Payee by email mail to:

(i)     For Antoinette Trovato and the Estate of Salvatore Trovato: Adam P. Wofse, Esq., LaMonica Herbst & Maniscalco, LLP, 3305 Jerusalem Avenue, Wantagh, NY 11793, AWofse@lhmlawfirm.com

(ii)    For Trocom Construction Corp. (Debtor-in -Possession): C. Nathan Dee, Esq. and Bonnie Pollack, Cullen and Dykman LLP, 100 Quentin Roosevelt Boulevard, Suite 402, Garden City, New York 11530, NDee@CullenandDykman.com and bpollack@CullenandDykman.com

(iii)   For Newfound LLC, Found Property Resources Inc., and Joseph Trovato: Joseph Trovato, c/o Trocom Construction Corp., 46-27 54th Road, Maspeth, NY 11378

(iv)    Ali Trovato, 333 Carnation Drive, Farmingdale, NY 11735.

5.     Miscellaneous.

(a)  The Maker hereby waives the right to any jury trial in any action, proceeding or counterclaim brought against the Maker under this Note.

(b) The Maker's obligations under this note shall not be subject to any setoff or recoupment.  In any proceeding under this Note, the Maker covenants not to plead or interpose any counterclaims or crossclaims, and shall not raise any defense other than actual payment.

-2-

(c) The Maker acknowledges this Note is secured by the Mortgages.

(d) This Note is binding upon the Maker and their successors, assigns, heirs and representatives and shall inure to the benefit of the Payee and its successors and assigns.

(e) This Note and the rights and obligations of the parties hereto shall be subject to and governed by the laws of the State of New York. The Maker irrevocably agrees to submit to the jurisdiction of the courts of the State of New York and of any federal court located within the State of New York having subject matter jurisdiction.

(f) The Maker has had the opportunity to review this Note with the Maker's own counsel, and agrees that the doctrine of contra proferentem shall not apply to this Note. Rather, the Note shall be interpreted in favor of securing the rights of the Payee to repayment in full. The Maker hereby waives and release all claims and/or defenses against Payee, including all of its affiliates, predecessors in interest, parent corporations, subsidiaries, successors-in-interest and assigns and all of Payee's present and future directors, officers, employees, agents and attorneys, from any and all claims, causes of action, suits and damages (including claims for attorneys' fees) which any or all of the Makers ever had or now has–and to the maximum degree allowed by law, any and all future claims-against any or all of said parties whether arising out of this Note, the Mortgages, the Memorandum of Understanding, or any other matter, even if unrelated to any the subject matter of the referenced agreements.

(g) This Note may not be changed orally, but only by an agreement in writing, signed by the party against whom enforcement of any waiver, change, modification or discharge is sought.

(h) In the event that any Maker fails to sign this Note, or if any Maker's signature is invalid or nonbinding for any reason (including but not limited to invalidity under the Bankruptcy Code), this Note and the Mortgages shall nevertheless be and remain binding and enforceable as to all other Makers.

PRIOR TO SIGNING THIS NOTE, THE MAKER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS NOTE. THE MAKER AGREES TO THE TERMS OF THE NOTE.

THE MAKER ACKNOWLEDGES RECEIPT OF A COMPLETED AND FULLY-EXECUTED COPY OF THIS NOTE.

IN WITNESS WHEREOF, the undersigned has caused this Note to be duly executed by its authorized officers, members, managers or individuals, as applicable, as of the day and year above written.

5328045.4

Trocom Construction Corp. (DIP)

By: _____
        Joseph Trovato, President


Newfound LLC

By: _____
        Joseph Trovato, Managing Member


Found Properties Resources, Inc.

By: _____
        Joseph Trovato, President


_____
Joseph Trovato

-4-

_____          _____
Antoinette Trovato                                    Antoinette Trovato, as fiduciary of
                                                              The Estate of Salvatore Trovato


_____
Ali Trovato

-5-

## ACKNOWLEDGMENTS

STATE OF NEW YORK          )
                          )          ss:
COUNTY OF                  )


On this, the _____ day of _____, 2015, before me, a Notary Public in and for the State and County aforesaid, personally appeared _____, known to me (or satisfactorily proven) and who acknowledged themselves to be the persons whose name is subscribed to the within instrument and acknowledged that they executed the same for the purposes therein contained.

In witness whereof, I hereunto set my hand and official seal.


_____
Notary Public


STATE OF NEW YORK          )
                          )          ss:
COUNTY OF                  )


On this, the _____ day of _____, 2015, before me, a Notary Public in and for the State and County aforesaid, personally appeared _____, who acknowledged himself/herself to be the _____ of _____, and that he/she as such _____, being authorized to do so, executed the foregoing instrument for the purposes therein contained by signing the name of the company by himself/herself as _____.

In witness whereof, I hereunto set my hand and official seal.


_____
Notary Public

STATE OF NEW YORK          )
                          )          ss:
COUNTY OF                  )


On this, the _____ day of _____, 2015, before me, a Notary Public in and for the State and County aforesaid, personally appeared _____, who acknowledged himself/herself to be the _____ of _____, and that he/she as such _____, being authorized to do so, executed the foregoing instrument for the purposes therein contained by signing the name of the company by himself/herself as _____.

In witness whereof, I hereunto set my hand and official seal.


_____
Notary Public

[acknowledgments continued on the following page]

5328045.4

STATE OF NEW YORK )
) ss:
COUNTY OF )

On this, the _____ day of _____, 2015, before me, a Notary Public in and for the State and County aforesaid, personally appeared _____, who acknowledged himself/herself to be the _____ of _____, and that he/she as such _____, being authorized to do so, executed the foregoing instrument for the purposes therein contained by signing the name of the company by himself/herself as _____.

In witness whereof, I hereunto set my hand and official seal.

_____
Notary Public

STATE OF NEW YORK )
) ss:
COUNTY OF )

On this, the _____ day of _____, 2015, before me, a Notary Public in and for the State and County aforesaid, personally appeared _____, who acknowledged himself/herself to be the _____ of _____, and that he/she as such _____, being authorized to do so, executed the foregoing instrument for the purposes therein contained by signing the name of the company by himself/herself as _____.

In witness whereof, I hereunto set my hand and official seal.

_____
Notary Public

STATE OF NEW YORK )
) ss:
COUNTY OF )

On this, the _____ day of _____, 2015, before me, a Notary Public in and for the State and County aforesaid, personally appeared _____, who acknowledged himself/herself to be the _____ of _____, and that he/she as such _____, being authorized to do so, executed the foregoing instrument for the purposes therein contained by signing the name of the company by himself/herself as _____.

In witness whereof, I hereunto set my hand and official seal.

_____
Notary Public

[acknowledgments continued on the following page]

5328045.4

| STATE OF NEW YORK | ) | |
|---|---|---|
| | ) | ss: |
| COUNTY OF | ) | |

On this, the _____ day of _____, 2015, before me, a Notary Public in and for the State and County aforesaid, personally appeared _____, who acknowledged himself/herself to be the _____ of _____, and that he/she as such _____, being authorized to do so, executed the foregoing instrument for the purposes therein contained by signing the name of the company by himself/herself as _____.

In witness whereof, I hereunto set my hand and official seal.

_____
Notary Public

-8-

**Exhibit F**

# MORTGAGE, SECURITY AGREEMENT AND ASSIGNMENT OF LEASES AND RENTS

**By**

# NEWFOUND LLC

**To**

# LIBERTY MUTUAL INSURANCE COMPANY,
## a Massachusetts corporation

**Dated:  June _____, 2015**

Record and return to:
Chiesa Shahinian & Giantomasi PC
Attn: Jonathan Bondy, Esq.
One Boland Drive
West Orange, NJ 07052

THIS SECURITY INSTRUMENT COVERS REAL PROPERTY IMPROVED, OR TO BE IMPROVED, BY A COMMERCIAL STRUCTURE

.

5335243.3

# MORTGAGE

This Mortgage, Security Agreement and Assignment of Leases and Rents is made on this __ day of June, 2015

BY                    **Newfound LLC**, a New York limited liability company having a place of business at 46-27 54th Road, Maspeth, New York 11378 (the "<u>Mortgagor</u>");

IN FAVOR OF      **LIBERTY MUTUAL INSURANCE COMPANY**, a Massachusetts corporation having an address at 450 Plymouth Meeting Road, Suite 400, Plymouth Meeting, Pennsylvania, 19462, New York, New York 10036 (the "<u>Mortgagee</u>").

1.       Debt Obligations.

      (a)    <u>Indemnity Agreement</u>**.**    Trocom Construction Corp., and Salvatore Trovato (the "<u>Indemnitors</u>") executed and delivered to Mortgagee a General Agreement of Indemnity, dated December 4, 2007 with Amendments No. 01 and 02 and 03 dated September 20, 2011 and October 2, 2013 and June [     ], 2015     respectively (collectively the "<u>Indemnity Agreement</u>").

      (b)    <u>Bonds</u>.      In reliance upon the Indemnitors execution of the Indemnity Agreement, the Mortgagee issued one or more Bonds (as defined in the Indemnity Agreement) at the request of and on behalf of Trocom Construction Corp., as principal, in favor of the New York City Economic Development Corporation, as obligee, in connection with the construction of downtown Brooklyn streetscape, Flatbush Avenue project.

      (c)    <u>Promissory Note</u>.    In accordance with their obligations under a Memorandum of Understanding, Trocom Construction Corp.; Newfound LLC; Found Properties Resources, Inc. LLC; Antoinette Trovato as fiduciary of the Estate of Salvatore Trovato, Antoinette Trovato, Joseph Trovato and Ali Trovato (individually and collectively, jointly and severally the "<u>Maker</u>") are contemporaneously herewith executing and delivering to the Mortgagee a Promissory Note dated the date hereof in the original principal amount of Five Million and 00/100 ($5,000,000.00) Dollars (the "<u>Note</u>"). This Mortgage, the Note, together with the Indemnity Agreement, the Memorandum of Understanding and any other documents and instruments executed and delivered by the Mortgagor and/or the Indemnitors and/or the Maker   are collectively referred to herein as the "<u>Indemnity Documents</u>").

      (d)    <u>Obligations</u>.    The Mortgagor has agreed to execute and deliver this Mortgage in favor of Mortgagee to secure the Indemnitors and/or Maker's obligations under the Indemnity Documents. Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Indemnity Documents.

2.      Property Mortgaged.

The Mortgagor has granted, bargained and sold, mortgaged, warranted and conveyed and by these presents does hereby grant, bargain and sell, mortgage, warrant and convey the Property (as hereinafter defined) to the Mortgagee and its successors and assigns.  When all of the Obligations (as hereinafter defined) have been performed and satisfied in full, the Mortgagee's rights under this Mortgage will end.  The Mortgagee will then cancel this Mortgage at the Mortgagor's cost and expense including without limitation, reasonable attorney and filing fees.

The Property includes: (i) the land commonly known as 55-54 56 Road, in the Town of Maspeth, County of Queens, State of New York (Section 14, Block 2519, Lot 1); (ii) all buildings and other improvements that are now, or will be, located on the land, (iii) all fixtures and personal property that are now, or will be, attached to the land or building(s); (iv) all condemnation awards and insurance proceeds relating to the land and building(s); (v) all other rights that the Mortgagor has as owner of the Property; and (vi) all of Mortgagor's rights, title and interest in and to any and all existing or future leases or other agreements for the use of occupancy of all or any portion of the Premises (each a "Lease" and collectively the "Leases") and all rents, security deposits, guarantees, and other proceeds and benefits of such Leases (collectively, "Rents"), as well as any sales contracts (including any deposit funds paid thereunder), in each case relating to or arising from the Property.  The legal description of the Property is set forth on Exhibit A attached hereto and made a part hereof. This Mortgage and Security Agreement is to be filed with the City Register of the City of New York, County of Queens, as a financing statement pursuant to Section 9-402 of the Uniform Commercial Code, and Mortgagee shall have all of the rights and remedies, in addition to those specified herein or under any of the other Indemnity Documents, of a secured party under the Uniform Commercial Code.

3.      Rights Given to the Mortgagee.

(a)      The Mortgagor has agreed to execute and deliver this Mortgage to secure the payment of the amounts due under the Indemnity Documents, plus all fees, charges, costs, expenses and other amounts payable thereunder, together with all amounts, sums and expenses paid or incurred hereunder by the Mortgagee according to the terms hereof, or in defending, maintaining, preserving or protecting the lien of this Mortgage, the priority thereof, or the Property, all charges and expenses of collection incurred by the Mortgagee, including court costs and attorney's fees and disbursements, and all other sums which may become due and payable to the Mortgagee hereunder or which may be secured by this Mortgage, and all other obligations and liabilities of the Mortgagor under this Mortgage and all extensions and any renewals of and substitutions for the foregoing, including all amendments, modifications and supplements thereto (collectively, the "Obligations").

(b)      **Notwithstanding the foregoing, the maximum amount of principal indebtedness which is or under any contingency may be secured by this Mortgage is $2,000,000.00 (the "Secured Amount"), together with interest thereon**

**and all amounts, sums, costs and other expenses paid or incurred by the Mortgagee in defending, maintaining, preserving or perfecting the lien of this Mortgage, the priority thereof, or the Property, and all charges and expenses of collection incurred by the Mortgagee in respect of this Mortgage, including court costs and attorney's fees and disbursements**.

4.    **Warranties and Promises.**    The Mortgagor represents and warrants, and makes the following promises, to the Mortgagee:

(a)    **Indemnity Documents and Mortgage.** Mortgagor will comply with all of the terms of this Mortgage and the other Indemnity Documents to which the Mortgagor is a party.

(b)    **Payments.** Mortgagor will perform all Obligations and make all payments required by this Mortgage and the other Indemnity Documents to which Mortgagor is a party.

(c)    **Ownership.** Mortgagor is the sole and rightful owner of the Property as set forth in Section 2 hereof.

(d)    **Liens and Taxes.** Mortgagor will pay all liens, taxes, assessments and other governmental charges made against the Property when due. Mortgagor will not claim any deduction from the taxable value of the Property because of this Mortgage.  Mortgagor will not claim any credit against any payment made under this Mortgage, or any other Indemnity Documents for any taxes paid on the Property.

(e)    **Insurance.**  Mortgagor will keep the Property insured against loss by fire and other risks included in the standard form of extended coverage insurance. The amounts must be reasonably acceptable to the Mortgagee. Mortgagor will also maintain flood insurance or other types of insurance if required by the Mortgagee. The policies shall name the Mortgagee as additional insured and loss payee. Mortgagor will notify the Mortgagee in the event of any loss or damage to any Property and all insurance proceeds shall be immediately paid to the Mortgagee, subject to the rights of any prior lienholders. At the Mortgagee's sole and absolute discretion, the insurance proceeds may be applied to the Obligations, or advanced, in accordance with the Mortgagee's procedures therefor, to the Mortgagor to repair and restore the Property if practical to do so. This will not delay the due date for any payment under this Mortgage, or any other Indemnity Documents.

(f)    **Repairs.**    Mortgagor will keep the Property in good repair, neither damaging nor abandoning it.  Mortgagor will allow the Mortgagee to inspect the Property upon reasonable notice to the Mortgagor.

(g)    **Statement of Amount Due.**    Upon written request of the Mortgagee, Mortgagor will certify to the Mortgagee in writing within ten (10) days of the Mortgagee's request: (a) any amounts due and outstanding under this Mortgage or any other Indemnity Documents, and (b) whether or not the Mortgagor has any defenses,

5335243.3

setoffs or counterclaims to her obligations under this Mortgage or any other Settlement Documents.

(h)    **Rent**. Mortgagor will not accept rent from any tenant on the Property for more than one month in advance.

(i)    **Lawful Use; Environmental Indemnity.**    Mortgagor will use the Property in compliance with applicable all laws, statutes, regulations, ordinances and any requirements of any governmental authority (collectively, "<u>Laws</u>"), including without limitation, all Laws relating to the environmental or human or health safety. Mortgagor will, and hereby does, indemnify, defend and hold harmless the Mortgagee and its affiliates and subsidiaries and each of their respective employees, directors, shareholders, officers, members, principals, partners, agents and representatives, and their respective successors and assigns (each, an "<u>Indemnified Party</u>"), from and against any and all liabilities, losses, costs, claims, suits, expenses or damages (collectively, "<u>Losses</u>") which any Indemnified Party may incur as a result of, arising out of or in connection with (1) operations or conduct of business on the Property by the Mortgagor, (2) any alleged or actual violation of any of the foregoing covenants in this subsection (i), (3) any disposal, release or threatened release of any contaminants or hazardous substance or the presence or removal of an underground storage tank on, from or under any Property, or the presence of any contaminants or hazardous substance which has come to be located on or under any Property from another location, (4) any injury to human health, or safety (including wrongful death), or the environment by reason of the condition of, or activities on, or under, any Property; (5) any violation, or alleged violation, of any Law at any Property; (6) any lawsuit, litigation, proceeding, arbitration, demand or other claim asserted, brought, settlement reached, or governmental order relating to any contaminants or hazardous substance on, from, under or affecting any Property; or (7) any lien imposed upon any Property in favor of any governmental authority as a result of the presence, disposal, release or threat of release of contaminants or hazardous substance on, from, under or affecting any Property.

(j)    **Permits.**    The Mortgagor hereby assigns, transfers and sets over to the Mortgagee all of the Mortgagor's right, title, interest, benefit and privileges (the "<u>Rights</u>"), but none of the duties or obligations, in, to and under the Permits and Approvals (as defined below); <u>provided</u>, <u>however</u>, that so long as there shall not have occurred a Default (as defined below), the Mortgagor shall have the right to use, exercise and enjoy all of its rights and privileges under the Permits and Approvals.  As used herein, the term "<u>Permits and Approvals</u>" means all permits, approvals, licenses, concessions, registrations or other rights issued or granted, or hereafter to be issued or granted, by any federal, state or local governmental authority and relating to or affecting any Property and/or the business or operations now or hereafter being conducted thereon, and any renewals, extensions and modifications thereof.  Upon the occurrence of a Default, the Mortgagee shall have the right, but no duty or obligation, at its option and in its sole discretion, to exercise any and all of the Mortgagor's rights, privileges or powers under, or otherwise to use or deal with, any or all of the Permits and Approvals. The Mortgagee shall not be deemed to have assumed, and shall be under no obligation

to perform or discharge, any duty or obligation under any of the Permits or Approvals by reason of this assignment or this Mortgage.  The Mortgagor shall, and hereby does, indemnify, defend and hold harmless each Indemnified Party from and against any and all Losses which any Indemnified Party may incur as a result of, arising out of or in connection with (1) any Permit or Approval, (2) this assignment of the Permits and Approvals, or (3) any claims or demands whatsoever which may be asserted against any Indemnified Party in connection with any alleged assumption by the Mortgagee of any obligation or undertaking to perform or discharge any covenant, duty or condition contained in any Permit and Approval.

Notwithstanding the foregoing provisions of this subsection (j), if and to the extent that any of the Permits and Approvals or any Rights thereunder are not capable of being transferred to the Mortgagee without the approval, consent or waiver of such third party, including any governmental authority, or if the transfer of such Permits and Approvals or any Rights thereunder would constitute a breach of any obligation thereunder, or a violation thereof or any applicable law, unless the approval, consent or waiver of such third person is obtained, then, without limiting the rights and remedies of the Mortgagee contained herein or in any of the other Settlement Documents, this Mortgage shall not constitute an agreement to transfer same unless and until such approval, consent or waiver has been obtained.  With respect to such Permits and Approvals and Rights thereunder for which an approval, consent or waiver is required, the Mortgagor shall: (i) at all times perform and comply with the terms and provisions thereof and in accordance with all applicable laws; (ii) promptly upon demand by the Mortgagee, obtain the necessary  approval, consent or waiver and/or cooperate with the Mortgagee in any arrangements designed to provide the Rights to the Mortgagee; and (iii) promptly upon demand by the Mortgagee, take all such actions and do or cause to be done all such things as are necessary or proper so that the value of such Permits and Approvals and Rights thereunder are preserved and inures to the benefit of the Mortgagee.

(k)    **Warranty of Title.**  Mortgagor is lawfully seized of an indefeasible estate in fee simple in the Property and will warrant and forever defend the title thereof unto the Mortgagee against all lawful claims whatsoever.

(l)    **No Further Financing.**  Except for this Mortgage, the Mortgagor shall not, without the prior written consent of the Mortgagee which consent may be withheld in its sole and absolute discretion, place or cause or permit to be placed on the Property any mortgage, lien or other encumbrance securing or given as security for a debt or obligation, or cause or permit the Property to be used or to serve as collateral for any reason.

(m)    **Leases.**  Except for any existing lease which has been previously disclosed to and approved by the Mortgagee (the "Existing Lease"), the Mortgagor shall not lease, sublease or consent to the leasing or subleasing or assignment of a lease by any tenant of all or any part of the Property, or consent to the amendment, modification or termination of the Existing Lease, except for increases in rent, without the prior

5335243.3

review and express prior written consent (both as to the form and substance thereof) of the Mortgagee.

5. **Security Interest**. This Mortgage further creates a security interest in the personal property and fixtures included in the Property and constitutes a security agreement and financing statement under Article 9 of the Uniform Commercial Code for the State of New York.  The Mortgagor shall file and refile such financing statements or other security agreements as the Mortgagee shall require from time to time with respect to such fixtures and other personal property and assets included in the Property.  The Mortgagor hereby authorizes the Mortgagee to file such financing statement or statements and any amendments thereto pursuant to said Uniform Commercial Code as the Mortgagee may deem necessary to perfect such interest or right in its favor at the Mortgagor's sole cost and expense.

6. **Assignment of Leases and Rents**.    Mortgagor    hereby    assigns    to Mortgagee, as further security for the payment and satisfaction of the Obligations, the Rents together with all Leases and other documents evidencing Rents now or hereafter in effect and any and all deposits held as security under said Leases, and shall, upon demand, deliver to the Mortgagee an executed counterpart of each such Lease or other document. Nothing contained in the foregoing sentence shall be construed to bind the Mortgagee to the performance of any of the covenants, conditions or provisions contained in any such Lease or other document or otherwise to impose any obligation on Mortgagee (including any liability under the covenant of quiet enjoyment contained in any Lease or in any law of the State of New York in the event that any tenant shall have been joined as a party defendant in any action to foreclose this Mortgage and shall have been barred and foreclosed thereby of all right, title and interest and equity of redemption in the Property), except that the Mortgagee shall be accountable for any money actually received pursuant to such assignment. Mortgagor hereby further grants to Mortgagee the right (a) to enter upon and take possession of the Property for the purpose of collecting said Rents; (b) to dispossess by the usual summary proceedings any tenant defaulting in payment thereof to Mortgagee; (c) to let the Property, or any part thereof; and (d) to apply said Rents, after payment of all necessary charges and expenses on account of the Obligations; and (d) to hold any of said Rents in excess of the existing Obligations as security for Mortgagor's performance of its future Obligations under the Indemnity Documents. Such assignment and grant shall continue in effect until the Obligations are paid in full, the execution of this Mortgage constituting and evidencing the irrevocable consent of Mortgagor to the entry upon and taking possession of the Property by Mortgagee pursuant to such grant whether foreclosure has been instituted or not and without applying for a receiver. Mortgagee agrees to hold said Rents in trust and to use the same first payment of the cost of the improvements, as required under the trust fund provision of Section 13 of the New York Lien Law, and then in payment of premiums for insurance required hereunder, Impositions, late charges and other sums required to be paid by Mortgagor to Mortgagee hereunder, and then to payment of the

5335243.3

remaining Obligations under the Indemnity Documents. Mortgagor hereby appoints Mortgagee as its attorney-in-fact, coupled with an interest, to receive and collect all Rent, additional rent and other sums due under the terms of each Lease and other documents evidencing Rents, now or hereafter in effect, and to direct any tenant, by written notice or otherwise hereafter, in effect, to forward such Rent, additional rent or other sums by mail or in person to Mortgagee, and to execute and deliver all such instruments in the name and on behalf of the Mortgagor.

7.    **Eminent Domain**.  All or part of the Property may be taken by a government entity for public use.  If this occurs, the Mortgagee agrees that any compensation shall be paid over to the Mortgagee to be applied against the Obligations.  This will not delay the due date for any further payment under this Mortgage or any of the other Settlement Documents.

8.    **Payments Made for the Mortgagor**.  If the Mortgagor does not make all of the repairs or payments as agreed in this Mortgage, the Mortgagee may do so for the Mortgagor.  The cost of these repairs and payments will be reimbursed to the Mortgagee upon demand.

9.    **Default.**  The Mortgagor will be in default ("Default") under this Mortgage if:

(a)    there occurs a default beyond the expiration of any applicable notice, grace or cure period under the Note;

(b)    the Mortgagor fails to make any payment required under this Mortgage or fails to obtain and/or maintain insurance required under Section 4(e) of this Mortgage and such failure has not been cured within ten (10) business days after receiving written notice from the Mortgagee of such failure;

(c)    the Mortgagor fails to fulfill or keep any obligation or promise the Mortgagor undertakes under the provisions of Section 4(l) or 4(m);

(d)    the Mortgagor fails to fulfill or keep any other obligation or promise the Mortgagor undertakes in this Mortgage and such failure has not been cured within thirty (30) days after receiving written notice from Mortgagee of such failure, except that with respect to such defaults which are curable but which are incapable of being cured in said thirty (30) day period, the Mortgagor shall commence to cure such default within thirty (30) days, shall proceed promptly and diligently to cure the same and shall complete such cure within sixty (60) days after such notice date;

(e)    the Mortgagor is no longer the sole owner of the Property;

(f)    the holder of any lien on any Property starts foreclosure proceedings which are not dismissed within sixty (60) days after the filing thereof; or

(g)    bankruptcy, insolvency or receivership proceedings are started by or against the Mortgagor which are not dismissed within sixty (60) days after the filing thereof.

10.    **Payments Due Upon Default.**  If the Mortgagor is in Default, the Mortgagor must immediately pay any and all amounts owed to the Mortgagee under this Mortgage and the Mortgagee's costs of collection and reasonable attorneys' fees upon demand therefor by the Mortgagee.

11.    **Mortgagee's Rights Upon Default.**  If the Mortgagor is in Default, the Mortgagee will have all rights given by law and/or set forth in this Mortgage or any of the other Settlement Documents.  This includes the right to do any one or more of the following:

(a)    take possession of and manage the Property or any portion thereof, including the collection of rents and profits, if any;

(b)    have a court appoint a receiver to accept rent for the Property (the Mortgagor consents to this);

(c)    start a court action, known as foreclosure, which will result in a sale of the Property to reduce the Mortgagor's obligations under this Mortgage and the other Settlement Documents; and

(d)    sue the Mortgagor for any money that the Mortgagor owes to the Mortgagee.

12.    **Notices.**  Copies of all notices to Mortgagee shall be sent to Chiesa Shahinian & Giantomasi PC, One Boland Drive, West Orange, NJ 07052, Attention: Jonathan Bondy, Esq. All notices to the Mortgagor shall be sent to the address set forth at the beginning of this Mortgage, with a copy to [                         ], Attention: [         ] All notices and copy notices must be in writing and personally delivered or sent by certified mail, return receipt requested or by nationally recognized overnight courier service, to the addresses given in this Mortgage.  Address changes may be made upon notice to the other party.

13.    **No Waiver by Mortgagee.**  The Mortgagee may exercise any right under this Mortgage or under any law even if the Mortgagee has delayed in exercising that right or has agreed in an earlier instance not to exercise that right.  The Mortgagee does not waive its right to declare that the Mortgagor is in default by making payments or incurring expenses or otherwise performing the Mortgagor's obligations on the Mortgagor's behalf.

14.    **Legally Binding.**  This Mortgage is legally binding upon the Mortgagor and all who succeed to her responsibilities.

15.    **No Oral Changes.**  This Mortgage can only be changed by an agreement in writing signed by the Mortgagor and the Mortgagee.

5335243.3

16.    **Copy Received**.  THE MORTGAGOR ACKNOWLEDGES RECEIPT OF A TRUE COPY OF THIS MORTGAGE WITHOUT CHARGE.

17.    **Discharge.**  This Mortgage shall not be discharged until all of the Obligations have been paid in full.

18.    **Governing Law.** This Mortgage shall be governed by the laws of the State of New York without giving effect to the principles of conflicts of law. Any claim, action or proceeding arising out of or relating to this Mortgage shall be commenced and maintained exclusively in the courts of the State of New York, or in any federal court in the State of New York, and in no other court or forum.

19.    **Miscellaneous**.

    (a)    **Commercial Property.**  This Mortgage covers real property principally improved by a commercial structure.

    (b)    **Trust Fund.**  Pursuant to Section 13 of the Lien Law of the State of New York, Mortgagor shall receive any advances secured by this Mortgage and shall hold the right to receive such advances as a trust fund to be applied first for the purposes of paying the cost of any improvement and shall apply such advances first to the payment of the cost of any such improvement on the Property before using any part of the total of the same for any other purpose.

    (c)    **Sums Deemed To Be Interest**. Any sums, including and prepayment premiums, late charges or liquidated damages, that may become due and payable pursuant to the terms of this Mortgage and/or any of the other Indemnity Documents that are in the nature of interest: (i) shall for the purpose of determining the amount of mortgage recording tax due and payable on this Mortgage, be considered as additional interest, whether or not so denominated, (ii) shall be secured by the lien of this Mortgage to the fullest extent possible without causing this Mortgage to be covered by Section 256 of the tax Law of the State of New York, and (iii) shall not be deemed principal and shall not accrue any interest.

    (d)    **New York Real Property Law.**  The Mortgagee shall have all of the rights set forth in Section 254 of the New York Real Property Law in addition to all of the Mortgagee's rights in this Mortgage, even if the rights are different from each other.

    (e)    **Non-Judicial Foreclosure**.    To the extent permitted by law, Mortgagee may choose to utilize the procedures set forth in Article 14 of the Real Property Actions and Proceedings Law of New York to commence a non-judicial foreclosure of this Mortgage by power of sale. To the extent permitted by law, Mortgagor waives any right granted pursuant to Section 1421 or any other provision of the Real Property Actions and Proceedings Law of New York to challenge the Mortgagee's election to enforce this Mortgage by means of such non-judicial foreclosure by power of sale. If the Property consists of two or more distinct parcels, all of such parcels shall be sold as one parcel, unless Mortgagee shall elect otherwise.

5335243.3

(f)    **291-F Agreement**.  This Mortgage is intended to be, and shall operate as, the agreement described in Section 291-f of the Real Property Law of the State of New York and Mortgagee shall be entitled to the benefits afforded thereby. Mortgagor shall (unless such notice is contained in such tenant's Lease) deliver notice of this Mortgage in form and substance reasonably acceptable to Mortgagee, to all present and future holders of any interest in any Lease of the Premises or any portion thereof, by assignment or otherwise, and shall take such other action as may now or hereafter be reasonably required to afford Mortgagee the full protections and benefits of Section 291-f of the Real Property Law of the State of New York.

20.    **Subordinate Mortgage**.    This mortgage is subject and subordinate to that certain Mortgage and Note Consolidation, Modification and Extension Agreement in the principal sum of Four Million Seven Hundred Fifty Thousand and 00/100 ($4,750,000.00) Dollars between Newfound LLC and M&T Bank dated February 16, 2012 and recorded on April 10, 2012 in CRFN: 2012000140677 in the Registers Office of the County of Queens.

21.    **Signatures.**  The Mortgagor agrees to the terms of this Mortgage.


IN WITNESS WHEREOF, the Mortgagor has executed and delivered this Mortgage as of the day and year first above written.


Newfound LLC, a New York limited liability company


By: _____
Name:
Title:

STATE OF NEW YORK    )
                                          ss:
COUNTY OF                    )


On the _____ day of _____ in the year 2015, before me, the undersigned personally appeared [                    ], personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her capacity, and that by his/her signature on the instrument, the individual or the person upon behalf of which the individual acted, executed the instrument.


_____

Notary public

5335243.3

EXHIBIT A

Description of Property

# MORTGAGE, SECURITY AGREEMENT AND ASSIGNMENT OF LEASES AND RENTS

**By**

## FOUND PROPERTY RESOURCES, INC.

**To**

## LIBERTY MUTUAL INSURANCE COMPANY, A Massachusetts corporation

**Dated:  June _____, 2015**

Record and return to:
Chiesa Shahinian & Giantomasi PC
Attn: Jonathan Bondy, Esq.
One Boland Drive
West Orange, NJ 07052

THIS SECURITY INSTRUMENT COVERS REAL PROPERTY IMPROVED, OR TO BE IMPROVED, BY A COMMERCIAL STRUCTURE

.

5335711.3

# MORTGAGE

This Mortgage, Security Agreement and Assignment of Leases and Rents is made on this __ day of June, 2015

BY **FOUND PROPERTY RESOURCES, INC.**, a New York corporation having a place of business at 46-27 54th Road, Maspeth, New York 11378 (the "Mortgagor");

IN FAVOR OF **LIBERTY MUTUAL INSURANCE COMPANY**, a Massachusetts corporation having an address at 450 Plymouth Meeting Road, Suite 400, Plymouth Meeting, Pennsylvania, 19462, New York, New York 10036 (the "Mortgagee").

1. Debt Obligations.

 (a) Indemnity Agreement**.** Trocom Construction Corp., and Salvatore Trovato (the "Indemnitors") executed and delivered to Mortgagee a General Agreement of Indemnity, dated December 4, 2007 with Amendments No. 01 and 02 and 03 dated September 20, 2011 and October 2, 2013 and June [  ], 2015 respectively (collectively the "Indemnity Agreement").

 (b) Bonds. In reliance upon the Indemnitors execution of the Indemnity Agreement, the Mortgagee issued one or more Bonds (as defined in the Indemnity Agreement) at the request of and on behalf of Trocom Construction Corp., as principal, in favor of the New York City Economic Development Corporation, as obligee, in connection with the construction of downtown Brooklyn streetscape, Flatbush Avenue project.

 (c) Promissory Note. In accordance with their obligations under a Memorandum of Understanding, Trocom Construction Corp.; Newfound LLC; Found Properties Resources, Inc. LLC; Antoinette Trovato as fiduciary of the Estate of Salvatore Trovato, Antoinette Trovato, Joseph Trovato and Ali Trovato (individually and collectively, jointly and severally the "Maker") are contemporaneously herewith executing and delivering to the Mortgagee a Promissory Note dated the date hereof in the original principal amount of Five Million and 00/100 ($5,000,000.00) Dollars (the "Note"). This Mortgage, the Note, together with the Indemnity Agreement, the Memorandum of Understanding and any other documents and instruments executed and delivered by the Mortgagor and/or the Indemnitors and/or the Maker  are collectively referred to herein as the "Indemnity Documents").

 (d) Obligations. The Mortgagor has agreed to execute and deliver this Mortgage in favor of Mortgagee to secure the Indemnitors and/or Maker's obligations under the Indemnity Documents. Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Indemnity Documents.

2.      Property Mortgaged.

The Mortgagor has granted, bargained and sold, mortgaged, warranted and conveyed and by these presents does hereby grant, bargain and sell, mortgage, warrant and convey the Property (as hereinafter defined) to the Mortgagee and its successors and assigns.  When all of the Obligations (as hereinafter defined) have been performed and satisfied in full, the Mortgagee's rights under this Mortgage will end.  The Mortgagee will then cancel this Mortgage at the Mortgagor's cost and expense including without limitation, reasonable attorney and filing fees.

The Property includes: (i) the land commonly known as 46-27 54th Road, Maspeth, in the  Town of Maspeth, County of Queens, State of New York (Section 14, Block 2519, Lot 82); (ii) all buildings and other improvements that are now, or will be, located on the land, (iii) all fixtures and personal property that are now, or will be, attached to the land or building(s); (iv) all condemnation awards and insurance proceeds relating to the land and building(s); (v) all other rights that the Mortgagor has as owner of the Property; (vi) all of Mortgagor's rights, title and interest in and to any and all existing or future leases or other agreements for the use of occupancy of all or any portion of the Premises (each a "Lease" and collectively the "Leases") and all rents, security deposits, guarantees, and other proceeds and benefits of such Leases (collectively, "Rents"), as well as any sales contracts (including any deposit funds paid thereunder), in each case relating to or arising from the Property.  The legal description of the Property is set forth on Exhibit A attached hereto and made a part hereof. This Mortgage and Security Agreement is to be filed with the City Register of the City of New York, County of Queens, as a financing statement pursuant to Section 9-402 of the Uniform Commercial Code, and Mortgagee shall have all of the rights and remedies, in addition to those specified herein or under any of the other Indemnity Documents, of a secured party under the Uniform Commercial Code.

3.      Rights Given to the Mortgagee.

(a)      The Mortgagor has agreed to execute and deliver this Mortgage to secure the payment of the amounts due under the Indemnity Documents, plus all fees, charges, costs, expenses and other amounts payable thereunder, together with all amounts, sums and expenses paid or incurred hereunder by the Mortgagee according to the terms hereof, or in defending, maintaining, preserving or protecting the lien of this Mortgage, the priority thereof, or the Property, all charges and expenses of collection incurred by the Mortgagee, including court costs and attorney's fees and disbursements, and all other sums which may become due and payable to the Mortgagee hereunder or which may be secured by this Mortgage, and all other obligations and liabilities of the Mortgagor under this Mortgage and all extensions and any renewals of and substitutions for the foregoing, including all amendments, modifications and supplements thereto (collectively, the "Obligations").

(b)      **Notwithstanding the foregoing, the maximum amount of principal indebtedness which is or under any contingency may be secured by this Mortgage is $2,000,000.00 (the "Secured Amount"), together with interest thereon**

**and all amounts, sums, costs and other expenses paid or incurred by the Mortgagee in defending, maintaining, preserving or perfecting the lien of this Mortgage, the priority thereof, or the Property, and all charges and expenses of collection incurred by the Mortgagee in respect of this Mortgage, including court costs and attorney's fees and disbursements**.

4.    **Warranties and Promises.**    The Mortgagor represents and warrants, and makes the following promises, to the Mortgagee:

(a)    **Indemnity Documents and Mortgage.** Mortgagor will comply with all of the terms of this Mortgage and the other Indemnity Documents to which the Mortgagor is a party.

(b)    **Payments.**    Mortgagor will perform all Obligations and make all payments required by this Mortgage and the other Indemnity Documents to which Mortgagor is a party.

(c)    **Ownership.** Mortgagor is the sole and rightful owner of the Property as set forth in Section 2 hereof.

(d)    **Liens and Taxes.** Mortgagor will pay all liens, taxes, assessments and other governmental charges made against the Property when due. Mortgagor will not claim any deduction from the taxable value of the Property because of this Mortgage.  Mortgagor will not claim any credit against any payment made under this Mortgage, or any other Indemnity Documents for any taxes paid on the Property.

(e)    **Insurance.**    Mortgagor will keep the Property insured against loss by fire and other risks included in the standard form of extended coverage insurance. The amounts must be reasonably acceptable to the Mortgagee. Mortgagor will also maintain flood insurance or other types of insurance if required by the Mortgagee. The policies shall name the Mortgagee as additional insured and loss payee. Mortgagor will notify the Mortgagee in the event of any loss or damage to any Property and all insurance proceeds shall be immediately paid to the Mortgagee, subject to the rights of any prior lienholders. At the Mortgagee's sole and absolute discretion, the insurance proceeds may be applied to the Obligations, or advanced, in accordance with the Mortgagee's procedures therefor, to the Mortgagor to repair and restore the Property if practical to do so. This will not delay the due date for any payment under this Mortgage, or any other Indemnity Documents.

(f)    **Repairs.**    Mortgagor will keep the Property in good repair, neither damaging nor abandoning it.  Mortgagor will allow the Mortgagee to inspect the Property upon reasonable notice to the Mortgagor.

(g)    **Statement of Amount Due.**    Upon written request of the Mortgagee, Mortgagor will certify to the Mortgagee in writing within ten (10) days of the Mortgagee's request: (a) any amounts due and outstanding under this Mortgage or any other Indemnity Documents, and (b) whether or not the Mortgagor has any defenses,

setoffs or counterclaims to her obligations under this Mortgage or any other Settlement Documents.

(h)    **Rent**. Mortgagor will not accept rent from any tenant on the Property for more than one month in advance.

(i)    **Lawful Use; Environmental Indemnity.**    Mortgagor will use the Property in compliance with applicable all laws, statutes, regulations, ordinances and any requirements of any governmental authority (collectively, "Laws"), including without limitation, all Laws relating to the environmental or human or health safety. Mortgagor will, and hereby does, indemnify, defend and hold harmless the Mortgagee and its affiliates and subsidiaries and each of their respective employees, directors, shareholders, officers, members, principals, partners, agents and representatives, and their respective successors and assigns (each, an "Indemnified Party"), from and against any and all liabilities, losses, costs, claims, suits, expenses or damages (collectively, "Losses") which any Indemnified Party may incur as a result of, arising out of or in connection with (1) operations or conduct of business on the Property by the Mortgagor, (2) any alleged or actual violation of any of the foregoing covenants in this subsection (i), (3) any disposal, release or threatened release of any contaminants or hazardous substance or the presence or removal of an underground storage tank on, from or under any Property, or the presence of any contaminants or hazardous substance which has come to be located on or under any Property from another location, (4) any injury to human health, or safety (including wrongful death), or the environment by reason of the condition of, or activities on, or under, any Property; (5) any violation, or alleged violation, of any Law at any Property; (6) any lawsuit, litigation, proceeding, arbitration, demand or other claim asserted, brought, settlement reached, or governmental order relating to any contaminants or hazardous substance on, from, under or affecting any Property; or (7) any lien imposed upon any Property in favor of any governmental authority as a result of the presence, disposal, release or threat of release of contaminants or hazardous substance on, from, under or affecting any Property.

(j)    **Permits.**    The Mortgagor hereby assigns, transfers and sets over to the Mortgagee all of the Mortgagor's right, title, interest, benefit and privileges (the "Rights"), but none of the duties or obligations, in, to and under the Permits and Approvals (as defined below); provided, however, that so long as there shall not have occurred a Default (as defined below), the Mortgagor shall have the right to use, exercise and enjoy all of its rights and privileges under the Permits and Approvals.  As used herein, the term "Permits and Approvals" means all permits, approvals, licenses, concessions, registrations or other rights issued or granted, or hereafter to be issued or granted, by any federal, state or local governmental authority and relating to or affecting any Property and/or the business or operations now or hereafter being conducted thereon, and any renewals, extensions and modifications thereof.  Upon the occurrence of a Default, the Mortgagee shall have the right, but no duty or obligation, at its option and in its sole discretion, to exercise any and all of the Mortgagor's rights, privileges or powers under, or otherwise to use or deal with, any or all of the Permits and Approvals. The Mortgagee shall not be deemed to have assumed, and shall be under no obligation

to perform or discharge, any duty or obligation under any of the Permits or Approvals by reason of this assignment or this Mortgage.  The Mortgagor shall, and hereby does, indemnify, defend and hold harmless each Indemnified Party from and against any and all Losses which any Indemnified Party may incur as a result of, arising out of or in connection with (1) any Permit or Approval, (2) this assignment of the Permits and Approvals, or (3) any claims or demands whatsoever which may be asserted against any Indemnified Party in connection with any alleged assumption by the Mortgagee of any obligation or undertaking to perform or discharge any covenant, duty or condition contained in any Permit and Approval.

Notwithstanding the foregoing provisions of this subsection (j), if and to the extent that any of the Permits and Approvals or any Rights thereunder are not capable of being transferred to the Mortgagee without the approval, consent or waiver of any third party, including any governmental authority, or if the transfer of such Permits and Approvals or any Rights thereunder would constitute a breach of any obligation thereunder, or a violation thereof or any applicable law, unless the approval, consent or waiver of such third person is obtained, then, without limiting the rights and remedies of the Mortgagee contained herein or in any of the other Settlement Documents, this Mortgage shall not constitute an agreement to transfer same unless and until such approval, consent or waiver has been obtained.  With respect to such Permits and Approvals and Rights thereunder for which an approval, consent or waiver is required, the Mortgagor shall: (i) at all times perform and comply with the terms and provisions thereof and in accordance with all applicable laws; (ii) promptly upon demand by the Mortgagee, obtain the necessary  approval, consent or waiver and/or cooperate with the Mortgagee in any arrangements designed to provide the Rights to the Mortgagee; and (iii) promptly upon demand by the Mortgagee, take all such actions and do or cause to be done all such things as are necessary or proper so that the value of such Permits and Approvals and Rights thereunder are preserved and inures to the benefit of the Mortgagee.

(k)    **Warranty of Title.**  Mortgagor is lawfully seized of an indefeasible estate in fee simple in the Property and will warrant and forever defend the title thereof unto the Mortgagee against all lawful claims whatsoever.

(l)    **No Further Financing.**  Except for this Mortgage, the Mortgagor shall not, without the prior written consent of the Mortgagee which consent may be withheld in its sole and absolute discretion, place or cause or permit to be placed on the Property any mortgage, lien or other encumbrance securing or given as security for a debt or obligation, or cause or permit the Property to be used or to serve as collateral for any reason.

(m)    **Leases.**  Except for any existing lease which has been previously disclosed to and approved by the Mortgagee (the "Existing Lease"), the Mortgagor shall not lease, sublease or consent to the leasing or subleasing or assignment of a lease by any tenant of all or any part of the Property, or consent to the amendment, modification or termination of the Existing Lease, except for increases in rent, without the prior

6

review and express prior written consent (both as to the form and substance thereof) of the Mortgagee.

5.  **Security Interest**. This Mortgage further creates a security interest in the personal property and fixtures included in the Property and constitutes a security agreement and financing statement under Article 9 of the Uniform Commercial Code for the State of New York.  The Mortgagor shall file and refile such financing statements or other security agreements as the Mortgagee shall require from time to time with respect to such fixtures and other personal property and assets included in the Property.  The Mortgagor hereby authorizes the Mortgagee to file such financing statement or statements and any amendments thereto pursuant to said Uniform Commercial Code as the Mortgagee may deem necessary to perfect such interest or right in its favor at the Mortgagor's sole cost and expense.

6.  **Assignment of Leases and Rents**.    Mortgagor    hereby    assigns    to Mortgagee, as further security for the payment and satisfaction of the Obligations, the Rents together with all Leases and other documents evidencing Rents now or hereafter in effect and any and all deposits held as security under said Leases, and shall, upon demand, deliver to the Mortgagee an executed counterpart of each such Lease or other document. Nothing contained in the foregoing sentence shall be construed to bind the Mortgagee to the performance of any of the covenants, conditions or provisions contained in any such Lease or other document or otherwise to impose any obligation on Mortgagee (including any liability under the covenant of quiet enjoyment contained in any Lease or in any law of the State of New York in the event that any tenant shall have been joined as a party defendant in any action to foreclose this Mortgage and shall have been barred and foreclosed thereby of all right, title and interest and equity of redemption in the Property), except that the Mortgagee shall be accountable for any money actually received pursuant to such assignment. Mortgagor hereby further grants to Mortgagee the right (a) to enter upon and take possession of the Property for the purpose of collecting said Rents; (b) to dispossess by the usual summary proceedings any tenant defaulting in payment thereof to Mortgagee; (c) to let the Property, or any part thereof; and (d) to apply said Rents, after payment of all necessary charges and expenses on account of the Obligations; and (d) to hold any of said Rents in excess of the existing Obligations as security for Mortgagor's performance of its future Obligations under the Indemnity Documents. Such assignment and grant shall continue in effect until the Obligations are paid in full, the execution of this Mortgage constituting and evidencing the irrevocable consent of Mortgagor to the entry upon and taking possession of the Property by Mortgagee pursuant to such grant whether foreclosure has been instituted or not and without applying for a receiver. Mortgagee agrees to hold said Rents in trust and to use the same first payment of the cost of the improvements, as required under the trust fund provision of Section 13 of the New York Lien Law, and then in payment of premiums for insurance required hereunder, Impositions, late charges and other sums required to be paid by Mortgagor to Mortgagee hereunder, and then to payment of the

5335711.3

remaining Obligations under the Indemnity Documents. Mortgagor hereby appoints Mortgagee as its attorney-in-fact, coupled with an interest, to receive and collect all Rent, additional rent and other sums due under the terms of each Lease and other documents evidencing Rents, now or hereafter in effect, and to direct any tenant, by written notice or otherwise hereafter, in effect, to forward such Rent, additional rent or other sums by mail or in person to Mortgagee, and to execute and deliver all such instruments in the name and on behalf of the Mortgagor.

7.    **Eminent Domain**.  All or part of the Property may be taken by a government entity for public use.  If this occurs, the Mortgagee agrees that any compensation shall be paid over to the Mortgagee to be applied against the Obligations.  This will not delay the due date for any further payment under this Mortgage or any of the other Settlement Documents.

8.    **Payments Made for the Mortgagor**.  If the Mortgagor does not make all of the repairs or payments as agreed in this Mortgage, the Mortgagee may do so for the Mortgagor.  The cost of these repairs and payments will be reimbursed to the Mortgagee upon demand.

9.    **Default.**  The Mortgagor will be in default ("Default") under this Mortgage if:

(a)    there occurs a default beyond the expiration of any applicable notice, grace or cure period under the Note;

(b)    the Mortgagor fails to make any payment required under this Mortgage or fails to obtain and/or maintain insurance required under Section 4(e) of this Mortgage and such failure has not been cured within ten (10) business days after receiving written notice from the Mortgagee of such failure;

(c)    the Mortgagor fails to fulfill or keep any obligation or promise the Mortgagor undertakes under the provisions of Section 4(l) or 4(m);

(d)    the Mortgagor fails to fulfill or keep any other obligation or promise the Mortgagor undertakes in this Mortgage and such failure has not been cured within thirty (30) days after receiving written notice from Mortgagee of such failure, except that with respect to such defaults which are curable but which are incapable of being cured in said thirty (30) day period, the Mortgagor shall commence to cure such default within thirty (30) days, shall proceed promptly and diligently to cure the same and shall complete such cure within sixty (60) days after such notice date;

(e)    the Mortgagor is no longer the sole owner of the Property;

(f)    the holder of any lien on any Property starts foreclosure proceedings which are not dismissed within sixty (60) days after the filing thereof; or

(g)    bankruptcy, insolvency or receivership proceedings are started by or against the Mortgagor which are not dismissed within sixty (60) days after the filing thereof.

10.    **Payments Due Upon Default.**  If the Mortgagor is in Default, the Mortgagor must immediately pay any and all amounts owed to the Mortgagee under this Mortgage and the Mortgagee's costs of collection and reasonable attorneys' fees upon demand therefor by the Mortgagee.

11.    **Mortgagee's Rights Upon Default.**  If the Mortgagor is in Default, the Mortgagee will have all rights given by law and/or set forth in this Mortgage or any of the other Settlement Documents.  This includes the right to do any one or more of the following:

(a)    take possession of and manage the Property or any portion thereof, including the collection of rents and profits, if any;

(b)    have a court appoint a receiver to accept rent for the Property (the Mortgagor consents to this);

(c)    start a court action, known as foreclosure, which will result in a sale of the Property to reduce the Mortgagor's obligations under this Mortgage and the other Settlement Documents; and

(d)    sue the Mortgagor for any money that the Mortgagor owes to the Mortgagee.

12.    **Notices.**  Copies of all notices to Mortgagee shall be sent to Chiesa Shahinian & Giantomasi PC, One Boland Drive, West Orange, NJ 07052, Attention: Jonathan Bondy, Esq. All notices to the Mortgagor shall be sent to the address set forth at the beginning of this Mortgage, with a copy to [                                  ], Attention: [          ] All notices and copy notices must be in writing and personally delivered or sent by certified mail, return receipt requested or by nationally recognized overnight courier service, to the addresses given in this Mortgage.  Address changes may be made upon notice to the other party.

13.    **No Waiver by Mortgagee.**  The Mortgagee may exercise any right under this Mortgage or under any law even if the Mortgagee has delayed in exercising that right or has agreed in an earlier instance not to exercise that right.  The Mortgagee does not waive its right to declare that the Mortgagor is in default by making payments or incurring expenses or otherwise performing the Mortgagor's obligations on the Mortgagor's behalf.

14.    **Legally Binding.**  This Mortgage is legally binding upon the Mortgagor and all who succeed to her responsibilities.

15.    **No Oral Changes.**  This Mortgage can only be changed by an agreement in writing signed by the Mortgagor and the Mortgagee.

5335711.3

16.   **Copy Received**.   THE MORTGAGOR ACKNOWLEDGES RECEIPT OF A TRUE COPY OF THIS MORTGAGE WITHOUT CHARGE.

17.   **Discharge.**   This Mortgage shall not be discharged until all of the Obligations have been paid in full.

18.   **Governing Law.** This Mortgage shall be governed by the laws of the State of New York without giving effect to the principles of conflicts of law. Any claim, action or proceeding arising out of or relating to this Mortgage shall be commenced and maintained exclusively in the courts of the State of New York, or in any federal court in the State of New York, and in no other court or forum.

19.   **Miscellaneous**.

(a)   **Commercial Property.**   This Mortgage covers real property principally improved by a commercial structure.

(b)   **Trust Fund.**   Pursuant to Section 13 of the Lien Law of the State of New York, Mortgagor shall receive any advances secured by this Mortgage and shall hold the right to receive such advances as a trust fund to be applied first for the purposes of paying the cost of any improvement and shall apply such advances first to the payment of the cost of any such improvement on the Property before using any part of the total of the same for any other purpose.

(c)   **Sums Deemed To Be Interest**. Any sums, including and prepayment premiums, late charges or liquidated damages, that may become due and payable pursuant to the terms of this Mortgage and/or any of the other Indemnity Documents that are in the nature of interest: (i) shall for the purpose of determining the amount of mortgage recording tax due and payable on this Mortgage, be considered as additional interest, whether or not so denominated, (ii) shall be secured by the lien of this Mortgage to the fullest extent possible without causing this Mortgage to be covered by Section 256 of the tax Law of the State of New York, and (iii) shall not be deemed principal and shall not accrue any interest.

(d)   **New York Real Property Law.**   The Mortgagee shall have all of the rights set forth in Section 254 of the New York Real Property Law in addition to all of the Mortgagee's rights in this Mortgage, even if the rights are different from each other.

(e)   **Non-Judicial Foreclosure**.     To the extent permitted by law, Mortgagee may choose to utilize the procedures set forth in Article 14 of the Real Property Actions and Proceedings Law of New York to commence a non-judicial foreclosure of this Mortgage by power of sale. To the extent permitted by law, Mortgagor waives any right granted pursuant to Section 1421 or any other provision of the Real Property Actions and Proceedings Law of New York to challenge the Mortgagee's election to enforce this Mortgage by means of such non-judicial foreclosure by power of sale. If the Property consists of two or more distinct parcels, all of such parcels shall be sold as one parcel, unless Mortgagee shall elect otherwise.

(f)    **291-F Agreement**. This Mortgage is intended to be, and shall operate as, the agreement described in Section 291-f of the Real Property Law of the State of New York and Mortgagee shall be entitled to the benefits afforded thereby. Mortgagor shall (unless such notice is contained in such tenant's Lease) deliver notice of this Mortgage in form and substance reasonably acceptable to Mortgagee, to all present and future holders of any interest in any Lease of the Premises or any portion thereof, by assignment or otherwise, and shall take such other action as may now or hereafter be reasonably required to afford Mortgagee the full protections and benefits of Section 291-f of the Real Property Law of the State of New York.

20.    **Signatures.**  The Mortgagor agrees to the terms of this Mortgage.


        IN WITNESS WHEREOF, the Mortgagor has executed and delivered this Mortgage as of the day and year first above written.


                                        Found Property Resources, Inc., a New York corporation


                                        By:_____
                                        Name:
                                        Title:

STATE OF NEW YORK    )
                                            ss:
COUNTY OF                )


        On the _____ day of _____ in the year 2015, before me, the undersigned personally appeared [                ], personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her capacity, and that by his/her signature on the instrument, the individual or the person upon behalf of which the individual acted, executed the instrument.


        _____
        Notary public

## EXHIBIT A

Description of Property

# MORTGAGE AND SECURITY AGREEMENT

By

## ANTOINETTE TROVATO

To

## LIBERTY MUTUAL INSURANCE COMPANY,
### a Massachusetts corporation

**Dated:  June _____, 2015**

Record and return to:
Chiesa Shahinian & Giantomasi PC
Attn: Jonathan Bondy, Esq.
One Boland Drive
West Orange, NJ 07052

THIS SECURITY INSTRUMENT COVERS REAL PROPERTY IMPROVED, OR TO BE IMPROVED, BY A ONE OR TWO FAMILY DWELLING ONLY

.

5334731.2

# MORTGAGE

This Mortgage is made on this __ day of June, 2015

BY                **ANTOINETTE TROVATO**, an individual having an address at 30 Stone Hill Drive South, Manhasset, New York 11030 (the "Mortgagor");

IN FAVOR OF      **LIBERTY MUTUAL INSURANCE COMPANY**, a Massachusetts corporation having an address at 450 Plymouth Meeting Road, Suite 400, Plymouth Meeting, Pennsylvania, 19462, New York, New York 10036 (the "Mortgagee").

1.      Debt Obligations.

      (a)    Indemnity Agreement**.**   Trocom Construction Corp., and Salvatore Trovato (the "Indemnitors") executed and delivered to Mortgagee a General Agreement of Indemnity, dated December 4, 2007 with Amendments No. 01 and 02 and 03 dated September 20, 2011 and October 2, 2013 and June [      ], 2015 respectively (collectively the "Indemnity Agreement").

      (b)    Bonds.    In reliance upon the Indemnitors execution of the Indemnity Agreement, the Mortgagee issued one or more Bonds (as defined in the Indemnity Agreement) at the request of and on behalf of Trocom Construction Corp., as principal, in favor of the New York City Economic Development Corporation, as obligee, in connection with the construction of downtown Brooklyn streetscape, Flatbush Avenue project.

      (c)    Promissory Note.   In accordance with their obligations under a Memorandum of Understanding, Trocom Construction Corp.; Newfound LLC; Found Properties Resources, Inc. LLC; Antoinette Trovato as fiduciary of the Estate of Salvatore Trovato, Antoinette Trovato, Joseph Trovato and Ali Trovato (individually and collectively, jointly and severally the "Maker") are contemporaneously herewith executing and delivering to the Mortgagee a Promissory Note dated the date hereof in the original principal amount of Five Million and 00/100 ($5,000,000.00) Dollars (the "Note"). This Mortgage, the Note, together with the Indemnity Agreement, the Memorandum of Understanding and any other documents and instruments executed and delivered by the Mortgagor and/or the Indemnitors and/or the Maker are collectively referred to herein as the "Indemnity Documents").

      (d)    Obligations.   The Mortgagor has agreed to execute and deliver this Mortgage in favor of Mortgagee to secure the Indemnitors and/or Maker's obligations under the Indemnity Documents. Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Indemnity Documents.

2.      Property Mortgaged.

The Mortgagor has granted, bargained and sold, mortgaged, warranted and conveyed and by these presents does hereby grant, bargain and sell, mortgage, warrant and convey the Property (as hereinafter defined) to the Mortgagee and its successors and assigns.  When all of the Obligations (as hereinafter defined) have been performed and satisfied in full, the Mortgagee's rights under this Mortgage will end.  The Mortgagee will then cancel this Mortgage at the Mortgagor's cost and expense including without limitation, reasonable attorney and filing fees.

The Property includes: (i) the land commonly known as 30 Stone Hill Drive South, in the Village of North Hills, Town of North Hempstead, County of Nassau, State of New York (Section 3, Block 239, Lot 66); (ii) all buildings and other improvements that are now, or will be, located on the land, (iii) all fixtures and personal property that are now, or will be, attached to the land or building(s); (iv) all condemnation awards and insurance proceeds relating to the land and building(s); and (v) all other rights that the Mortgagor has as owner of the Property.  The legal description of the Property is set forth on Exhibit A attached hereto and made a part hereof. This Mortgage and Security Agreement is to be filed with the City Register of the City of New York, County of Nassau, as a financing statement pursuant to Section 9-402 of the Uniform Commercial Code, and Mortgagee shall have all of the rights and remedies, in addition to those specified herein or under any of the other Indemnity Documents, of a secured party under the Uniform Commercial Code.

3.      Rights Given to the Mortgagee.

(a)      The Mortgagor has agreed to execute and deliver this Mortgage to secure the payment of the amounts due under the Indemnity Documents, plus all fees, charges, costs, expenses and other amounts payable thereunder, together with all amounts, sums and expenses paid or incurred hereunder by the Mortgagee according to the terms hereof, or in defending, maintaining, preserving or protecting the lien of this Mortgage, the priority thereof, or the Property, all charges and expenses of collection incurred by the Mortgagee, including court costs and attorney's fees and disbursements, and all other sums which may become due and payable to the Mortgagee hereunder or which may be secured by this Mortgage, and all other obligations and liabilities of the Mortgagor under this Mortgage and all extensions and any renewals of and substitutions for the foregoing, including all amendments, modifications and supplements thereto (collectively, the "Obligations").

**(b)      Notwithstanding the foregoing, the maximum amount of principal indebtedness which is or under any contingency may be secured by this Mortgage is $2,000,000.00 (the "Secured Amount"), together with interest thereon and all amounts, sums, costs and other expenses paid or incurred by the Mortgagee in defending, maintaining, preserving or perfecting the lien of this Mortgage, the priority thereof, or the Property, and all charges and expenses of collection incurred by the Mortgagee in respect of this Mortgage, including court costs and attorney's fees and disbursements**.

4.    **Warranties and Promises.**    The Mortgagor represents and warrants, and makes the following promises, to the Mortgagee:

(a)    **Indemnity Documents and Mortgage.**  Mortgagor will comply with all of the terms of this Mortgage and the other Indemnity Documents to which the Mortgagor is a party.

(b)    **Payments.**  Mortgagor will perform all Obligations and make all payments required by this Mortgage and the other Indemnity Documents to which Mortgagor is a party.

(c)    **Ownership.**  Mortgagor is the sole and rightful owner of the Property as set forth in Section 2 hereof.

(d)    **Liens and Taxes.**  Mortgagor will pay all liens, taxes, assessments and other governmental charges made against the Property when due. Mortgagor will not claim any deduction from the taxable value of the Property because of this Mortgage.  Mortgagor will not claim any credit against any payment made under this Mortgage, or any other Indemnity Documents for any taxes paid on the Property.

(e)    **Insurance.**  Mortgagor will keep the Property insured against loss by fire and other risks included in the standard form of extended coverage insurance. The amounts must be reasonably acceptable to the Mortgagee. Mortgagor will also maintain flood insurance or other types of insurance if required by the Mortgagee. The policies shall name the Mortgagee as additional insured and loss payee. Mortgagor will notify the Mortgagee in the event of any loss or damage to any Property and all insurance proceeds shall be immediately paid to the Mortgagee, subject to the rights of any prior lienholders. At the Mortgagee's sole and absolute discretion, the insurance proceeds may be applied to the Obligations, or advanced, in accordance with the Mortgagee's procedures therefor, to the Mortgagor to repair and restore the Property if practical to do so. This will not delay the due date for any payment under this Mortgage, or any other Indemnity Documents.

(f)    **Repairs.**  Mortgagor will keep the Property in good repair, neither damaging nor abandoning it.  Mortgagor will allow the Mortgagee to inspect the Property upon reasonable notice to the Mortgagor.

(g)    **Statement of Amount Due.**    Upon written request of the Mortgagee, Mortgagor will certify to the Mortgagee in writing within ten (10) days of the Mortgagee's request: (a) any amounts due and outstanding under this Mortgage or any other Indemnity Documents, and (b) whether or not the Mortgagor has any defenses, setoffs or counterclaims to her obligations under this Mortgage or any other Settlement Documents.

(h)    **Rent**. Mortgagor will not accept rent from any tenant on the Property for more than one month in advance.

5334731.2

(i)    **Lawful Use; Environmental Indemnity.**    Mortgagor will use the Property in compliance with applicable all laws, statutes, regulations, ordinances and any requirements of any governmental authority (collectively, "<u>Laws</u>"), including without limitation, all Laws relating to the environmental or human or health safety. Mortgagor will, and hereby does, indemnify, defend and hold harmless the Mortgagee and its affiliates and subsidiaries and each of their respective employees, directors, shareholders, officers, members, principals, partners, agents and representatives, and their respective successors and assigns (each, an "<u>Indemnified Party</u>"), from and against any and all liabilities, losses, costs, claims, suits, expenses or damages (collectively, "<u>Losses</u>") which any Indemnified Party may incur as a result of, arising out of or in connection with (1) operations or conduct of business on the Property by the Mortgagor, (2) any alleged or actual violation of any of the foregoing covenants in this subsection (i), (3) any disposal, release or threatened release of any contaminants or hazardous substance or the presence or removal of an underground storage tank on, from or under any Property, or the presence of any contaminants or hazardous substance which has come to be located on or under any Property from another location, (4) any injury to human health, or safety (including wrongful death), or the environment by reason of the condition of, or activities on, or under, any Property; (5) any violation, or alleged violation, of any Law at any Property; (6) any lawsuit, litigation, proceeding, arbitration, demand or other claim asserted, brought, settlement reached, or governmental order relating to any contaminants or hazardous substance on, from, under or affecting any Property; or (7) any lien imposed upon any Property in favor of any governmental authority as a result of the presence, disposal, release or threat of release of contaminants or hazardous substance on, from, under or affecting any Property.

(j)    **Permits.**  The Mortgagor hereby assigns, transfers and sets over to the Mortgagee all of the Mortgagor's right, title, interest, benefit and privileges (the "<u>Rights</u>"), but none of the duties or obligations, in, to and under the Permits and Approvals (as defined below); <u>provided</u>, <u>however</u>, that so long as there shall not have occurred a Default (as defined below), the Mortgagor shall have the right to use, exercise and enjoy all of its rights and privileges under the Permits and Approvals.  As used herein, the term "<u>Permits and Approvals</u>" means all permits, approvals, licenses, concessions, registrations or other rights issued or granted, or hereafter to be issued or granted, by any federal, state or local governmental authority and relating to or affecting any Property and/or the business or operations now or hereafter being conducted thereon, and any renewals, extensions and modifications thereof.  Upon the occurrence of a Default, the Mortgagee shall have the right, but no duty or obligation, at its option and in its sole discretion, to exercise any and all of the Mortgagor's rights, privileges or powers under, or otherwise to use or deal with, any or all of the Permits and Approvals. The Mortgagee shall not be deemed to have assumed, and shall be under no obligation to perform or discharge, any duty or obligation under any of the Permits or Approvals by reason of this assignment or this Mortgage.  The Mortgagor shall, and hereby does, indemnify, defend and hold harmless each Indemnified Party from and against any and all Losses which any Indemnified Party may incur as a result of, arising out of or in connection with (1) any Permit or Approval, (2) this assignment of the Permits and Approvals, or (3) any claims or demands whatsoever which may be asserted against

5334731.2

any Indemnified Party in connection with any alleged assumption by the Mortgagee of any obligation or undertaking to perform or discharge any covenant, duty or condition contained in any Permit and Approval.

Notwithstanding the foregoing provisions of this subsection (j), if and to the extent that any of the Permits and Approvals or any Rights thereunder are not capable of being transferred to the Mortgagee without the approval, consent or waiver of any third party, including any governmental authority, or if the transfer of such Permits and Approvals or any Rights thereunder would constitute a breach of any obligation thereunder, or a violation thereof or any applicable law, unless the approval, consent or waiver of such third person is obtained, then, without limiting the rights and remedies of the Mortgagee contained herein or in any of the other Settlement Documents, this Mortgage shall not constitute an agreement to transfer same unless and until such approval, consent or waiver has been obtained.  With respect to such Permits and Approvals and Rights thereunder for which an approval, consent or waiver is required, the Mortgagor shall: (i) at all times perform and comply with the terms and provisions thereof and in accordance with all applicable laws; (ii) promptly upon demand by the Mortgagee, obtain the necessary  approval, consent or waiver and/or cooperate with the Mortgagee in any arrangements designed to provide the Rights to the Mortgagee; and (iii) promptly upon demand by the Mortgagee, take all such actions and do or cause to be done all such things as are necessary or proper so that the value of such Permits and Approvals and Rights thereunder are preserved and inures to the benefit of the Mortgagee.

(k)    **Warranty of Title.**  Mortgagor is lawfully seized of an indefeasible estate in fee simple in the Property and will warrant and forever defend the title thereof unto the Mortgagee against all lawful claims whatsoever.

(l)    **No Further Financing.**  Except for this Mortgage, the Mortgagor shall not, without the prior written consent of the Mortgagee which consent may be withheld in its sole and absolute discretion, place or cause or permit to be placed on the Property any mortgage, lien or other encumbrance securing or given as security for a debt or obligation, or cause or permit the Property to be used or to serve as collateral for any reason.

(m)    **Leases.**  Except for any existing lease which has been previously disclosed to and approved by the Mortgagee (the "Existing Lease"), the Mortgagor shall not lease, sublease or consent to the leasing or subleasing or assignment of a lease by any tenant of all or any part of the Property, or consent to the amendment, modification or termination of the Existing Lease, except for increases in rent, without the prior review and express prior written consent (both as to the form and substance thereof) of the Mortgagee.

5.    **Security Interest**. This Mortgage further creates a security interest in the personal property and fixtures included in the Property and constitutes a security agreement and financing statement under Article 9 of the Uniform Commercial Code for the State of New York.   The Mortgagor shall file and refile such

financing statements or other security agreements as the Mortgagee shall require from time to time with respect to such fixtures and other personal property and assets included in the Property.   The Mortgagor hereby authorizes the Mortgagee to file such financing statement or statements and any amendments thereto pursuant to said Uniform Commercial Code as the Mortgagee may deem necessary to perfect such interest or right in its favor at the Mortgagor's sole cost and expense.

6.      **Eminent Domain**.  All or part of the Property may be taken by a government entity for public use.  If this occurs, the Mortgagee agrees that any compensation shall be paid over to the Mortgagee to be applied against the Obligations.  This will not delay the due date for any further payment under this Mortgage or any of the other Settlement Documents.

7.      **Payments Made for the Mortgagor**.  If the Mortgagor does not make all of the repairs or payments as agreed in this Mortgage, the Mortgagee may do so for the Mortgagor.  The cost of these repairs and payments will be reimbursed to the Mortgagee upon demand.

8.      **Default.**  The Mortgagor will be in default ("Default") under this Mortgage if:

(a)      there occurs a default beyond the expiration of any applicable notice, grace or cure period under the Note;

(b)      the Mortgagor fails to make any payment required under this Mortgage or fails to obtain and/or maintain insurance required under Section 4(e) of this Mortgage and such failure has not been cured within ten (10) business days after receiving written notice from the Mortgagee of such failure;

(c)      the Mortgagor fails to fulfill or keep any obligation or promise the Mortgagor undertakes under the provisions of Section 4(l) or 4(m);

(d)      the Mortgagor fails to fulfill or keep any other obligation or promise the Mortgagor undertakes in this Mortgage and such failure has not been cured within thirty (30) days after receiving written notice from Mortgagee of such failure, except that with respect to such defaults which are curable but which are incapable of being cured in said thirty (30) day period, the Mortgagor shall commence to cure such default within thirty (30) days, shall proceed promptly and diligently to cure the same and shall complete such cure within sixty (60) days after such notice date;

(e)      the Mortgagor is no longer the sole owner of the Property;

(f)      the holder of any lien on any Property starts foreclosure proceedings which are not dismissed within sixty (60) days after the filing thereof; or

(g)      bankruptcy, insolvency or receivership proceedings are started by or against the Mortgagor which are not dismissed within sixty (60) days after the filing thereof.

5334731.2

9.    **Payments Due Upon Default.**  If the Mortgagor is in Default, the Mortgagor must immediately pay any and all amounts owed to the Mortgagee under this Mortgage and the Mortgagee's costs of collection and reasonable attorneys' fees upon demand therefor by the Mortgagee.

10.    **Mortgagee's Rights Upon Default.**  If the Mortgagor is in Default, the Mortgagee will have all rights given by law and/or set forth in this Mortgage or any of the other Settlement Documents.  This includes the right to do any one or more of the following:

(a)    take possession of and manage the Property or any portion thereof, including the collection of rents and profits, if any;

(b)    have a court appoint a receiver to accept rent for the Property (the Mortgagor consents to this);

(c)    start a court action, known as foreclosure, which will result in a sale of the Property to reduce the Mortgagor's obligations under this Mortgage and the other Settlement Documents; and

(d)    sue the Mortgagor for any money that the Mortgagor owes to the Mortgagee.

11.    **Notices.**  Copies of all notices to Mortgagee shall be sent to Chiesa Shahinian & Giantomasi PC, One Boland Drive, West Orange, NJ 07052, Attention: Jonathan Bondy, Esq. All notices to the Mortgagor shall be sent to the address set forth at the beginning of this Mortgage, with a copy to [                              ], Attention: [        ] All notices and copy notices must be in writing and personally delivered or sent by certified mail, return receipt requested or by nationally recognized overnight courier service, to the addresses given in this Mortgage.  Address changes may be made upon notice to the other party.

12.    **No Waiver by Mortgagee.**  The Mortgagee may exercise any right under this Mortgage or under any law even if the Mortgagee has delayed in exercising that right or has agreed in an earlier instance not to exercise that right.  The Mortgagee does not waive its right to declare that the Mortgagor is in default by making payments or incurring expenses or otherwise performing the Mortgagor's obligations on the Mortgagor's behalf.

13.    **Legally Binding.**  This Mortgage is legally binding upon the Mortgagor and all who succeed to her responsibilities.

14.    **No Oral Changes.**  This Mortgage can only be changed by an agreement in writing signed by the Mortgagor and the Mortgagee.

15.    Copy Received.  THE MORTGAGOR ACKNOWLEDGES RECEIPT OF A TRUE COPY OF THIS MORTGAGE WITHOUT CHARGE.

5334731.2

16. **Discharge.** This Mortgage shall not be discharged until all of the Obligations have been paid in full.

17. **Governing Law.** This Mortgage shall be governed by the laws of the State of New York without giving effect to the principles of conflicts of law. Any claim, action or proceeding arising out of or relating to this Mortgage shall be commenced and maintained exclusively in the courts of the State of New York, or in any federal court in the State of New York, and in no other court or forum.

18. **Miscellaneous**.

    (a)  **Residential Property.** This Mortgage covers real property principally improved by one or more structures containing in the aggregate six (6) or less residential dwelling units having their own separate cooking facilities.

    (b)  **Trust Fund.** Pursuant to Section 13 of the Lien Law of the State of New York, Mortgagor shall receive any advances secured by this Mortgage and shall hold the right to receive such advances as a trust fund to be applied first for the purposes of paying the cost of any improvement and shall apply such advances first to the payment of the cost of any such improvement on the Property before using any part of the total of the same for any other purpose.

    (c)  **Sums Deemed To Be Interest**. Any sums, including and prepayment premiums, late charges or liquidated damages, that may become due and payable pursuant to the terms of this Mortgage and/or any of the other Indemnity Documents that are in the nature of interest: (i) shall for the purpose of determining the amount of mortgage recording tax due and payable on this Mortgage, be considered as additional interest, whether or not so denominated, (ii) shall be secured by the lien of this Mortgage to the fullest extent possible without causing this Mortgage to be covered by Section 256 of the tax Law of the State of New York, and (iii) shall not be deemed principal and shall not accrue any interest.

    (d)  **New York Real Property Law.** The Mortgagee shall have all of the rights set forth in Section 254 of the New York Real Property Law in addition to all of the Mortgagee's rights in this Mortgage, even if the rights are different from each other.

    (e)  **Non-Judicial Foreclosure**. To the extent permitted by law, Mortgagee may choose to utilize the procedures set forth in Article 14 of the Real Property Actions and Proceedings Law of New York to commence a non-judicial foreclosure of this Mortgage by power of sale. To the extent permitted by law, Mortgagor waives any right granted pursuant to Section 1421 or any other provision of the Real Property Actions and Proceedings Law of New York to challenge the Mortgagee's election to enforce this Mortgage by means of such non-judicial foreclosure by power of sale. If the Property consists of two or more distinct parcels, all of such parcels shall be sold as one parcel, unless Mortgagee shall elect otherwise.

19. **Signatures.** The Mortgagor agrees to the terms of this Mortgage.

IN WITNESS WHEREOF, the Mortgagor has executed and delivered this Mortgage as of the day and year first above written.

By:_____

ANTOINETTE TROVATO

STATE OF NEW YORK    )

ss:

COUNTY OF    )

On the _____ day of _____ in the year 2015, before me, the undersigned personally appeared ANTOINETTE TROVATO, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that she executed the same in her capacity, and that by her signature on the instrument, the individual or the person upon behalf of which the individual acted, executed the instrument.

_____

Notary public

5334731.2

## EXHIBIT A

Description of Property

**Exhibit G**

## AFFIDAVIT, PARTIAL RELEASE AND ACKNOWLEDGMENT OF
## SUBROGATION/ASSIGNMENT

IN CONSIDERATION OF THE PAYMENT OF _____ by Liberty Mutual Insurance Company ("Liberty"), _____ ("Claimant"), hereby releases and forever discharges Liberty (and its successors and assigns), and the Owner (as defined below) to the extent of the amount paid by or on behalf of Liberty, from any and all causes of action, claims, and demands of any kind or nature whatsoever, arising out of, in connection with, or relating to the furnishing of materials or equipment on bond no. _____ in connection with the following contract:

        Name of Contractor:    Trocom Construction Corp. ("Contractor")

        Name of Obligee:    _____ ("Owner")

        Description of Contract: _____ ("Contract")

Claimant affirms that the amount set forth above is true and accurate and that Claimant has not received this payment from Contractor, and that this payment is for invoice/purchase order no. _____ issued by Claimant to Contractor in connection with the Contract. The payment made hereunder is to be applied gainst the penal sum of the payment bond issued for the Contract.

In further consideration of the aforesaid payment, Claimant hereby acknowledges that Liberty is subrogated to Claimant's rights with respect to and to the extent of the amount paid, and further assigns, transfers, and sets over to Liberty its above-mentioned claim(s) or cause(s) of action against Contractor, Owner and/or any other person or entity, together with all of its rights, title and interest in and to said claim(s) or cause(s) of action; and Claimant appoints Liberty as its true, lawful, and irrevocable attorney to demand receipt for, and enforce payment of, the said claim, and at its own expense to sue for the said sum so assigned, either in the name of Claimant, or in its own name.

As a further inducement to Liberty for making payment at this time, Claimant hereby agrees that all guarantees and warranties required under the terms of the Contract pertaining to the materials furnished by Claimant shall remain in full force and effect in accordance with their terms, which, however, shall not be extended nor enlarged hereby.

Claimant further represents and warrants (a) that all laborers employed by Claimant on this Contract have been fully paid in accordance with the prevailing wage laws, (b) that all suppliers from whom Claimant has purchased or rented materials or equipment for this Contract have been fully paid, and (c) that all subcontractors of Claimant who have furnished labor, materials and/or equipment for this Contract have been fully paid.

Claimant further agrees, to the fullest extent permitted by law, to indemnify, defend, and hold harmless Liberty, its successors and assigns from and against all costs, losses, damages, claims, liens, causes of action, judgments and expenses, including attorneys' fees, arising out of, or in connection with, claims for payment on the Contract asserted against Liberty by Claimant or any of its suppliers or any of their representatives, officers, directors, agents or employees, or their respective successors or assigns.

_____

By:_____
Print Name:_____
Title:_____
Date:_____

Sworn to and subscribed before me this _____ day of _____ 20_____.
Notary Public, State of: _____

        County of: _____
        My Commission expires: _____

**Exhibit B**

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------------x
                                                          :
In re:                                                    :    Chapter 11
                                                          :
TROCOM CONSTRUCTION CORP.,                                :    Case No. 15-42145 (NHL)
                                                          :
                                                          :
                                                          :
                          Debtor.                         :
                                                          :
-----------------------------------------------------------------x

**INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362,
AND 364 (A) AUTHORIZING POST-PETITION FINANCING, (B)
GRANTING ADEQUATE PROTECTION, (C) SCHEDULING A
<u>FINAL HEARING, AND (D) GRANTING RELATED RELIEF</u>**

Upon the motion (the "Financing Motion") of Trocom Construction Corp. (the "Debtor")

pursuant to sections 105(a), 361, 362 and 364 of title 11, United States Code (the "Bankruptcy

Code"), Rules 4001, 6004(h) and 7062 of the Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rules"), and Rule 4001-5 of the Local Bankruptcy Rules for the Eastern District of

New York (the "Local Rules"), seeking, among other things:

(i)     authorization for the Debtor to obtain a secured post-petition financing facility

(the "Loan Facility") from Liberty Mutual Insurance Company ("Liberty") pursuant to the terms

and conditions set forth in the loan agreement (the "Loan Agreement"") attached as Exhibit A to

the Motion;

(ii)    authorization for immediate funding from the Loan Facility of $3,477,131;

(iii)   the granting of superpriority administrative expense claim status with respect to

all obligations of the Debtor to Liberty arising under the Loan Facility (collectively, the "Loan

Obligations");

(iv)     the granting to Liberty of automatically perfected junior security interests in and liens on all of the Debtor's assets to secure all Loan Obligations;

(v)     the granting to Liberty of perfected liens against the non-Debtor assets, as set forth in the Loan Agreement;

(vi)     scheduling a final hearing (the "Final Hearing") within 15 days of the Interim Hearing to consider entry of a final order (the "Final Order") authorizing the balance of the amounts due under the Loan Facility, and any requested relief not granted under the Interim Order on a final basis, all as set forth in the Motion; and

(vii)     such other and further relief as is sought in the Motion.

NOW THEREFORE, the Court having considered the Motion, the Loan Agreement, and the evidence submitted at the Interim Hearing; and due and appropriate notice of the Motion, the relief requested therein, and Interim Hearing having been given in accordance with Bankruptcy Rules 4001, 6004(h) and 7062; and the Interim Hearing to consider the interim relief requested in the Motion having been held and concluded; and all objections, if any, to the interim relief requested in the Motion having been withdrawn, resolved or overruled by the Court and the interim relief requested being necessary to avoid immediate and irreparable harm to the Debtor and its estate pending the Final Hearing, and otherwise is fair and reasonable and in the best interests of the Debtor, its estate, its creditors and equity holders, and essential for the continued operation of the Debtor's business; and it further appearing that the Debtor is unable to obtain unsecured credit for money borrowed allowable as an administrative expense under section 503(b)(l) of the Bankruptcy Code; and after due deliberation and consideration, and for good and sufficient cause appearing therefor;

IT IS HEREBY ORDERED, that:

1. <u>Interim Financing Approved</u>.  The Motion is granted in accordance with the terms of this Interim Order.  All objections to the Motion, to the extent not withdrawn or resolved, and all reservations of rights included therein, are hereby overruled.

2. <u>Jurisdiction</u>.  This Court has core jurisdiction over the Debtor's case, the Motion, and the persons and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334.  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3. <u>Notice</u>.  Under the circumstances, the notice given by the Debtor of the Motion, the relief requested therein and the Interim Hearing constitutes appropriate, due and sufficient notice thereof and complies with the Bankruptcy Rules and Local Bankruptcy Rules, and no further notice of the relief sought at the Interim Hearing and the relief granted herein is necessary or required.

4. <u>Debtor's Stipulations Regarding Facility</u>.  Subject to paragraph 18 of this Interim Order, the Debtor hereby forever waives and releases any and all claims, counterclaims, causes of action, defenses, recoupment rights, or setoff rights against Liberty and any of its respective affiliates, agents, attorneys, advisors, professionals, officers, directors and employees, arising prior to the date of entry of this Interim Order, whether arising at law or in equity, including without limitation any claim arising under or pursuant to section 105 or chapter 5 of the Bankruptcy Code or similar provisions of applicable non-bankruptcy law, in each case arising from or relating to the negotiation and documentation of the Loan Facility.

5.      <u>Findings Regarding the Post-Petition Financing</u>.

(i)      *Cause*.  Good cause has been shown for entry of this Interim Order.

(ii)      *Need for Post-Petition Financing*.  Without the financing proposed by the Motion, the Debtor does not have the funds necessary to continue its operations.   The Debtor's ability to continue its operations, to maintain business relationships, to make payroll, to pay the costs of administration of its estate and to satisfy other working capital and operational needs, depends on obtaining immediate access to the Loan Facility.  The access of the Debtor to sufficient working capital and liquidity through the incurrence of new indebtedness for borrowed money and other financial accommodations is vital for preserving and maintaining the going concern value of the Debtor.  Failure to obtain the relief requested in the Motion will immediately and irreparably harm the Debtor, its estate, creditors and equity holders.

(iii)      *No Credit Available on More Favorable Terms*.  The Debtor is unable to obtain financing on terms more favorable than those offered by Liberty under the Loan Facility and is unable to obtain unsecured credit allowable under section 503(b)(l) of the Bankruptcy Code as an administrative expense.  The Debtor is also unable to obtain secured credit under section 364(c) of the Bankruptcy Code on equal or more favorable terms than those offered by Liberty under the Loan Facility.  The Debtor has made an adequate showing of its efforts to obtain financing on more favorable terms.  A credit facility in the amount and on the terms provided by the Loan Facility is not available from Liberty without the Debtor granting Liberty (a) the Post-Petition Liens (as defined herein) and the Superpriority Claims (as defined herein), and (b) the other protections set forth in this Interim Order.

(iv)      *Business Judgment and Good Faith Pursuant to Section 364(e)*.  The terms and conditions of the Loan Facility and the Loan Agreement are fair, reasonable, and the

best available to the Debtor under the circumstances, reflect the exercise of prudent business judgment by the Debtor consistent with its fiduciary duties, and are supported by reasonably equivalent value and consideration. The Loan Facility was negotiated without collusion, in good faith and at arms' length between and among the Debtor and Liberty.  Use of credit to be extended under the Loan Facility shall be deemed to have been so allowed, advanced, made, used or extended in good faith, within the meaning of section 364(e) of the Bankruptcy Code and in express reliance on the protections offered by section 364(e) of the Bankruptcy Code, and Liberty is therefore entitled to the full protection and benefits of section 364(e) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is vacated, reversed, or modified, on appeal or otherwise.

(v)    *Interim Relief.*  Absent the relief sought by this Interim Order, the Debtor's estate will be immediately and irreparably harmed.  Consummation of the Loan Facility in accordance with the Loan Agreement is therefore in the best interests of the Debtor and its estate and is consistent with its fiduciary duties.

6.    Authorization of the Loan Facility.  The Debtor is expressly and immediately authorized to incur and to perform the Loan Obligations in accordance with, and subject to, the terms of this Interim Order and the Loan Agreement, which is expressly approved and incorporated herein by reference.  The Interim Availability (as defined below) is hereby approved upon the terms and conditions set forth herein and in the Loan Agreement.  The Loan Obligations shall represent valid and binding obligations of the Debtor, enforceable against the Debtor and its estate in accordance with their terms.

7.    Authorization to Perform Under Loan Agreement.  The Debtor is hereby authorized to execute, enter into, and deliver the Loan Agreement and all instruments and

documents which may be required or reasonably necessary for the performance by the Debtor

under the Loan Facility and the creation and perfection of the Post-Petition Liens as described in

and provided for by this Interim Order and the Loan Agreement, and the Loan Agreement is

hereby approved with respect to the Interim Availability.  Pending the entry of the Final Order,

this Interim Order and the Loan Agreement shall evidence the validity and binding effect of the

Loan Obligations and shall govern the financial accommodations to be provided to the Debtor by

Liberty.

8.    <u>Authorization to Borrow</u>.   Subject to the terms, conditions, limitations on

availability set forth in the Loan Agreement and this Interim Order and in order to prevent

immediate and irreparable harm to the Debtor's estate, the Debtor is hereby authorized to request

and obtain one or more advances on the Loan Facility, prior to entry of the Final Order, from

Liberty in an aggregate amount not greater than $3,477,131 (the "Interim Availability").

9.    <u>No Obligation to Extend Credit</u>.  Liberty shall have no obligation to make any

loan or advance under the Loan Agreement or this Interim Order, unless (a) all of the conditions

precedent to the making of such extension of credit under the Loan Agreement and this Interim

Order have been satisfied in full or have been waived by Liberty in its sole and absolute

discretion and (b) such loan or advance is in accordance with the terms of the Loan Agreement.

10.    <u>Use of Loan Facility Proceeds</u>.  From and after the Petition Date, the Debtor shall

use advances under the Loan Facility only for the purposes specifically set forth in this Interim

Order and the Loan Agreement and any documents executed pursuant thereto.  The current

budget for the Interim Availability included in paragraph E(iii) of, and Exhibit D to, the Loan

Agreement; and further budgets may be agreed upon between the Debtor and Liberty as set forth

in the Loan Agreement.  Notwithstanding anything to the contrary in this Interim Order or the

Loan Agreement, in no event shall any proceeds of the Loan Facility be used (a) for any purpose that is not permitted under the Interim Order; (b) in a manner not consistent with any approved budget; (c) for any investigation or analysis of any claim or cause of action against Liberty or any of its affiliates; and (d) for any preparation or prosecution of any claim or cause of action against Liberty or any of its affiliates.

11.    <u>Superpriority Claims</u>.  Pursuant to section 364(c)(l) of the Bankruptcy Code, but subject to the Carve-Out (as defined herein), all of the Loan Obligations shall constitute allowed superpriority administrative expense claims against the Debtor (the "Superpriority Claims") with priority over any and all administrative expense claims, adequate protection claims, diminution claims, and all other claims against the Debtor or its estate at any time existing or arising, of any kind or nature whatsoever, including without limitation, administrative expenses of the kinds specified in or ordered pursuant to Bankruptcy Code sections 105, 326, 328, 330, 331, 364(c), 365, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726, 1113 and 1114, and any other provision of the Bankruptcy Code, as provided under section 364(c)(1) of the Bankruptcy Code; and which shall at all times be senior to the rights of the Debtor, and the estate, any successor trustee or other estate representative and any creditor or other party in interest to the extent permitted by law.  The Superpriority Claims shall be senior to any superpriority claim asserted by M&T Bank in the Debtor's case.  The Superpriority Claims shall not extend to proceeds of avoidance actions under chapter 5 of the Bankruptcy Code.

12.    <u>Post-Petition Liens</u>.  As security for the Loan Obligations, effective and perfected upon the date of this Interim Order and without the necessity of the execution,  recordation of filings by the Debtor of mortgages, security agreements, control agreements, pledge agreements, financing statements or other similar documents, or the possession or control by Liberty or its

7

agents over any collateral, the following security interests and liens are hereby granted to Liberty (the "Post-Petition Liens"):

(a)        pursuant to section 364(c)(2) of the Bankruptcy Code, a perfected first-priority security interest in and lien on all currently-owned or hereafter acquired assets and property, including without limitation all real and personal property, plant and equipment, accounts receivable and inventory, intellectual property, claims and causes of action, and any proceeds thereof (except proceeds of any claims or causes of action available under sections 502(d), 544, 545, 547, 548, 549, 550, and 553 of the Bankruptcy Code or similar non-bankruptcy law), and any rights to receive proceeds or distributions from any affiliates or subsidiaries, of the Debtor (the "Collateral"), to the extent that such Collateral is not subject to valid, perfected and non-avoidable liens as of the Petition Date. For the avoidance of doubt, this provision is not intended to prime any liens of M&T Bank in the Debtor's assets;

(b)        pursuant to Section 364(c)(3) of the Bankruptcy Code, a perfected security interest in and lien on all Collateral, subject only to valid, perfected and non-avoidable liens and in favor of third parties and in existence as of the Petition Date, or to valid and non-avoidable liens in favor of third parties and in existence at the Petition Date that are subsequently perfected as permitted by section 546(b) of the Bankruptcy Code;

(c)        A mortgage in the amount of $2,000,000 against the property located at 46-27 54th Road, Maspeth, New York, owned by Found Property Resources, an entity owned by the Estate of Salvatore Trovato;

(d)        A second mortgage in the amount of $2,000,000 against the property located at 55-54 56th Road, Maspeth, New York, owned by Newfound LLC, an entity owned by various members of the Trovato family; and

8

- A mortgage in the amount of $2,000,000 against the property located at 30 Stone Hill Drive South, Manhasset, New York, owned by Antoinette Trovato.

Liberty shall not be required to marshal the Collateral , and shall be authorized to foreclose on and liquidate any of the Collateral as consistent with the Loan Agreement, in any manner or order in Liberty's sole and absolute discretion. The Post-Petition Liens shall be subject only to the Carve-Out.

13.    Perfection of Post-Petition Liens.  This Interim Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of all Post-Petition Liens, without the necessity of filing or recording any financing statement, mortgage, notice, or other instrument or document which may otherwise be required under the law or regulation of any jurisdiction or the taking of any other action (including, for the avoidance of doubt, entering into any lockbox or deposit account control agreement) to validate or perfect (in accordance with applicable non-bankruptcy law) the Post-Petition Liens, or to entitle Liberty to the priorities granted herein. Notwithstanding the foregoing, Liberty is authorized to file, at its sole discretion, such financing statements, mortgages, notices of liens and other similar documents to perfect in accordance with applicable non-bankruptcy law or to otherwise evidence the Post-Petition Liens, and all such financing statements, mortgages, notices, other documents, and approvals shall be deemed to have been filed or recorded as of the Petition Date; *provided, however*, that no such filing or recordation shall be necessary or required in order to create or perfect the Post-Petition Liens. The Debtor is authorized and directed to execute and deliver promptly upon demand to Liberty all such financing statements, mortgages, notices and other documents as Liberty reasonably requests.  Liberty in its discretion may file a photocopy of this Interim Order as a financing

statement with any filing or recording office or with any registry of deeds or similar office, in addition to or in lieu of such financing statements, notices of lien or similar instrument.

14.     <u>Carve-Out</u>.  (a) Each of the Post-Petition Liens and Superpriority Claims granted under this Interim Order or in existence on, or arising after, the Petition Date, shall be subject only to a carve-out for the following (the "Carve-Out"): (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee pursuant to 28 U.S.C. § 1930(a); and (ii) all reasonable and unpaid fees, costs, disbursements and expenses (the "Debtor Professional Fees") of professionals retained or to be retained by the Debtor in this case (collectively, the "Debtor's Professionals") up to the aggregate amount of $500,000.  This Carve-Out is in addition to any carve-out given by M&T Bank and to any of the Debtor's rights under section 506(c) of the Bankruptcy Code. For the avoidance of doubt, in no event shall the Carve-Out for Debtor's Professionals and the Debtor's 506(c) rights against Liberty's collateral exceed the aggregate amount of $500,000.

15.     <u>Right to Credit Bid</u>.  Liberty shall be permitted to credit bid in any amount not exceeding the accrued Loan Obligations on any proposed sale of any Collateral.  The rights of Liberty to credit bid (whether under section 363(k) of the Bankruptcy Code or otherwise) shall not be impaired.

16.     <u>Good Faith Under Section 364(e) of the Bankruptcy Code; No Modification or Stay of this Interim Order</u>.  The terms and conditions of the Loan Facility and the Loan Agreement are fair, reasonable, and the best available to the Debtor the circumstances, reflect the exercise of prudent business judgment by the Debtor consistent with its fiduciary duties, and are supported by reasonably equivalent value and consideration.  The Loan Facility was negotiated without collusion, in good faith and at arms' length among the Debtor and Liberty.  Liberty has

10

acted in good faith in connection with this Interim Order and its reliance on this Interim Order is in good faith. Based on the findings set forth in this Interim Order and the record made during the Interim Hearing, and in accordance with section 364(e) of the Bankruptcy Code, in the event any or all of the provisions of this Interim Order are hereafter modified, amended or vacated by a subsequent order of this Court or any other court, Liberty is entitled to the protections provided in section 364(e) of the Bankruptcy Code.  Any such modification, amendment or vacatur shall not affect the validity and enforceability of any advances previously made or made hereunder, or any lien, claim or priority authorized or created hereby.  Any liens or claims granted to Liberty hereunder arising prior to the effective date of any such modification, amendment or vacatur of this Interim Order shall be governed in all respects by the original provisions of this Interim Order, including entitlement to all rights, remedies, privileges and benefits granted herein.

17.    <u>Limitations on the Loan Facility and the Collateral</u>.  The Loan Facility and the Collateral may not be used in connection with: (a) opposing, preventing, hindering, or delaying Liberty's  enforcement or realization upon any of the Collateral once an Event of Default (as defined in the Loan Agreement) has occurred; (b) using, seeking to use, selling, seeking to sell, or otherwise disposing of or seeking to dispose of any Collateral without the prior written consent of Liberty; (c) incurring indebtedness without the prior written consent of Liberty, except to the extent permitted under the Loan Agreement; (d) objecting to or challenging in any way any of the claims, liens, security interests, or Collateral granted to Liberty pursuant to this Interim Order and held by or on behalf of Liberty; (e) asserting, commencing or prosecuting any claims or causes of action, including, without limitation, any actions under Chapter 5 of the Bankruptcy Code, against Liberty or any of its affiliates, agents, attorneys, advisors, professionals, officers, directors and employees; or (f) prosecuting an objection to, or contesting

in any manner, or raising any defenses to, the validity, extent, amount, perfection, priority, or enforceability of any of the Loan Obligations, the Post-Petition Liens, or any other rights or interests of Liberty.

18.    <u>Effect of Stipulations on Third Parties</u>.  Each release, waiver, stipulation, admission and agreement in paragraph 4 of this Interim Order, shall be binding upon the Debtor and any successor thereto (including, without limitation, any Chapter 7 or Chapter 11 trustee appointed or elected for any of the Debtor) under all circumstances and for all purposes, and the Debtor is deemed to have irrevocably waived and relinquished all claims against Liberty and any of its affiliates, agents, attorneys, advisors, professionals, officers, directors and employees as of the date of entry of this Interim Order.

19.    <u>Modification of Automatic Stay</u>.  The automatic stay imposed under section 362(a) of the Bankruptcy Code is hereby modified solely to the extent necessary to authorize the Debtor and Liberty to take any action necessary to implement and effectuate the terms and provisions of this Interim Order and the Loan Documents.

20.    <u>Liberty Not Responsible Person</u>.  In (a) making the decision to provide the Loan Facility; (b) administering the Loan Facility; or (c) extending related financial accommodations to the Debtor, Liberty shall not be considered to be exercising control over any operations of the Debtor or acting in any way as a "responsible person," or as an "owner or operator" with respect to the operation or management of the Debtor, or otherwise cause liability to arise to the federal or state government or the status of responsible person or managing agent to exist under any applicable law.

21.     <u>No Third Party Rights</u>.  Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder or any direct, indirect, or incidental beneficiary.

22.     <u>Rights Preserved</u>.  Entry of this Interim Order is without prejudice to any and all rights of any Committee and any other party in interest with respect to the terms and approval of the Final Order and any other position which such parties or Committee deem appropriate to raise.

23.     <u>No Waiver by Failure to Seek Relief</u>.  The failure of Liberty to seek relief or otherwise exercise its rights and remedies under this Interim Order, the Loan Agreement, or applicable law, as the case may be, shall not constitute a waiver of any of the rights hereunder, thereunder, or otherwise.

24.     <u>Binding Effect of Interim Order</u>.  Immediately upon execution by this Court, the terms and provisions of this Interim Order shall become valid and binding upon and inure to the benefit of the Debtor, Liberty, all other creditors of the Debtor, and all other parties in interest and their respective successors and assigns, including any trustee or other fiduciary hereafter appointed in this case, or upon dismissal of this case.

25.     <u>Binding Effect on Non-Debtor Indemnitors</u>.  In the event that the full extent of the relief sought in the Motion is not granted as to the Debtor, the Indemnitors shall nevertheless be bound by the Loan Agreement pursuant to the terms thereof.

26.     <u>Headings</u>.  Section headings used herein are for convenience only and are not to affect the construction of or to be taken into consideration in interpreting this Interim Order.

27.     <u>Survival</u>.  The terms and provisions of this Interim Order, including the claims, liens, security interests and other protections granted to Liberty pursuant to this Interim Order,

notwithstanding the entry of any further order, shall continue in this case, or following dismissal

of this case, and shall maintain their priority as provided by this Interim Order until all the Loan

Obligations pursuant to the Loan agreement and this Interim Order have been indefeasibly paid

in full (such payment being without prejudice to any terms or provisions contained in the Loan

Facility which survive such discharge by their terms), and all commitments to extend credit

under the Loan Facility are terminated.

28.    <u>Final Hearing</u>.  The Final Hearing to consider final approval of the Loan Facility

and entry of the Final Order is scheduled before this Court for _____, 2015, at _____

_m.  On or before _____, 2015, the Debtor shall serve a copy of this Interim Order

and the Motion (a) by electronic mail upon (i) the U.S. Trustee; (ii) any Committee and its

counsel; (iii) counsel to M&T; and (vi) counsel to Liberty, and (b) by overnight mail upon (i) the

Debtor's twenty (20) largest unsecured creditors and (ii) all parties requesting notice in this case.

Any party in interest objecting to the entry of the proposed Final Order shall file written

objections with the Clerk of the Court no later than on _____, 2015 at 4:00 p.m., which

objections shall be served so as to be received on or before such date by: (1) counsel to the

Debtor, Cullen and Dykman LLP, 100 Quentin Roosevelt Boulevard Garden City, NY 11530

(Attn:  Bonnie L. Pollack, Esq. and C. Nathan Dee, Esq.); (2) the U.S. Trustee, 33 Whitehall

Street, 21st Floor, New York, NY 10004 (Attn: Marylou Martin, Esq.); and (3) counsel to

Liberty, Chiesa Shahinian & Giantomasi, P.C., 1 Boland Drive, West Orange, NJ 07052 (Attn:

Jonathan Bondy, Esq. and Scott Zuber, Esq.)

29.    <u>Bankruptcy Rule 7052</u>.  This Interim Order shall constitute findings of fact and

conclusions of law pursuant to Bankruptcy Rule 7052.

30. <u>Bankruptcy Rules 6004(h) and 7062</u>.  This Interim Order shall take effect immediately upon the entry hereof notwithstanding the stay provisions of Bankruptcy Rules 6004(h) and 7062, the provisions of which are hereby waived.

31. <u>Retention of Jurisdiction</u>.  The Court has and will retain jurisdiction to enforce this Interim Order according to its terms.